**Nos. 25-1049, 25-1272**

IN THE

# United States Court of Appeals
# for the Third Circuit

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

and

NOKIA OF AMERICA CORP.,
*Intervenor-Appellant*,

OCCIDENTAL CHEMICAL CORP.,
*Intervenor-Appellant*,

vs.

ALDEN LEEDS INC., ET AL.,
*Defendants-Appellees*,

---

*On Appeal from the United States District Court
for the District of New Jersey*

## OPENING BRIEF OF INTERVENOR-APPELLANT
## NOKIA OF AMERICA CORPORATION

MICHAEL D. LICHTENSTEIN
MARK S. HEINZELMANN
THOMAS E. MESEVAGE
ZACHARY L. BERLINER
LOWENSTEIN SANDLER LLP
One Lowenstein Drive
Roseland, NJ 07068
(973) 597-2500

*Counsel for Intervenor-Appellant
Nokia of America Corporation*

## DISCLOSURE STATEMENT

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, Intervenor-Appellant Nokia of America Corporation ("Nokia") makes the following disclosure:

1.      Nokia is a wholly owned subsidiary of Nokia Solutions and Networks Oy, a company organized under the laws of Finland.  Nokia Solutions and Networks Oy is a wholly owned subsidiary of Nokia Corporation.  Nokia Corporation is a publicly traded company organized under the laws of Finland.

2.      The only publicly held company that holds 10% or more of Nokia's stock is Nokia Corporation.

3.      There is no publicly held corporation which is not a party to this consolidated appeal that has a financial interest in the outcome of the litigation.

Dated:  July 28, 2025                    By:    */s/ Michael D. Lichtenstein*
                                                Michael D. Lichtenstein

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...…………..…………………………………………v

INTRODUCTION ...........................................................................................1

JURISDICTIONAL STATEMENT ................................................................5

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..........................5

STATEMENT OF RELATED CASES AND PROCEEDINGS ...................6

STATEMENT OF THE CASE........................................................................7

I.     The Lower Passaic River Study Area and its History of Degradation ...........7

       A.     The PVSC System ...................................................................9

       B.     The Lister Avenue Site – Diamond Alkali ...........................10

II.    EPA's Final and Interim Remedies for the LPRSA .......................10

III.   Origin of the Consent Decree .......................................................13

       A.     EPA Outsources an Allocation .............................................13

       B.     Uncertainty Pervades the Allocation....................................15

       C.     The Allocation Results: Mr. Batson Fails to Produce a Reliable
              Ranking of the APs and then Resorts to "Tiering" Them ...................17

       D.     The Tiers Are Shown to Be Arbitrary and Irrational...........................24

       E.     The United States Structures the Consent Decree on Mr. Batson's
              Tiering ...................................................................................26

IV.    Procedural History .......................................................................29

       A.     Lodging of the Consent Decree.............................................29

       B.     In Response to the Motion for Entry, Nokia Proves, Without
              Rebuttal, that Mr. Batson's Tiering is Irrational and Arbitrary ..........30

C.      The District Court Approves the Consent Decree, Failing to Address Nokia's Unrebutted Evidence ...................................32

SUMMARY OF THE ARGUMENT .......................................................32

STANDARD OF REVIEW ......................................................................35

ARGUMENT ...........................................................................................37

I.      THE DISTRICT COURT ERRED IN APPROVING A SUBSTANTIVELY UNFAIR SETTLEMENT THAT FAILS TO DISTINGUISH DEFENDANTS AND NOKIA RATIONALLY AND NON-ARBITRARILY, OVERLOOKING NOKIA'S KEY, UNREBUTTED EVIDENCE ...........................................................37

A.      Mr. Batson Failed to Support the Claimed Reliability of His Tiers. .................................................................................39

B.      The Government Adopted Mr. Batson's Tiering on Faith with No Evaluation of its Rationality. ...........................................40

C.      The District Court Erred by Overlooking a Dispositive, Unrebutted Expert Declaration Showing that the Settlement Relies on an Arbitrary Apportionment of Liability. ...........................42

        i.      Dr. Plancich's Sensitivity Study Affirmed that Mr. Batson's Tiers Are Unreliable. ...................................43

        ii.     The Government Declined to Contest Dr. Plancich's Findings, So Conceding Their Validity. ...................45

        iii.    The Court Erred in Overlooking Key, Unrebutted Evidence. ................................................................47

D.      The $150 Million Settlement Value is Arbitrary; There is No Basis to Conclude the Defendants are Paying Their Fair Share. ........49

II.     THE CONSENT DECREE IS NEITHER REASONABLE, IN THE PUBLIC INTEREST, NOR IN FURTHERANCE OF CERCLA'S GOALS. .................................................................................51

III.    THE DISTRICT COURT ERRED IN APPROVING A CONSENT
        DECREE    ARISING    FROM    THE    GOVERNMENT'S
        INDISCRIMINATE ENFORCEMENT STRATEGY. ...................................53

CONCLUSION ........................................................................................................57

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Adarand Constructors, Inc. v. Pena*,
    515 U.S. 200 (1995)........................................................................54

*City of Bangor v. Citizens Commc'ns Co.*,
    532 F.3d 70 (1st Cir. 2008)............................................................37

*Fredericks v. Comm'r*,
    126 F.3d 433 (3d Cir. 1997) ..........................................................48

*Heckman v. N. Pa. Comprehensive Health Servs.*,
    No. 4:20-CV-01680, 2024 U.S. Dist. LEXIS 156116 (M.D. Pa.
    Aug. 30, 2024), *reconsideration denied,* 2024 U.S. Dist. LEXIS
    195919 (M.D. Pa. Oct. 29, 2024) ...................................................46

*Litgo N.J., Inc. v. Martin*,
    No. 06-cv-2891, 2010 WL 2400388 (D.N.J. June 10, 2010), *aff'd
    sub nom. Litgo N.J. Inc. v. Comm'r N.J. Dep't of Env't Prot.*, 725
    F.3d 369 (3d Cir. 2013) .................................................................19

*Martinez-Gonzalez v. Elkhorn Packing Co. LLC*,
    25 F.4th 613 (9th Cir. 2022) ..........................................................48

*McMahon v. Fulcomer*,
    821 F.2d 934 (3d Cir. 1987) ..........................................................49

*Moorestown Twp. Bd. of Educ. v. S.D.*,
    811 F. Supp. 2d 1057 (D.N.J. 2011)...............................................46

*N.J. Tpk. Auth. v. PPG Indus.*,
    16 F. Supp. 2d 460 (D.N.J. 1998), *aff'd,* 197 F.3d 96 (3d Cir.
    1999) ...............................................................................................46

*New York v. New Jersey*,
    256 U.S. 296 (1921)..........................................................................9

*Occidental Chemical Corp. v. 21st Century Fox*,
    No. 18-cv-11273 (D.N.J.) ......................................................6, 10, 52

*Occidental Chemical Corp. v. Givaudan Fragrances Corp.*,
  No. 2:23-cv-016 (D.N.J.) ...................................................................6, 52

*Pa. Dep't of Env't Prot. v. Trainer Custom Chem., LLC*,
  906 F.3d 85 (3d Cir. 2018) ......................................................................56

*Phillips v. Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ....................................................................36

*Pittsburgh Press Club v. United States*,
  615 F.2d 600 (3d Cir. 1980) ....................................................................48

*In re Search Warrant Issued June 13, 2019*,
  942 F.3d 159 (4th Cir. 2019) ...................................................................48

*Sec. & Exch. Comm'n v. Commonwealth Equity Servs., LLC*,
  133 F.4th 152 (1st Cir. 2025) ..................................................................48

*Summers v. PHH Mortg. Corp.*,
  No. 22-06726, 2023 U.S. Dist. LEXIS 147947 (D.N.J. Aug. 22,
  2023) .........................................................................................................46

*In re Tutu Water Wells CERCLA Litig.*,
  326 F.3d 201 (3d Cir. 2003) ..................................................35, 37, 52, 53

*United States v. Cannons Eng'g Corp.*,
  899 F.2d 79 (1st Cir. 1990).............................................................*passim*

*United States v. Charles George Trucking, Inc.*,
  34 F.3d 1081 (1st Cir. 1994) ....................................................................37

*United States v. Davis*,
  11 F. Supp. 2d 183 (D.R.I. 1998), *aff'd,* 261 F.3d 1 (1st Cir. 2001)............37, 38

*United States v. IMC E. Corp.*,
  627 F. Supp. 3d 166 (E.D.N.Y. 2022) .....................................................38

*United States v. Kramer*,
  19 F. Supp. 2d 273 ...................................................................................37

*United States v. Montrose Chem. Corp. of Cal.*,
  50 F.3d 741 (9th Cir. 1995) .....................................................................36

*United States v. Murray*,
821 F.3d 386 (3d Cir. 2016) ...............................................36

*United States v. Se. Pa. Transp. Auth. ("SEPTA")*,
235 F.3d 817 (3d Cir. 2000) ........................................*passim*

*United States v. U.S. Gypsum Co.*,
333 U.S. 364 (1948)...........................................................36

*Vill. of Willowbrook v. Olech*,
528 U.S. 562 (2000)......................................................36, 54

*Washington v. Davis*,
426 U.S. 229 (1976)...........................................................36

*Wayte v. United States*,
470 U.S. 598 (1985)...........................................................54

**Statutes**

28 U.S.C. § 1291 ...................................................................5

28 U.S.C. § 1331 ...................................................................5

28 U.S.C. § 1345 ...................................................................5

42 U.S.C. § 9606.................................................................29

CERCLA, Pub. L. No. 96-510, 94 Stat. 2767 (1980) (codified at 42
U.S.C. § 9601 *et seq.*) .....................................................15

Clean Water Act of 1977, Pub. L. No. 95-217, 91 Stat. 1566 (1977)
(codified at 33 U.S.C. § 1311 *et seq.*)................................15

N.J.S.A. 13:1K-9 *et seq.*.....................................................16

Toxic Substances Control Act of 1976, Pub. L. No. 94-469, 90 Stat.
2051 (1976) (codified at 15 U.S.C. § 2601 *et seq.*)...........16

**Other Authorities**

40 C.F.R. § 300.430(f)(5)(i)..................................................12

40 C.F.R. § 307.14 .................................................................7

*A Guide to Developing and Documenting Cost Estimates During the*
  *Feasibility Study* (July 2000),
    https://semspub.epa.gov/work/05/918808.pdf....................................................12

*Record of Decision for an Interim Remedy in the Upper 9 Miles of the*
  *Lower Passaic River Study Area, OU4 of the Diamond Alkali*
  *Superfund Site* (Sept. 2021),
    https://semspub.epa.gov/work/02/630399.pdf.........................................8, 11, 12

*Record of Decision, Lower 8.3 Miles of the Lower Passaic River Part*
  *of the Diamond Alkali Superfund Site* (Mar. 3, 2016),
    https://semspub.epa.gov/work/02/396055.pdf............................................*passim*

U.S. Bureau of Labor Statistics CPI Inflation Calculator,
  https://www.bls.gov/data/inflation_calculator.htm ............................................11

## INTRODUCTION

This is an appeal of the District Court's approval of a settlement between the United States and 82 companies (the "Defendants") that, for a payment of $150 million, relieves the Defendants of any responsibility under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") for up to $3.68 billion in cleanup activities relating to sediments of the Lower Passaic River Study Area. The settlement leaves Intervenor-Appellant Nokia and a handful of other parties, including the Passaic Valley Sewage Commission and its municipal members, open to joint and several liability, with no contribution rights against the 82 Defendants, for the remaining $3.53 billion.

In a clear abuse of discretion, the District Court did not consider Nokia's uncontested expert evidence that the settlement, one of massive consequences, lacks a rational basis and thus fails this Court's approval standard. Such an abdication by the District Court of its basic duty to consider relevant evidence and the resultant approval of an inappropriate settlement should be corrected by this Court.

The basis for the settlement is an allocation of responsibility that the Government outsourced to David Batson of AlterEcho. In Mr. Batson's final report, 79 "allocation parties" ("APs") were allocated shares of responsibility for the cleanup costs. Under the allocation's key measures, Mr. Batson estimated one AP, Occidental Chemical Company ("OxyChem"), to bear a 99.86% base share, with 73

other APs, including Nokia and Defendants, clustered in a minuscule 0.14% remainder, and 5 APs receiving 0% shares.  *See* Figure 1.



**Figure 1**

Mr. Batson recognized that his scores of the non-OxyChem APs in the 0.14% remnant were so finely drawn and uncertain that they lacked credibility.  Despite this, he separated the 73 APs into four groups of so-called "similarly situated" parties, labeled Tiers 2, 3, 4, and 5.  In doing so, Mr. Batson relied on a precision of 14 ten thousandths of a percent (0.0014%)—***14 in a million***— in creating Tier 2, in which Nokia was placed, and Tier 3, including eight other APs, a fantastically improbable level of accuracy in a CERCLA allocation.

Without explanation, Mr. Batson declared his tiers to be "acceptably certain." Nothing in the record suggests that Mr. Batson quantified the recognized uncertainty

of his allocation scoring, assessed its impact on his tiers, or determined that his tiers did not suffer the same inaccuracy as his individual scorings.

The Government then centered its enforcement strategy and this settlement on the tiers. The Government selected APs in Tiers 3, 4, and 5 as eligible for settlement; it classified Tier 1—OxyChem—and Tier 2—Nokia and one other company (Pharmacia LLC)—as "work parties" to perform and fund the multi-billion-dollar cleanup, alongside PVSC and a handful of other companies. The record contains no evidence that the Government assessed Mr. Batson's claim that the tiers are "acceptably certain." In fact, the Government's own allocation expert testified that he ***could not*** endorse the tiering.

In opposing the settlement, Nokia submitted the declaration of expert Dr. Stephanie Plancich. She testified that Mr. Batson's tiers were not "estimated to any degree of certainty." She also concluded, following a study of the allocation model uncertainty, that Nokia is indistinguishable from, and so similarly situated with, Tier 3 Defendants, so proving Mr. Batson's tiers unreliable.

The Government did not contest Dr. Plancich's findings or Nokia's contentions as to the irrational nature of the tiering, so conceding them. In doing so, the Government failed to plausibly explain why relying on Mr. Batson's tiers for its enforcement strategy and structuring the settlement was rational and non-arbitrary.

Without oral argument or a fairness hearing, the District Court approved the settlement—again, failing to consider Dr. Plancich's uncontested testimony and the substance of Nokia's challenge to the rationality of the settlement. Rather, foregoing the necessary judicial inquiry, the District Court stated that it "will not otherwise interfere with the Government's authority to draw difficult but well-considered 'fine lines' between PRPs in furtherance of cleanup." The District Court neither explained why the supposed fine lines were "well considered" nor identified the actions that the Government took to ensure they were rational. Critically, the Court itself made no finding that the tiering was nonarbitrary and rational.

Well-settled caselaw requires that a CERCLA settlement be "substantively fair." The Government's basis for determining the relative responsibility of parties, who will settle versus perform, and who will fund the cleanup and for how much, must not be arbitrary, capricious, or irrational. The Government has the burden to show that this standard is met. It failed to do so before the District Court.

In approving the settlement, the District Court engaged in a compound abuse of discretion: (1) an error of law in declining to examine and make a finding as to the rationality of the tiering underlying the settlement, conferring on the Government an unfettered ability to arbitrarily discriminate between similarly situated parties; and (2) clear error in inferring that any purported "fine line" supporting the settlement was "well considered" based on the record. Similarly, because the

-4-

arbitrary tiering is the basis for calculating the $150 million settlement amount, the District Court finding that the Defendants are paying their fair share suffers from the identical compound abuse of discretion.

For all these reasons, the District Court's order approving the settlement should be reversed.

## JURISDICTIONAL STATEMENT

This is an appeal of a final Order and accompanying opinion of the United States District Court for the District of New Jersey, entered on December 18, 2024, that granted a motion to enter a consent decree ("CD") settling a civil action brought by the Government under Sections 106, 107(a), and 113(b) of CERCLA, 42 U.S.C. §§ 9606, 9607(a), and 9613(b).  Thus, this matter was within the District Court's subject-matter jurisdiction under 28 U.S.C. §§ 1331 (covering "civil actions arising under the . . . laws . . . of the United States") and 28 U.S.C. § 1345 (covering "civil actions . . . commenced by the United States").

The District Court's Order disposed of all claims in, and closed, this action. ECF No. 394.  Thus, this Court has appellate jurisdiction under 28 U.S.C. § 1291.

Nokia timely filed a notice of appeal on January 9, 2025.  ECF No. 396.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Did the District Court err in approving a CERCLA settlement that depends on a distinction between and among Defendants and Nokia that is arbitrary

and irrational, in so doing overlooking Nokia's uncontested expert testimony establishing same?

2.    Did the District Court err in finding that the CD is "fair, reasonable, and in alignment with CERCLA's goals" when the Government failed to plausibly explain how, if Nokia's responsibility is indistinguishable from similarly situated Defendants, the $150 million settlement amount can be rationally supported?

3.    Did the District Court err in approving a CERCLA CD arising from an indiscriminate and substantively unfair enforcement strategy violative of Nokia's equal protection interests and fair play?

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case previously has not been before this Court.  It is related to two other pending cases—*Occidental Chemical Corp. v. 21st Century Fox*, No. 18-cv-11273 (D.N.J.) ("*21st Century Fox*") and *Occidental Chemical Corp. v. Givaudan Fragrances Corp.*, No. 2:23-cv-016 (D.N.J.) ("*Givaudan*")—brought by OxyChem against Nokia, most Defendants, other Intervenors in this action, and others seeking recovery of or contribution toward costs to address the same contamination in the Lower Passaic River Study Area ("LPRSA").

Nokia is aware of no other case or proceeding that is in any way related, completed, pending, or about to be presented before this Court or any other court or agency, state or federal.

## STATEMENT OF THE CASE

### I.    The Lower Passaic River Study Area and its History of Degradation

The appealed CD concerns Government claims for injunctive relief and cost recovery to perform and fund the cleanup of contaminated sediment in the LPRSA, a portion of the Diamond Alkali Superfund Site (the "DASS"). ECF No. 282 ¶¶ 2–3.[1] The DASS comprises several geographic areas the United States Environmental Protection Agency ("EPA") has designated as "operable units" ("OUs").[2] *See* Figure 2.[3]



**Figure 2**

- OU1 is the land of the former Diamond Alkali manufacturing facility that produced Agent Orange, a byproduct of which is dioxin. ECF No. 282 ¶¶ 17, 21.

---

[1] Unless otherwise noted, all page citations in this brief refer to the pagination of the PDF version of the cited documents, not any internal or original page numbering.

[2] An OU is a "discrete action" that "may address geographical portions of a site, specific site problems, or initial phases of an action, or may consist of any set of actions performed over time or any actions that are concurrent but located in different parts of a site." *See* 40 C.F.R. § 307.14.

[3] Source of Figure 2: https://semspub.epa.gov/work/02/704638.pdf.

- OU2 is the lower 8.3 miles of the LPRSA (before emptying into Newark Bay), an area of significant sediment contamination.[4]

- OU4 is the 17-mile LPRSA, extending from Dundee Dam to the Passaic River's discharge into Newark Bay.  While OU4 thus overlaps with OU2, it does not include the OU2 sediments subject to OU2 activities.[5]

- OU3 is the Newark Bay Study Area, a tidal bay at the confluence of the Passaic and Hackensack Rivers.  *Id.*

The 17-mile LPRSA, encompassing OU2 and OU4, courses through the most urbanized and industrial areas of New Jersey and over a dozen municipalities.  *See* ECF No. 289-19 at 50.  Many more municipalities, several densely populated and historically hosting hundreds of industrial facilities, lie within the LPRSA watershed and have long discharged wastes into the LPRSA.  As EPA has observed:

> The Passaic River was one of the major centers of the American industrial revolution starting two centuries ago. . . . By the end of the nineteenth century, a multitude of industrial operations . . . had located along the river's banks as cities such as Newark and Paterson grew.

---

[4] *Record of Decision, Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site* ("OU2 ROD") 2 (Mar. 3, 2016), https://semspub.epa.gov/work/02/396055.pdf.

[5] *Record of Decision for an Interim Remedy in the Upper 9 Miles of the Lower Passaic River Study Area, OU4 of the Diamond Alkali Superfund Site* ("OU4 ROD") 23 (Sept. 2021), https://semspub.epa.gov/work/02/630399.pdf.

OU2 ROD at 13. Of the many historic sources of pollutants in the LPRSA, two stand out: the PVSC and the Diamond Alkali Company, OxyChem's predecessor.

## A.    The PVSC System

Public health concerns over the Passaic River first arose over a century ago. In the 1910s, the New Jersey Legislature created the PVSC[6] and passed legislation under which, by 1924, the PVSC built an interceptor line along the Passaic River to capture wastes generated within its contracting municipalities and redirect them to New York Bay. ECF No. 289-19 at 49. This "PVSC System" initially collected and managed the wastes of twenty-two municipalities; today, it is forty-eight. *Id.* at 96–97.

Decades of operation of the interceptor line by the PVSC inconsistent with its design, and poor maintenance, caused near continual overflows and bypasses releasing a staggering volume of untreated wastes directly into the LPRSA. *Id.* at 79–88. One study estimates the total volume at 1.2 trillion gallons, accounting for much of the contaminants in OU2 sediments. *Id.* at 52–53.

The Government thus has identified the PVSC and several municipalities as CERCLA-liable parties ineligible for any cashout settlement and responsible for "substantial contributions" to the cleanup. ECF No. 288-5 ¶ 33; ECF No. 289-1 at

---

[6] L. 1902, c. 48, at 190; *see also New York v. New Jersey*, 256 U.S. 296 (1921) (describing polluting effects of municipal sewage drainage into the Passaic River and origins of the PVSC and interceptor trench).

27.  Consequently, the PVSC itself has warned that it and its municipality members are subject to "catastrophic monetary risk."  ECF No. 288-16 at 102.

### B.    The Lister Avenue Site – Diamond Alkali

The Diamond Alkali facility—a chemical plant located at 80-120 Lister Avenue in Newark operated by Diamond Alkali, adjudicated to be OxyChem's predecessor, *21st Century Fox*, ECF No. 1105 at 4—manufactured chemicals such as Agent Orange, a byproduct of which is dioxin, OU2 ROD at 13–14.  The facility has a "storied history of egregious waste disposal practices."  ECF No. 393 at 7.

Discharges from this facility contributed significantly to the environmental risk posed by LPRSA sediments.  Of the several chemicals of concern ("COCs") identified in LPRSA sediments, dioxin is overwhelmingly the most toxic.  ECF No. 288-7 ¶¶ 49–50.  Indeed, EPA has concluded that, but for the Lister Avenue facility releases, it is unknown if the LPRSA would have become a Superfund site or, if so, what type of cleanup would be appropriate.  *Id.* ¶ 11.

## II.    EPA's Final and Interim Remedies for the LPRSA

Relevant to the scope and dollar value of the appealed settlement are certain "remedies" and related cost projections that EPA announced years ago for contamination in OU2 and OU4.

After decades of study by EPA and several cooperating parties,[7] in 2016 EPA chose a final remedy for OU2 sediments. *See* OU2 ROD. Focused on eight COCs,[8] the remedy requires excavating 3.5 million cubic yards of contaminated sediment, enough to fill a sports stadium, and a "bank-to-bank" cap above deeper contaminated sediments. *Id.* at 3. At that time, EPA projected this remedy to cost $1.38 billion. *Id.* at 98. This 2016 estimate jumps to $1.86 billion after adjusting for inflation as of May 2025.[9]

In 2021, EPA selected an "interim," non-final remedy for the upper 9 miles of OU4. This interim remedy requires excavating sediment source areas of 2,3,7,8-TCDD (a particularly toxic form of dioxin), polychlorinated biphenyls ("PCBs"), and other co-located contaminants. OU4 ROD at 3. As much as a decade *after* completion of the interim remedy, EPA will select a final remedy for any remaining risk in sediments in the upper 9 miles of and in surface water throughout OU4. *Id.*

---

[7] For years after EPA designated the LPRSA as part of the DASS, Nokia cooperated with EPA, agreeing as part of a so-called Cooperating Parties Group ("CPG") to fund and perform investigation of the LPRSA. ECF No 307-1 ¶ 13; OU2 ROD at 14–15.

[8] Dioxin/furans, polychlorinated biphenyls ("PCBs"), Dichlorobiphenyl trichloroethane ("DDT") and its primary breakdown products, mercury, copper, lead, dieldrin, and polycyclic aromatic hydrocarbons ("PAHs"). OU2 ROD at 24–26.

[9] Adjusting for inflation using CPI-U from March 2016 to May 2025 results in a 31% cost increase, as determined using the U.S. Bureau of Labor Statistics CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm.

at 50.  Although the projected cost of the OU4 interim remedy was $441 million in 2021, *id.* at 89, adjusting for inflation as of May 2025 brings it to $517 million.

Accordingly, the inflation-adjusted costs of the final OU2 and interim OU4 remedies total $2.38 billion—$540 million more than the $1.84 billion used to calculate the Defendants' payment in the appealed settlement.  *See* ECF No. 288-5 ¶ 57.e.  These remedies will be among the costliest in Superfund history.

Importantly, cost projections in CERCLA feasibility studies and Records of Decision[10] ordinarily are used only for remedy selection, not settlements,[11] and encompass a wide uncertainty range of -30 percent/+50 percent, *see* OU2 ROD at 98; OU4 ROD at 89.  A truer cost projection is available only once the remedy design is complete—in this case, an event still several years away, subjecting the cost projection to even more inflationary risk.  Accounting for this uncertainty balloons the cost projection to as much as $3.57 billion, almost twice the Government-touted $1.84 billion estimate used for the settlement.  ECF No. 288-5 ¶ 56.

---

[10] A Record of Decision ("ROD") records EPA's selected remedy for a site.  40 C.F.R. § 300.430(f)(5)(i).

[11] EPA guidance states that cost estimates developed in feasibility studies "are primarily for the purpose of comparing remedial alternatives . . . , *not for . . . negotiating enforcement settlements*."  *A Guide to Developing and Documenting Cost Estimates During the Feasibility Study* 1.2 (July 2000), https://semspub.epa.gov/work/05/918808.pdf (emphasis added).

### III.    Origin of the Consent Decree

### A.    EPA Outsources an Allocation

In late 2017, EPA announced that it would sponsor an allocation of responsibility that would come to underlie the appealed settlement, promising "transparency and fairness" to induce participation. ECF No. 288-5 at 133. EPA outsourced the effort to a private third-party, David Batson of AlterEcho, but made clear that the results would be central to the Government's future enforcement decisions regarding the LPRSA. *See id.* Recognizing that the allocation therefore would lead to binding consequences, Nokia[12] (and many others) elected to participate.

The allocation covered 92 facilities associated with 79 APs alleged to have contributed COCs to OU2 sediments. ECF No. 289 at 8. Sixty-nine APs—including Nokia—actively took part as Participating Allocation Parties ("PAPs"). *Id.* at 19; ECF No. 289-3 at 57–58. OxyChem was invited by EPA to participate but declined. ECF No. 288-5 ¶¶ 36–37. Although EPA also identified the PVSC and several

---

[12] Nokia is the contractual successor to the environmental liabilities of the Western Electric Company for its former Kearny Works facility in Kearny, New Jersey. ECF No. 307-1 ¶ 5. Closed in 1984, the Kearny Works manufactured equipment for The Bell Operating System, the group of telecommunication companies, led by the Bell Telephone Company and, later, by the American Telephone and Telegraph Company. *Id.* ¶ 6.

municipalities as responsible parties, EPA excluded them from the allocation as ineligible for a cash-out settlement. *Id.* ¶ 33.

By specific intention, Mr. Batson's allocation was not performed by EPA. The results were generated solely by Mr. Batson and his firm. ECF No. 289 at 7. Indeed, EPA did not have access to many documents Mr. Batson evaluated and used in the allocation, including the most influential documents like PAP questionnaire responses, expert reports, advocacy briefs, and comments on Mr. Batson's draft work product. ECF No. 289-2 at 50–53, 75–76, 80–81. Likewise, EPA was not involved in commenting on or developing the draft or final versions of Mr. Batson's resulting Allocation Recommendation Report (the "Report"). *See id.* at 53, 81. Rather, at the end, Mr. Batson provided *his* Report to the PAPs and EPA. *Id.* at 81.

Pursuant to the allocation scope, Mr. Batson sought to estimate the relative equitable responsibility of the 79 APs for OU2 cleanup costs. ECF No. 289 at 7–8. That was designed to be a function of: (1) the mass of each of the eight COCs that each AP contributed to river sediments; and (2) the relative toxicity of such COCs to one another, percentages set forth in the Allocation Protocol, the allocation's key measures (collectively, the "Key Measures").[13] *Id.* at 20–21.

---

[13] The Government refers to these Key Measures as the allocation's "principal factors." ECF No. 337 at 28.

Thus, Mr. Batson's principal task was to estimate each AP's contribution of COC mass to OU2 sediments. Those estimates are core to how the APs are distinguished in the final allocation scoring and, eventually, to EPA's settlement decisions.

### B.    Uncertainty Pervades the Allocation

Data limitations in such an allocation effort are inevitable and substantial.

All 92 AP facilities operated for lengthy periods—at least multiple decades, but in several cases over a century.[14] Estimating each facility's COC mass contribution to sediments with even modest accuracy is near impossible given the muddled and incomplete historical record of LPRSA pollution. Most relevant operations long predated seminal environmental laws that required permitting and/or reporting of certain polluting activities.[15] Before enactment of these laws, it was rare to track contaminants in a discharge to the river. The environmental risks of several COCs, such as PCBs, were largely unknown and not regulated until the

---

[14] For example, the PSE&G facility operated for 118 years, ECF No. 289-16 at 8, and the Atlas Refining facility operated for 123 years, ECF No. 289-9 at 81. If owner/operational periods of all 92 facilities are summed, the total exceeds four thousand years.

[15] *See* Clean Water Act of 1977, Pub. L. No. 95-217, 91 Stat. 1566 (1977) (codified at 33 U.S.C. § 1311 *et seq.*); CERCLA, Pub. L. No. 96-510, 94 Stat. 2767 (1980) (codified at 42 U.S.C. § 9601 *et seq.*).

1970s or later.[16]  Documentation of specific polluting activities or operations from which discharges might be estimated were destroyed, unavailable, or simply not provided to Mr. Batson.

Further, the nature and extent of data given to Mr. Batson diverged widely. Some AP facilities had significant sampling data from environmental investigations required when certain operations were sold or closed.[17]  *See, e.g.*, ECF No 289-4 at 148–54 (BASF Catalysts facility).  Others had little available.  *See, e.g.*, ECF No. 289-7 at 236–37, 239 (Schiffenhaus Packaging facilities).  Generally, Mr. Batson treated the absence of data—for example, the failure to have sampled for a particular COC at an AP facility—as indicating zero discharge of that COC from the AP facility.  *See, e.g.*, ECF Nos. 289-4 at 174, 289-10 at 2 (for BASF Corporation facility, absence of Dioxin/Furan sampling data resulting in no estimated Dioxin/Furans contribution, despite acknowledged use of Dioxin precursors).

Lack of information forced Mr. Batson to extrapolate and assume a significant amount of data necessary to estimate AP historic COC contributions.  *See* ECF No. 289 at 36.  This is not necessarily a fatal fault in CERCLA allocations, which

---

[16] *See, e.g.*, Toxic Substances Control Act of 1976, Pub. L. No. 94-469, 90 Stat. 2051 (1976) (codified at 15 U.S.C. § 2601 *et seq.*) (banning PCBs' commercial distribution and use other than in a totally enclosed manner).

[17] The New Jersey Industrial Site Recovery Act, N.J.S.A. 13:1K-9 *et seq.*, requires owners of certain industrial facilities to investigate and remediate contamination before the business ceases operations or is sold.

invariably are time and resource limited and often face an incomplete record. But recourse to uncertain "data inferences" requires avoiding spurious accuracy, the appearance of a level of precision in distinguishing parties that does not exist in truth.

### C. The Allocation Results: Mr. Batson Fails to Produce a Reliable Ranking of the APs and then Resorts to "Tiering" Them

Mr. Batson issued his Report in December 2020. The key results are:

#### i. *OxyChem Is Assigned a 99.86% Base Score Share; All Other APs Fall Within the 0.14% Residual*

First, the "AP Base Scores" for the "Protocol" calculation are the allocation's foundational scoring of each AP's relative responsibility, encompassing the allocation's two Key Measures: Mr. Batson's estimates of COC *mass* each AP facility contributed to OU2 sediments, multiplied by the relative *toxicity* risk of each COC. ECF No. 289 at 32–33. When the scores are normalized to 100%,[18] OxyChem received a 99.86% share—with 73 other APs,[19] including Nokia, sharing in the

---

[18] Normalization here involves adjusting the AP Base Scores to total 100 and, thus, reflect shares of a whole. For example, OxyChem's Protocol AP Base Score is 83.9193436, and that of all other APs totals 0.116196886. ECF No. 289-8 at 3. When proportionally "normalized" to total 100, OxyChem's score becomes 99.86 and all other APs' total score becomes 0.14.

[19] The allocation included 79 APs. ECF No. 289 at 8. Five were assigned 0% shares by Mr. Batson and excluded from further scoring or ranking. *Id.* at 32.

remaining 0.14%, purportedly distinguished with the extraordinary precision of hundredths of a percent or less. *See supra* Figure 1 (reproduced below).



Mr. Batson's Key Measures scores were driven by three factors:

- Mr. Batson estimated that OxyChem contributed almost all dioxin/furans estimated to be in OU2 sediments, ECF No. 289-15 at 3;

- Dioxin/furans were assigned the highest relative toxicity among the eight COCs: 83.92%, ECF No. 289-3 at 33; and

- Mr. Batson estimated that the 73 non-OxyChem APs contributed very little of the remaining COC mass in OU2 sediments, typically under one percent of any COC, *see* ECF No. 289-19 at 374 (estimated COC mass in OU2 sediments), ECF Nos. 289-9 to -19 (estimated COC mass contribution per AP); thus, the overwhelming mass of non-dioxin/furan COCs were unattributed to any AP and treated as "orphan" share.

In allocations of CERCLA liability, the "orphan" share is typically distributed by courts to all parties proportionate to—and, thus, retaining—their allocation shares (or *pro rata*). *See, e.g., Litgo N.J., Inc. v. Martin*, No. 06-cv-2891, 2010 WL 2400388, at *40 (D.N.J. June 10, 2010), *aff'd sub nom. Litgo N.J. Inc. v. Comm'r N.J. Dep't of Env't Prot.*, 725 F.3d 369 (3d Cir. 2013) ("[c]ourts . . . have concluded that it is most equitable to divide the . . . orphan share between the responsible parties according to their relative equitable shares"). Mr. Batson's Protocol AP Base Scores effectively do just that. In contrast, Mr. Batson's Report also proposed a modification of the Key Measures Base Scores under an "Alternative Methodology," that distributed each COC's "orphan" share only to those APs estimated to have contributed any "non-orphan" portion of that COC estimated in OU2 sediments.[20] ECF No. 289 at 29–30.

Importantly, Mr. Batson's distribution of "orphan" share under the Alternative Methodology was based on the same data-limited, uncertain estimates of COC mass contribution underlying the Protocol AP Base Scores. For example, Mr. Batson estimated that of the 26,000 kgs of PCBs in OU2 sediments, merely 0.79%, 204.44 kgs in total, could be attributed to any APs, ECF No. 307-3 at 10, leaving the

---

[20] This violated the Allocation Protocol agreed to by EPA, Mr. Batson, and all PAPs. The Allocation Protocol mandated that, "[c]onsistent with judicial precedent and customary allocation practice," orphan share be "distributed among the [APs] on a pro rata basis." ECF No. 289-3 at 4.

remaining 99.21%, 25,795.56 kgs, as "orphan" share. Under the Alternative Methodology, Mr. Batson distributed this remaining 99.21% PCB "orphan" share to only the APs estimated to have contributed PCBs to sediments, proportionate to each AP's approximated share of the 0.79% contribution. *See* ECF No. 289 at 29–30. As such, the "orphan" share distribution is controlled by Mr. Batson's initial troubled estimates of each AP's COC contributions.

> ### ii. *Mr. Batson Admits He Could Not Reliably Rank The 73 Non-OxyChem APs, But Nonetheless Groups Them Into Four Tiers*

Second, despite Mr. Batson's core goal to rank the APs' relative responsibility with "a sufficient numerical significance," *id.* at 20, he admitted in his Report that the data limitations and consequent uncertainty in estimating COC contributions were so large that he could not do so, *id.* at 36. Indeed, he conceded:

> [D]ata limitations have created a sufficient uncertainty in the determination of allocation shares and substantially affect the credibility of relative numerical share calculations among and between similarly ranked individual [APs].

*Id.* Thus, on the primary task to estimate COC contributions, Mr. Batson found that the credibility of his scoring—particularly, the purported separations of the non-OxyChem APs within hundredths of a percent—was "substantially affect[ed]."

Mr. Batson at this point might have concluded that the allocation, through no fault of his own, could not distinguish between and among the non-OxyChem APs. He knew from his estimations that the non-OxyChem APs contributed: (1) no

appreciable mass of dioxins/furans, weighted the most toxic of the COCs by far; and (2) only small percentages of the remaining, much-less-toxic COCs estimated to be in OU2 sediments. *See supra* pp. 17–18.

Instead, Mr. Batson grouped the APs into five supposedly "numerically significant" tiers, each with APs purportedly "of similar responsibility *within an acceptable level of certainty*." ECF No. 289 at 36 (emphasis added). Mr. Batson, a lawyer with no apparent training in mathematics or statistics,[21] did not explain how he did this or what these conclusions meant. Nor did he attempt to answer a critical question: If each AP's score is "sufficient[ly] uncertain" because of imprecision in estimating COC contributions, how can one deem one AP's score "similar" to or "separable" from another's—as Mr. Batson claimed he did—without evaluating the impact of that uncertainty? (As discussed *infra* pp. 39–41, one cannot.)

By his logic, Mr. Batson's tiering of the non-OxyChem APs is an act of determining (1) which AP scores are indistinguishable and so "similarly situated"[22] and (2) which AP scores are distinguishable with "acceptable certainty" and so separable by tier. In doing so, Mr. Batson would have to decide just how wide a

---

[21] Mr. Batson has a Juris Doctor and a Bachelor of Arts in history. ECF No. 288-5 at 155.

[22] Mr. Batson concluded that all APs within a tier are indistinguishable. "[T]he specific location of an [AP] within each tiered grouping should be considered insignificant for purposes of the allocation." ECF No. 289 at 36.

spread in AP scores makes them similarly situated and how much additional spread in the scores makes them separable with "acceptable certainty" into distinct tiers. Yet, the level of precision Mr. Batson impliedly asserted as his standard of "acceptable certainty" is patently absurd.

How "fine" is the discernment of APs in Tiers 2, designated "work parties," and Tier 3, APs eligible for cashout settlement?  Based on the allocation Key Measures, Nokia and Pharmacia in Tier 2—which Mr. Batson deemed similarly situated—have normalized protocol base score shares of 0.0660772% and 0.0368261%, respectively,[23] separated by 0.0292510%, just under three hundredths

_____

[23] The table below sets forth the APs grouped by Mr. Batson in Tiers 1 to 3, ECF 289-19 at 369 (Report Attachment Q), including Nokia, Pharmacia, and EnPro, their base scores under the allocation Key Measures, ECF 289-8 at 3 (Report Attachment K), and the normalization of those base scores to 100% across all five tiers.

| AP | AP Base Score (Report Attachment K) | Normalized AP Base Score (Calculated) | Tier (Report Attachment Q) |
|---|---|---|---|
| Occidental Chemical Corp. | 83.9193436 | 99.8618199% | 1 |
| Nokia-Lucent Technologies | 0.055528253 | 0.0660772% | 2 |
| Pharmacia LLC | 0.030947019 | 0.0368261% | 2 |
| PMC, Inc. | 0.004923318 | 0.0058586% | 3 |
| EnPro Holdings, Inc. | 0.005172242 | 0.0061548% | 3 |
| Hexcel Corp. | 0.004522065 | 0.0053811% | 3 |
| Pitt Consol Chemical Company | 0.002374923 | 0.0028261% | 3 |
| ISP Chemicals LLC | 0.002646154 | 0.0031489% | 3 |
| Givaudan Fragrances Corp. | 0.002302265 | 0.0027396% | 3 |
| Congoleum Corp. | 0.001945765 | 0.0023154% | 3 |
| BASF Corporation | 0.001429937 | 0.0017016% | 3 |

Mr. Batson notably reported his base scores to nine significant digits with no indication of the plausibility or correctness of such extreme precision.  Yet, in acknowledging that he could not credibly rank the non-OxyChem APs, *see* ECF No.

of a percent. But, Defendant EnPro Holdings, Inc. ("EnPro")—which Mr. Batson put in Tier 3 and deemed similarly situated with all other Tier 3 APs—has a normalized protocol base score share of 0.0061548%, separated from Pharmacia by 0.0306713%. This difference is merely 14 ten thousandths of a percent (0.0014203%)—***14 parts in a million***—greater than the separation of "similarly situated" parties Nokia and Pharmacia. *See* Figure 3.



**Figure 3**

EnPro and all other Tier 3 APs were then classified by the Government as "cash-out eligible," offered the opportunity to settle, and are Defendants in this

_____

289 at 36, Mr. Batson admitted that such "precise" base scoring grossly misrepresents the true inaccuracy of his model.

matter; Nokia and Pharmacia were designated "work parties," denied the opportunity to settle. As such, the claimed distinction of APs in Tier 2 and Tier 3, upon which this settlement and the resolution of over $3 billion in claims depends, is based on a purported difference of merely 14 ten thousandths of a percent.

Nonetheless, and despite concluding that the credibility of his individual AP scores suffered "substantially" from data limitations, Mr. Batson endorsed his tiering of those scores as a reliable output of his allocation—with *no* support.

### D. The Tiers Are Shown to Be Arbitrary and Irrational

As Mr. Batson did not explain how he created or tested his tiers, Nokia retained Dr. Stephanie Plancich, Ph.D., an economist trained in statistics at the Massachusetts Institute of Technology. She conducted a study showing that the claimed distinguishment between Nokia and five settling Defendants in Tier 3 is arbitrary. *See* ECF No. 307-2 ¶¶ 3–4.

This "sensitivity analysis," a common statistical method, tested the uncertainty of Mr. Batson's scoring and tiers by using a sensible alternative for a key assumed input to the allocation and evaluating its impact on the results. *Id.* ¶ 20. Sensitivity analyses are frequently used to assess the uncertainty and, thus, reliability of the outputs of a computational model arising from the uncertainty of the inputs.[24]

---

[24] EPA commonly uses such analyses in environmental modeling and did so in selecting the cleanup plan for the LPRSA. *See* OU2 ROD at 422.

*Id.* ¶ 15.  While Mr. Batson's allocation model relies on thousands of data inputs, each with its own uncertainty, Dr. Plancich's study adjusted only one:  the estimated mass of one COC—PCBs—in surface soils used to approximate PCB contributions to river sediments via soil erosion.  *Id.* ¶ 21.

The study identified the seven APs assigned nearly all (approximately 99%) of the AP PCB contribution mass in Mr. Batson's model (the "PCB Group APs"). *Id*.  The PCB Group APs include: (1) two non-settlors, including Nokia, that Mr. Batson placed in Tier 2 and that EPA deemed "work parties"; and (2) five Defendants placed in Tier 3 and offered a "cash-out" settlement.  *Id.* ¶ 3.  The study then, for each PCB Group AP, replaced Mr. Batson's chosen PCB soil concentration estimate to determine PCBs in surface soil (almost always the maximum in the available data for each facility) with a valid alternative (the geometric mean of the same data).  *Id.* ¶¶ 21, 27 n.29.  Holding all else constant, the study recalculated the PCB Group APs' PCB contribution to sediments, scoring, and relative ranking.  *See id.* ¶¶ 20–21.

By changing this single assumption, the PCB Group APs' relative rankings shifted substantially from Mr. Batson's ordering.  *Four* Tier 3 APs ranked *higher* than Nokia.  *Id.* ¶ 37.  Thus, among these APs—with Nokia outside the settlement and four in it—Mr. Batson's model lacked the precision to credibly distinguish them.

This disproves Mr. Batson's unsupported claim that his tiering remedied the uncertainty of his scoring. As Dr. Plancich concluded:

> [T]he underlying variability in the input data [of the Allocator's model] does affect the outcome of the allocation and robustness of any resulting estimates of scores, relative ranks and Tiers—*the Tiering does not "fix" the uncertainty of the allocation results.*

*Id.* ¶ 3 (emphasis added). This stays true no matter how "orphan" shares are distributed. Indeed, running the same analysis using the "Alternative Methodology" on which the Government structured the settlement, *see supra* pp. 19–20, Dr. Plancich concluded that it likewise does not correct the unreliability of Mr. Batson's tiering. As Dr. Plancich found, tiers conjured from either "orphan" allocation method suffer from the same uncertainty in estimating the APs' COC contributions. ECF No. 307-2 ¶¶ 39–42.

### E. The United States Structures the Consent Decree on Mr. Batson's Tiering

After the allocation concluded, EPA began negotiations firmly based on Mr. Batson's Report and tiering that resulted in the appealed CD. *See* ECF No. 288-5 ¶¶ 57–61.

First, EPA decided that only APs in Mr. Batson's Tiers 3 to 5, now the Defendants, would be eligible for "cashout" settlement, while the APs in Tiers 1 and 2—including Nokia—would not be eligible and, instead, be "work" parties to perform and fund the OU2 and OU4 cleanup. *Id.* ¶ 54.

Nothing in the record shows that the Government evaluated the statistical rigor or rationality of Mr. Batson's tiers before making this critical decision. Instead, EPA and DOJ only claim to have reviewed the Report and determined that the individual and collective shares of the Tiers 3 to 5 APs were "minor," and thus, those APs were eligible for cashout settlement. *Id.* And, as noted, EPA never saw all key documents Mr. Batson evaluated in assigning shares to and tiering the APs, ECF Nos. 288-5 ¶ 40 n.47, 289-2 at 75–76, materially limiting any EPA review of Mr. Batson's work.

Then, the Government embarked on 18 months of negotiations with only the Tiers 3 to 5 APs to structure the settlement—again, wholly and blindly depending on Mr. Batson's tiering. *See* ECF No. 288-5 ¶ 57. Indeed, to compute the Defendants' $150 million payment amount, the Government followed these steps:

1. Adopt Mr. Batson's Alternative Methodology AP Base Scores and tiering, rejecting any further allocation adjustments as "subjective," *id.* ¶¶ 57(a)–(b);

2. Per tier, total Mr. Batson's individual Alternative Methodology AP Base Scores, as normalized to 100%, and deem it the tier's share (despite his admission that the credibility of any individual AP Base Score is substantially affected by data limitations), yielding a 3.88% total share

-27-

for the Defendants, 11.01% share for Tier 2, and 85.07% share for Tier 1, *id.* ¶ 57(c);

3.  Calculate a total LPRSA liability of approximately $3.73 billion by doubling the outdated $1.84 billion OU2 and OU4 remedy cost estimates ($3.68 billion) and adding $50 million in EPA past costs, *id.* ¶¶ 57(d)–(e); and

4.  Multiply the total liability by 3.88%, resulting in a rounded $150 million settlement value, *id.* ¶ 57, averaging about $1.82 million per Defendant.[25]

During these negotiations, Nokia made two settlement offers to the Government—one unsolicited and another in response to the Government's request—and several attempts to discuss them and settlement generally.  ECF No. 307-1 ¶¶ 9–10.  The Government did not respond to either offer.  *Id.* ¶ 10.  Instead, it declared Nokia a "work" party to fund and perform the cleanup, ineligible for a cashout settlement.  *Id.* ¶¶ 11–12.  The Government has otherwise not meaningfully communicated with Nokia about this matter.

---

[25] The Defendants have, without rationale, declined to disclose each's specific payment.  The Government has indicated no determination as to whether any individual Defendant has paid its fair share of cleanup costs.

## IV.    Procedural History

### A.    Lodging of the Consent Decree

In December 2022, the Government filed the complaint in this action and lodged a proposed CD with the District Court embodying its settlement with the then 85 Defendants. ECF Nos. 1–2. As a party excluded from the settlement that would be significantly affected by its approval, Nokia timely moved to intervene, which was granted via stipulation by the parties and entered by the District Court in April 2023. ECF No. 198. After reviewing public comments on the proposed CD, the Government filed an amended complaint and modified CD in January 2024 that, among other things, reduced the number of Defendants to 82.[26] ECF Nos. 282–83.

The CD's basic terms are:

- The Defendants would pay $150 million, and the Government would covenant not to sue or take administrative action as to OU2 and OU4 for injunctive relief for abatement of imminent and substantial endangerment of public health or the environment under Section 106 and cost recovery under Section 107 of CERCLA, 42 U.S.C. §§ 9606–07, regarding

---

[26] The few changes included removing three parties from the settlement, updating certain Defendant names, and adding a cause of action (under Section 106 of CERCLA, 42 U.S.C. § 9606) plus a "reopener" of the Defendants' liability if response costs exceed $3.68 billion. *See* ECF Nos. 281, 282, 282-2.

performance of work and/or expenditures up to $3.68 billion. *See* ECF No. 283 §§ 7.a, 13, 15.f, 23.

- Under Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(3), the Defendants would receive protection against contribution claims by *any* party—including non-settlors like Nokia and the PVSC—concerning "all response actions taken or to be taken and all response costs incurred or to be incurred, at or in connection with OU2 and OU4, by the [Government] or any other person, except for the State [of New Jersey]." *Id.* § 23. Such contribution protection would no longer be effective in the event the Government determines response costs exceed $3.68 billion. *Id.* §§ 15.f, 23.

**B.    In Response to the Motion for Entry, Nokia Proves, Without Rebuttal, that Mr. Batson's Tiering is Irrational and Arbitrary**

The Government moved for judicial approval of the CD (the "Motion for Entry") on January 31, 2024. ECF No. 288.

The Government did not submit any testimony from Mr. Batson or seek to qualify Mr. Batson as an expert. The primary supporting factual declaration about the allocation—from Ms. Alice Yeh—stated only the following about the key decision to base the settlement on Mr. Batson's tiers: (1) the Government "carefully

reviewed" the Report and deemed the APs in Tiers 3 to 5[27] eligible for settlement as they, "individually and collectively, are responsible for a minor share," ECF No. 288-5 ¶ 54; and (2) the tiers align with "natural breaks" in the AP scores, *id.* ¶ 45(h). The Government offered *no* explanation for these conclusions.

Further, the Motion for Entry included a declaration from Christopher M. Wittenbrink, J.D., the Government's sole expert retained to opine on whether Mr. Batson's "allocation methodology is consistent with allocation practice."  ECF No. 288-8 ¶ 8.  Mr. Wittenbrink noted that he, like the Government, "did not have access to any allocation process-related documents such as position papers or confidential communications between the allocator and the [PAPs]." *Id.* ¶ 5.  He then stated that, "[b]ecause I did not participate in the allocation process or review the entire file of allocation materials, I cannot opine on . . . whether [the Report] results are appropriate . . . or otherwise endorse [the Report]'s formula and results." *Id.* ¶ 8.

Nokia filed a response to the Motion for Entry.  ECF No. 307.  Nokia included a declaration from Dr. Plancich detailing her sensitivity study and opining that the line between Mr. Batson's Tiers 2 and 3—the basis for who is and is not in the settlement and the $150 million payment—is irrational, causing the CD to fail to meet the approval standard.  ECF No. 307-2.

---

[27] One such AP, Public Service Gas & Electric Company ("PSEG"), was not considered eligible for settlement.

In reply, neither the Government nor the Defendants rebutted or even mentioned Dr. Plancich's declaration, her sensitivity study, or its fatal effect on the CD. ECF Nos. 334, 340. In supplemental letters filed later in 2024, Nokia reiterated Dr. Plancich's opinion and noted its impact on the CD. ECF Nos. 350, 366, 379.

### C. The District Court Approves the Consent Decree, Failing to Address Nokia's Unrebutted Evidence

On December 18, 2024, the District Court entered an Order and accompanying Opinion granting the Motion for Entry. ECF Nos. 393–94. Like the Government and the Defendants, the Opinion does not mention Dr. Plancich's uncontested declaration, sensitivity study, or conclusions. Nor does it mention or address Nokia's unrebutted argument that the line between Tiers 2 and 3 is wholly arbitrary, requiring denial of the Motion for Entry.

Nokia timely filed a notice of appeal of the Order and Opinion on January 9, 2025. ECF No. 396. OxyChem filed a separate notice of appeal on February 13, 2025. ECF No. 402.

## SUMMARY OF THE ARGUMENT

Issue 1.    The District Court erred in approving a CD that is substantively unfair. Substantive fairness required the Government to establish that the CD's underlying "measure of comparative fault" and distinction between settlor and non-settlor is nonarbitrary, rational, and fair to non-settlors. The substantive fairness of

this CD hinges on the rationality of Mr. Batson's tiers, the sole basis of distinguishment between and among the APs.

Yet the Government adopted the tiers without critical analysis and has never plausibly explained them—despite Mr. Batson's candid admission of an inherent imprecision in his allocation results, and his failure to explain the basis for, or to evaluate, the fabricated tiers purporting to overcome that imprecision. Nokia's expert, Dr. Plancich, then determined by empirical analysis that the tiering fails to reliably distinguish Nokia from Defendants. As such, the claimed distinguishment by tiers is irrational and arbitrary, failing the approval standard. The Government, which had the burden of persuasion, declined to address, let alone contest, Dr. Plancich's findings, effectively conceding them and Nokia's contentions. The District Court's Opinion likewise did not mention, much less consider, both Dr. Plancich's unopposed declaration and Nokia's contentions on this fundamental issue, rather concluding, with clear error and no meaningful explanation, that the purported "fine line" of Mr. Batson's relevant tiering was "well-considered" by the Government.

Thus, the CD is substantively unfair, and the District Court erred in not engaging with key, unrebutted evidence to find as much.

Issue 2.    The District Court also erred in finding that the CD is reasonable, in the public interest, and in furtherance of CERCLA's goals. The approved $150

million settlement amount, averaging under $2 million per Defendant, is based wholly on Mr. Batson's arbitrary, unscrutinized tiering and a purportedly stark difference between Nokia's share and the shares of Defendants in Tier 3. But Dr. Plancich's uncontested testimony established, at a very minimum, that the shares of four Tier 3 Defendants and Nokia's share are indistinguishable. This means that either the Tier 3 Defendants are paying far too little or the Government arbitrarily has classified Nokia a "work" party ineligible for cashout settlement. Thus, the settlement value depends on an invalid distinction, one that fails to apportion liability according to rational estimates of the harm each party has caused. The District Court's finding that the CD holds the Defendants accountable "for more than their fair share of liability" accordingly is clearly erroneous and so an abuse of discretion. A CERCLA settlement that cannot ensure that the Defendants are paying their fair share cannot be reasonable, in the public interest, or consistent with CERCLA's goal to hold responsible parties liable for cleanup costs.

Issue 3.    The District Court further erred in approving a CD arising from EPA's enforcement and settlement strategy to indiscriminately exclude Nokia based on Mr. Batson's sham tiering. In negotiating a CERCLA CD, the Government cannot discriminate unfairly. If it treats someone differently from similarly situated parties without a rational basis, it violates Constitutional equal protection. The Government did just that here. The arbitrariness of the tiering of the non-OxyChem

APs is plain from the Report, which the Government reviewed long before negotiating this settlement. Yet the Government relied on *only* the untested, baseless tiers to treat Nokia differently from several similarly situated Defendants, exposing Nokia to massively disproportionate liability. The District Court erred by refusing to critically examine the purported "fine line" underlying this differential treatment. In doing so, it erroneously endorsed the Government's unfair discrimination that violated Nokia's interests in equal protection guaranteed by the Fifth Amendment of the United States Constitution.

For these reasons, the District Court's Order granting the Motion to Enter should be reversed.

## STANDARD OF REVIEW

To approve a CERCLA CD, the District Court must find it (1) substantively and procedurally fair, (2) reasonable, and (3) consistent with CERCLA's goals. *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 207 (3d Cir. 2003). This Court has stated that it then reviews such approval for abuse of discretion. *Id.* But this standard calls for applying less deferential standards to specific issues—*i.e.*, reviewing factual analysis for clear error and legal analysis *de novo*. *See United States v. Se. Pa. Transp. Auth. ("SEPTA")*, 235 F.3d 817, 822 (3d Cir. 2000) (the "argument . . . raises an issue of law, and we exercise plenary review . . . on this

issue"); *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 748 (9th Cir. 1995) (reversing CERCLA CD approval for clear error on factual issue).

A district court's finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Murray*, 821 F.3d 386, 391 (3d Cir. 2016) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Further, approval of a CERCLA CD is an abuse of discretion "when a material factor deserving significant weight is ignored, when an improper factor is relied upon, or when all proper and no improper factors are assessed, but the court makes a serious mistake in weighing them." *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990) (citation omitted).

Finally, it is reversible error for a district court to endorse federal governmental action that violates Constitutional equal protection under the Due Process Clauses of the Fifth and Fourteenth Amendments. *Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000); *see Washington v. Davis*, 426 U.S. 229, 239 (1976) ("the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups"). Such violation occurs when a party "was intentionally treated differently from others similarly situated by the [government]" without a "rational basis." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 243 (3d Cir. 2008).

# **ARGUMENT**

## I. THE DISTRICT COURT ERRED IN APPROVING A SUBSTANTIVELY UNFAIR SETTLEMENT THAT FAILS TO DISTINGUISH DEFENDANTS AND NOKIA RATIONALLY AND NON-ARBITRARILY, OVERLOOKING NOKIA'S KEY, UNREBUTTED EVIDENCE.

Under the "fairness" criterion of the CERCLA CD approval standard, the Government has the burden to show, and the district court must find, that a CERCLA CD's underlying "measure of comparative fault" is not "arbitrary, capricious, and devoid of rational basis." *Tutu Water Wells*, 326 F.3d at 207 (quoting *SEPTA*, 235 F.3d at 824). The settlement must apportion liability "according to rational estimates of the harm each party has caused," *SEPTA*, 235 F.3d at 823, as "a party should bear the cost of the harm for which it is legally responsible," *Cannons*, 899 F.2d at 87.

Thus, how the Government distinguishes between and among settlors and non-settlors must be "rational," "applied evenhandedly," and fair to non-settlors. *United States v. Davis*, 11 F. Supp. 2d 183, 190, 192 (D.R.I. 1998), *aff'd,* 261 F.3d 1 (1st Cir. 2001); *see also United States v. Charles George Trucking, Inc*., 34 F.3d 1081, 1087 (1st Cir. 1994). A district court must consider the fairness of a CERCLA CD to non-settlors, *United States v. Kramer*, 19 F. Supp. 2d 273, 285; *see City of Bangor v. Citizens Commc'ns Co*., 532 F.3d 70, 98 (1st Cir. 2008), especially those like Nokia who have not rejected a settlement offer but earnestly sought one. This is because approval of a CERCLA CD—primarily by granting the settlors protection

from contribution claims by non-settlors concerning the matters addressed under the settlement—"significantly impacts" non-settlors. *Davis*, 11 F. Supp. 2d at 189.

To the extent such basic tenets of "fair play" permit the Government to draw a "fine line" between settlors and non-settlors, the Government must plausibly explain the line and show that it is neither arbitrary nor irrational. *Id.* at 192. To be sure, courts have cautioned against imposing false precision in this way, finding that allocating liability to minute detail is impossible "when the historical record is incomplete" and since "a muddled record is the norm in most CERCLA litigation." *Davis*, 11 F. Supp. 2d at 190 (citing *Charles George Trucking*, 34 F.3d at 1088–89); *see United States v. IMC E. Corp.*, 627 F. Supp. 3d 166, 174 (E.D.N.Y. 2022) (finding that practical considerations prevent mathematical precision in apportioning liability in CERCLA settlement).

From this flows the obligatory judicial inquiry: Does the purported "fine line" rationally and non-arbitrarily distinguish the Defendants from non-settlors like Nokia? And, since this case involves the quintessential "muddled record" rendering precision impractical—the very "inherent limitation" Mr. Batson recognized—is the purported "fine line" plausibly explained and shown to be rational? If not, then the CD must be rejected.

Here, the Government failed to meet its burden to establish and explain that its fine line was rational and not arbitrary, and the District Court failed to conduct

the required factual inquiry.  The District Court committed clear error in both not finding that the purported "fine line" is an arbitrary apportionment of liability and ignoring Nokia's unrebutted expert testimony proving so.  This renders the District Court's approval of the CD an abuse of discretion that must be reversed.

### A.    Mr. Batson Failed to Support the Claimed Reliability of His Tiers.

One major flaw in the supposed "fine line" underlying the settlement is Mr. Batson's failure to test whether his tiers fixed his inability to rank the APs due to the lack of credibility of his estimations of their COC contributions.

To create tiers of the non-OxyChem APs with any reliability in this case, one must confirm that the APs' estimated COC contributions are meaningfully different and not grossly imprecise or haphazard due to missing data, error, random sampling variation, or other sources of uncertainty in the allocation.  Without measuring that uncertainty, any grouping of the non-OxyChem APs is meaningless.[28]

Yet, as Dr. Plancich observed:

---

[28] For example, imagine a weight scale producing readings for five objects of 7 lbs., 15 lbs., 38 lbs., 42 lbs., and 73 lbs.  Due to function limitations, the scale has an average error of +/- 35 lbs. (one standard deviation); thus, the 7 lbs. reading could just as easily have been 42 lbs., the 73 lbs. reading could have readily been 38 lbs., and all other readings could have similar variation.  Any effort to rank or group the five objects meaningfully by true weight would fail.

Similarly, as discussed *supra* pp. 22–23, Mr. Batson's purported discernment of the APs that are "similarly situated" from those that are "separable" into tiers is as finely wrought as ten thousandths of a percent.  The uncertainty of those distinctions must be evaluated to determine if the tiering has any reliability or, instead, is arbitrary like the five weight readings.

-39-

> [D]espite [Mr. Batson's] acknowledgement of underlying data uncertainty that renders a strict rank ordering of the APs not meaningful, Mr. Batson does not assess the impact of this uncertainty on his proposed Tiers. He performs no analysis to quantify the impact of the acknowledged uncertainty in his allocation model input data on his results. He reports no statistical confidence intervals around his estimated values or any sensitivity tests of the scores generated from his model or the resulting Tiers to which he has assigned each AP.

ECF No. 307-2 ¶ 2. Thus, the creator of the purported tiers, relying on a discernment of 14 ten thousandths of a percent in creating Tiers 2 and 3, *see supra* pp. 22–24, never offered any analysis showing they are anything other than arbitrary.

**B.    The Government Adopted Mr. Batson's Tiering on Faith with No Evaluation of its Rationality.**

Another major flaw is the Government's own failure to evaluate Mr. Batson's claim that his tiering solved the "substantially affected credibility" of his scoring before making it the centerpiece of Government enforcement and the settlement.

Alice Yeh, the Government's main factual declarant regarding the outsourced allocation, gave zero detail behind this pivotal decision. All she said is that the Government "carefully review[ed]" Mr. Batson's Report and identified the APs in Tiers 3 to 5 as eligible for settlement as they "individually and collectively, are responsible for a minor share," and that the tiers supposedly align with "natural breaks" in the AP scoring. ECF No. 288-5 ¶¶ 45(h), 54. Ms. Yeh offered no details of the "careful review," nor explained what she meant by "natural breaks" or their relevance.

Additionally, Ms. Yeh ignored Mr. Batson's key admission that data gaps made his scoring of the non-OxyChem APs unreliable. She mentioned no analysis of Mr. Batson's claim that the tiers somehow fix the scoring uncertainty and have "acceptable certainty." Indeed, Ms. Yeh failed to mention the words "certainty," "accuracy" or "reliability" at all. Ms. Yeh disregarded Mr. Batson's avowal of allocation imprecision. And, critically, she did not assert that the tiers are rational, non-arbitrary, or reliable.

It gets worse. The Government's sole allocation expert offered in support of the CD, Chris Wittenbrink, explicitly declined to endorse the allocation results. ECF No. 288-8 ¶ 8. Despite noting that tiering sometimes may be used in CERCLA allocations, particularly when "factual information is largely drawn from inferences," *id.* ¶ 38—*i.e.*, when the historical record in muddled—Mr. Wittenbrink refused to opine on Mr. Batson's tiers because he "did not participate in the allocation process or review the entire file of allocation materials." *Id.* ¶ 8. EPA and DOJ likewise did not fully participate in the allocation and lacked access to all allocation materials before Mr. Batson. *See supra* p. 14. Thus, under Mr. Wittenbrink's logic, the Government is also in no position to endorse the allocation results. *And, in fact, no Government declarant did so.*

But, nothing prevented Mr. Wittenbrink or the Government from doing the necessary, critical evaluation of Mr. Batson's distinguishment of the non-OxyChem

APs or his assertion of its "certainty" after receiving the Report.  Indeed, Dr. Plancich showed that such an evaluation was not only feasible, but that it decisively disproves the claimed "certainty" of the tiering.  The Government simply chose not to do the work.

In sum, despite Mr. Batson's admission that the credibility of his estimations was substantially affected by data gaps and that the allocation suffered a resultant imprecision, the Government *did not diligence* Mr. Batson's indefensible distinguishment of the non-OxyChem APs via tiers and, instead, blindly adopted it and then offered an expert before the District Court who declined to endorse it.  The Government's resolution of $3.68 billion in CERCLA claims against the 82 Defendants thus rests solely on Mr. Batson's unverified say-so.  On this basis alone, the Government failed to meet its burden of establishing that the tiers are rational and non-arbitrary.

### C.    The District Court Erred by Overlooking a Dispositive, Unrebutted Expert Declaration Showing that the Settlement Relies on an Arbitrary Apportionment of Liability.

Ultimately, the Government never contested Nokia's proofs that Mr. Batson's tiering is unreliable and arbitrary or tried to oppose, or even mention, Dr. Plancich's declaration.  Likewise, the District Court's opinion does not mention, or even acknowledge, Nokia's contentions on this point and entirely overlooks Dr. Plancich's uncontested declaration.  This is reversible error.

i.    *Dr. Plancich's Sensitivity Study Affirmed that Mr. Batson's Tiers Are Unreliable.*

As discussed above, *supra* pp. 24–26, Dr. Plancich demonstrated the fatal uncertainty of Mr. Batson's tiering by testing the sensitivity of his scoring by adjusting only one of thousands of estimates in the allocation for the seven PCB Group APs—*i.e.*, two non-settlor "work" parties in Tier 2, including Nokia, and five Defendants in Tier 3. The resulting scores for, and relative ranking of, each PCB Group AP differed materially from those in the Report:

**Exhibit 6**
**Change in Allocation Rank Under Different Estimation Metrics for Soil Concentration**
*Limited to PCB Group Included in Analysis Only Under the Protocol Method*

| Within PCB Group AP Rank | Rank Within the PCB Group Under Different Soil Concentration Estimation Metrics | | | | |
|---|---|---|---|---|---|
| | Using Base Scores | | Using Adjusted Base Scores | | |
| | AlterEcho Measure | Geometric Mean | AlterEcho Measure | Geometric Mean | |
| (1) | (2) | (3) | (4) | (5) | |
| Rank 1 | Nokia-Lucent Technologies | Pitt Consol Chemical Company | Nokia-Lucent Technologies | Pitt Consol Chemical Company | |
| Rank 2 | Pharmacia LLC | Hexcel Corp. | Pharmacia LLC | Hexcel Corp. | |
| Rank 3 | Hexcel Corp. | Pharmacia LLC | Hexcel Corp. | Pharmacia LLC | |
| Rank 4 | ISP Chemicals LLC | Congoleum Corp. | Pitt Consol Chemical Company | Congoleum Corp. | |
| Rank 5 | Pitt Consol Chemical Company | BASF Corporation | ISP Chemicals LLC | BASF Corporation | |
| Rank 6 | Congoleum Corp. | Nokia-Lucent Technologies | Congoleum Corp. | Nokia-Lucent Technologies | |
| Rank 7 | BASF Corporation | ISP Chemicals LLC | BASF Corporation | ISP Chemicals LLC | |

**Notes and Sources:**
- Nokia-Lucent Technologies and Pharmacia LLC were assigned Tier 2 in Attachment Q of the Allocation Report, while Hexcel Corp., ISP Chemicals LLC, Pitt Consol Chemical Company, Congoleum Corp., and BASF Corporation were assigned Tier 3.

ECF No. 307-2 at Exh. 6. This shows that Nokia's share is indistinguishable from those of several Defendants and, thus, that Nokia and the Defendants are similarly situated. Dr. Plancich found that such a substantial change resulting from this one reasonable adjustment renders Mr. Batson's tiers unreliable. *Id.* ¶¶ 37–38.

Dr. Plancich further testified that this is not changed by the Government's adoption of Mr. Batson's concocted Alternative Methodology of distributing unattributed COC mass in OU2 sediments. *Id.* ¶ 41. Using the same alternative input and holding all else constant, running the study using the Alternative Methodology—again—resulted in materially different scores for and relative rankings of each PCB Group AP versus the Report:

**Exhibit 9**
**Change in Allocation Rank Under Different Estimation Metrics for Soil Concentration**
*Limited to PCB Group Included in Analysis Only Under the Alternative Method*

| Within PCB Group AP Rank | Rank Within the PCB Group Under Different Soil Concentration Estimation Metrics | | | |
| | Using Base Scores | | Using Adjusted Base Scores | |
| | AlterEcho Measure | Geometric Mean | AlterEcho Measure | Geometric Mean |
| (1) | (2) | (3) | (4) | (5) |
| Rank 1 | Nokia-Lucent Technologies | Hexcel Corp. | Nokia-Lucent Technologies | Hexcel Corp. |
| Rank 2 | Pharmacia LLC | Pharmacia LLC | Pharmacia LLC | Pharmacia LLC |
| Rank 3 | Hexcel Corp. | Pitt Consol Chemical Company | Hexcel Corp. | Pitt Consol Chemical Company |
| Rank 4 | Pitt Consol Chemical Company | BASF Corporation | Pitt Consol Chemical Company | BASF Corporation |
| Rank 5 | ISP Chemicals LLC | Congoleum Corp. | ISP Chemicals LLC | Congoleum Corp. |
| Rank 6 | Congoleum Corp. | Nokia-Lucent Technologies | Congoleum Corp. | Nokia-Lucent Technologies |
| Rank 7 | BASF Corporation | ISP Chemicals LLC | BASF Corporation | ISP Chemicals LLC |

Notes and Sources:
- Nokia-Lucent Technologies and Pharmacia LLC were assigned Tier 2 in Attachment Q of the Allocation Report, while Hexcel Corp., ISP Chemicals LLC, Pitt Consol Chemical Company, Congoleum Corp., and BASF Corporation were assigned Tier 3.

*Id.* Exh. 9. Indeed, Dr. Plancich concluded that the Alternative Methodology merely generates a falsely inflated separation of the APs without resolving the underlying uncertainty. *Id.* ¶ 42. The vast orphan share is still distributed to the APs

proportionate to the unreliable estimates of COC contributions that Mr. Batson found lacked credibility.[29]

Dr. Plancich was clear: Mr. Batson's tiering is unreliable, and his unsupported claim that his tiering was estimated to an acceptable level of certainty is false.

### ii. The Government Declined to Contest Dr. Plancich's Findings, So Conceding Their Validity.

The Government declined to offer any rebuttal to Dr. Plancich's opinion or any explanation supporting the reliability of Mr. Batson's tiering. It could have sought testimony from Mr. Batson but did not. Nor did the Government even *mention* Dr. Plancich's declaration in its reply brief. *See* ECF No. 334. And, as noted, the Government's own allocation expert was already on record expressly declining to endorse the tiering, the allocation result on which the Government based the settlement. *See supra* pp. 31.

---

[29] To illustrate, consider the same scale example from footnote 28 *supra*. Again, a scale produces weight readings for five different objects of 7, 15, 38, 42, and 73 lbs., each. The scale has a +/-35 lbs. error range (standard deviation) that prevents meaningful ranking or grouping of the objects by weight.

If one then proportionately distributes 10,000 lbs. of weight value (an "orphan" share mass) to the original measurements of the five items, each object's purported weight nominally increases to: 407, 872.1, 2,209.4, 2,384.9, and 4,244.4 lbs. While the apparent gap between the lightest and heaviest measurements grows significantly, from 66 lbs. to 3,837.4 lbs., one still could not meaningfully distinguish those two (or any of the five) objects by true weight. Distributing even a lot more "orphan" weight to the initial measurements does not fix their inherent uncertainty that renders them indistinguishable.

This all amounted to a concession of the validity of Dr. Plancich's findings and Nokia's contentions. *See N.J. Tpk. Auth. v. PPG Indus.*, 16 F. Supp. 2d 460, 480 (D.N.J. 1998), *aff'd,* 197 F.3d 96 (3d Cir. 1999) (plaintiff "concede[d]" "Defendants' arguments in its moving brief" where Plaintiff "chose not to respond" to them); *Summers v. PHH Mortg. Corp.*, No. 22-06726, 2023 U.S. Dist. LEXIS 147947, at *13 (D.N.J. Aug. 22, 2023) (quoting *Sang Geoul Lee v. Won Il Park*, 720 F. App'x 663, 666 (3d Cir. 2017)) ("Plaintiffs' 'failure to respond to the pertinent . . . argument acts as a concession of that argument'") (omission in original); *Heckman v. N. Pa. Comprehensive Health Servs.*, No. 4:20-CV-01680, 2024 U.S. Dist. LEXIS 156116, at *39 (M.D. Pa. Aug. 30, 2024), *reconsideration denied,* 2024 U.S. Dist. LEXIS 195919 (M.D. Pa. Oct. 29, 2024) ("failure to respond to an issue where a party has filed a brief is . . . a concession of the issue"); *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1085 (D.N.J. 2011) ("[s]ince [plaintiff] did not respond to [d]efendant's argument[] in its Reply . . . the Court deems the issue conceded").

Indeed, the Government only mischaracterized Nokia's argument, asserting that "Nokia contends that the difference between Tier 2 and 3 is negligible." ECF No. 334 at 14. Not so. This difference is *fictional.* Nokia *actually* stated:

> Once the distinction between the Tiers collapses, there is no rational way to determine which APs in those two Tiers are more or less relatively responsible for the Cleanup. And since [Mr. Batson]'s Tiering is the only basis upon which the [Government] chose to include

Tier 3 but not Tier 2 in the Proposed CD, that decision is irrational and arbitrary.

ECF No. 307 at 27.

### iii.   The Court Erred in Overlooking Key, Unrebutted Evidence.

Like the Government, the District Court entirely overlooked this key factual item. Its Opinion neither mentioned Dr. Plancich's unrebutted testimony nor engaged with Nokia's equally unopposed proof that Mr. Batson's tiers are irrational. The District Court did not analyze or make a finding as to the rationality of Mr. Batson's tiers, on which the settlement's substantive fairness wholly depends.

Rather, in a forty-seven-page opinion that discusses Nokia with utmost brevity, the District Court stated on the final page that it "will not otherwise interfere with the Government's authority to draw the difficult but well-considered 'fine lines' between PRPs in furtherance of cleanup."[30]  ECF No. 393 at 47.

The District Court had no factual basis to find that the purported "fine line" is "well-considered," and to do so is clearly erroneous. Mr. Batson showed zero analysis of the "certainty" of his tiers. The Government's own allocation expert squarely declined to endorse the allocation results. The Government's key factual

---

[30] The District Court obscurely cites page 93 of *Cannons*, 899 F. 2d. Perhaps it is referring to the statement that "the right to draw fine lines . . . is an agency prerogative." Although Nokia acknowledges that the Government may draw "fine lines," doing so must be in good faith as well as rational, non-arbitrary, and reliable, *see SEPTA*, 235 F.3d at 824; *Cannons*, 899 F.2d at 87, 93, none of which the District Court analyzed nor found in this case.

declarant, Alice Yeh, offered no assessment of the "fine line" or any discussion of uncertainty or unreliability. And, the Government did not rebut—or even mention—Dr. Plancich's testimony proving that the "line" is fiction. The failure of the District Court to engage with key, unrebutted evidence, particularly Dr. Plancich's declaration, was clear error and an abuse of discretion. *See Pittsburgh Press Club v. United States*, 615 F.2d 600, 606 (3d Cir. 1980) (reversing as "[t]he district court totally ignored this [unrebutted] evidence," which "was clearly erroneous"); *Fredericks v. Comm'r*, 126 F.3d 433, 439–40 (3d Cir. 1997) (the court "committed reversible error" as it "appeared to have ignored . . . undisputed evidence"); *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 171 (4th Cir. 2019) (a court abuses its discretion when it "ignores unrebutted, legally significant evidence") (internal quotation omitted); *Martinez-Gonzalez v. Elkhorn Packing Co. LLC*, 25 F.4th 613, 625 (9th Cir. 2022) ("where . . . we are firmly convinced the district court overlooked key facts, it is our duty to reverse").

The District Court simply refused to examine, and does not make any finding, whether the purported fine line underlying this settlement is rational, non-arbitrary, and reliable, instead deferring to a "governmental authority" that renders hollow any notion of "substantive fairness" and "fair play." This was an error of law. *See Sec. & Exch. Comm'n v. Commonwealth Equity Servs., LLC*, 133 F.4th 152, 168 (1st Cir. 2025) (finding reversible "error of law" when district court "did not engage in the

required 'fact-specific inquiry' and instead rested on a generalized . . . conclusion"); *see also McMahon v. Fulcomer*, 821 F.2d 934, 944 (3d Cir. 1987) (finding an abuse of discretion when district court did not "engag[e] in *any* on-the-record inquiry" on key factual issue) (emphasis in original).

> **D.    The $150 Million Settlement Value is Arbitrary; There is No Basis to Conclude the Defendants are Paying Their Fair Share.**

Finally, Dr. Plancich's study showed that there is enough uncertainty in the allocation to conclude that the shares of four Tier 3 Defendants, at a minimum, are indistinguishable from Nokia and that Nokia and such Defendants are similarly situated.    And, as Mr. Batson concluded that all APs within a tier are indistinguishable, ECF No. 289 at 36 ("the specific location of an [AP] within each tiered grouping should be considered insignificant for purposes of the allocation"), the purported distinction between and among all Tiers 2 and 3 APs collapses entirely. Such uncontroverted evidence renders the $150 million settlement amount arbitrary and cements this settlement as fatally unfair.

Nobody has disclosed how much each of these four Tier 3 Defendants are paying toward the $150 million settlement.    However, assuming that these Defendants alone are paying the entire $150 million in equal $37.5 million shares, they would be paying an amount materially less than the share the Government assigns to Nokia, despite being indistinguishable from Nokia.

Under the Government's "rationale" for the $150 million value, Tier 2—Nokia and Pharmacia—has an 11.01% share of responsibility, or $416 million of the $3.73 billion liability estimate used by the Government for settlement. ECF No. 288-5 ¶ 57. As Nokia and Pharmacia are "similarly situated" in the allocation results, assume that Nokia is responsible for half of the Tier 2 share, 5.51%, or $208 million of the Government's liability estimate.

Dr. Plancich established that Nokia is indistinguishable from the four Tier 3 Defendants mentioned above, a finding the Government did not contest. If each of these Tier 3 Defendants bore Nokia's identical 5.51% share under the Government's settlement rationale, then each of these four would be responsible for a $170.5 million shortfall[31] for a total settlement shortfall of ***$682 million*** ($170.5 million × 4).

The Government has never addressed this dire possibility, let alone shown how it is less likely than any other outcome. And yet, if the settlement amount is in fact less than the Defendants' fair share, the Government then could hold Nokia and the few others it excluded from the settlement, including the PVSC and municipalities, liable for the shortfall, no matter how massive. Such extreme

---

[31] $208 million – $37.5 million (highest possible share for each of the four Defendants) = $170.5 million. This calculation is conservative, as these four Defendants likely did not fully fund the $150 million settlement and, instead, paid far less than $37.5 million each.

arbitrariness in the settlement amount is the opposite of fairness to non-settlors as it fails to apportion liability "according to rational estimates of the harm each party has caused." *SEPTA*, 235 F.3d at 823. It therefore was clearly erroneous and an abuse of discretion for the District Court to find that the CD holds Defendants "accountable for more than their fair share." ECF No. 393 at 39.

## II.   THE CONSENT DECREE IS NEITHER REASONABLE, IN THE PUBLIC INTEREST, NOR IN FURTHERANCE OF CERCLA'S GOALS.

The District Court concluded that the CD is "fair, reasonable, and in alignment with CERCLA's goals," *id.* at 47, but without at all assessing the rationality of the Government's "fine line" or fully engaging with the evidence, particularly Dr. Plancich's declaration. This was an abuse of discretion. *See Cannons*, 899 F.2d at 84 (an abuse occurs "when a material factor deserving significant weight is ignored").

A CERCLA settlement for which the Defendants' fair share is equally likely to be over $600 million short as valued at $150 million (but otherwise fatally flawed because it arbitrarily excludes Nokia) can be neither reasonable nor rational. APs that cannot be distinguished from one another cannot be placed on both sides of the "work party" / "cashout settlor" divide. Yet, this is precisely what the CD arbitrarily does.

And, a CERCLA settlement that cannot rationally ensure the Defendants are paying their fair share cannot possibly be in the public interest. In comments submitted when EPA proposed the CD, the PVSC warned that the CD "exposes the *public*, vis-à-vis PVSC and its 48 municipal constituent members which share PVSC's funding obligations . . . , to catastrophic monetary risk." ECF No. 288-16 at 102 (emphasis in original). PVSC, a public entity, *see supra* at 9, is a defendant in pending CERCLA litigation brought by OxyChem (an EPA-designated "work" party) concerning the LPRSA, *21st Century Fox* and *Givaudan*. PVSC and its member municipalities—like Nokia, identified by the Government as ineligible for cashout settlement—bear the risk of shouldering the potentially huge shortfall in the Defendants' settlement payment. Thus, the CD does not "satisfactorily compensate[] the public for the actual (and anticipated) costs of remedial and response measures." *See Cannons*, 899 F.2d at 90.

Further, it is an oft-stated goal of CERCLA to hold responsible parties liable for cleanup costs. *See Tutu Water Wells*, 326 F.3d at 206. The District Court approved a $150 million settlement involving 82 Defendants, including many in the Fortune 500, for an average cost per company of under $2 million, likely far less than their legal costs in this matter. The settlement releases claims by the Government jointly and severally against the Defendants for up to $3.68 billion in cleanup costs. Claims under Section 113 of CERCLA for contribution by Nokia,

the PVSC, and other EPA-designated "work" parties are barred.  *See* ECF No. 283 § 23.  No such settlement, based on an outsourced allocation, the results of which the Government failed to appropriately diligence or defend, can be found to achieve the goal of holding the Defendants responsible for their proper share of cleanup costs.

The District Court so abused its discretion in finding that the CD is "[r]easonable and [f]urthers CERCLA's [g]oals."  ECF No. 393 at 39.

## III.  THE DISTRICT COURT ERRED IN APPROVING A CONSENT DECREE ARISING FROM THE GOVERNMENT'S INDISCRIMINATE ENFORCEMENT STRATEGY.

As detailed above, it is a brute fact that Nokia is *similarly situated* with many, if not all, Defendants.  Yet, the Government disparately classified Nokia as a "work" party, likely subject to joint and several liability for up to $3.53 billion in cleanup costs, and justified the settlement on assigning Nokia a share of responsibility starkly greater than the similarly situated Defendants, collectively and individually.

Although the Government has discretion in determining CERCLA enforcement and settlement strategies, "EPA may not mislead any of the parties, discriminate unfairly, or engage in deceptive practices."  *Cannons*, 899 F.2d at 93.  Indeed, this Court's directive that "[s]ubstantive fairness requires that the terms of the [CERCLA CD] are based on 'comparative fault' and apportion liability 'according to rational estimates of the harm each party has caused,'"  *Tutu Water*

*Wells*, 326 F.3d at 207 (citing *SEPTA*, 235 F.3d at 823), embraces the well-settled view that indiscriminate enforcement is prohibited.

The Constitution's guarantee of equal protection under law under the Fourteenth and Fifth Amendments is violated when federal governmental action treats someone "differently from others similarly situated" with "no rational basis." *Vil. of Willowbrook*, 528 U.S. at 560; *see Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217 (1995) ("Equal protection analysis in the Fifth Amendment area [against the United States] is the same as that under the Fourteenth Amendment." (quoting *Buckley v. Valeo*, 424 U.S. 1, 93 (1976))). "Selectivity in the enforcement of [the] law[ ] . . . is subject to constitutional constraints," even when agencies enjoy considerable statutory discretion. *Wayte v. United States*, 470 U.S. 598, 608 (1985). In knowingly treating Nokia starkly differently than similarly situated Defendants, with no rational basis, the Government defied these principles, and the District Court erred in approving a settlement arising from such conduct.

The arbitrariness of Mr. Batson's tiering of the non-OxyChem APs is clear from the Report, which the Government had in hand long before negotiating this settlement. Yet the Government undiscerningly relied on only the tiers to make the critical classifications of APs into "work" parties versus "cashout" parties, ECF Nos. 307-1 at 8, 288-5 ¶ 54, and, then, compute the $150 million settlement amount intended to recover the Defendants' "fair share" of $3.68 billion in cleanup costs,

ECF No. 288-5 ¶ 58–60.  But, as Dr. Plancich's unrebutted declaration showed, "work" party Nokia is identically situated to at least several, if not all, "cashout-eligible" Defendants, and their differential treatment by the Government has no rational basis.

The Government's conduct toward, and its classification's profound impact on, Nokia substantially injure Nokia's protected interests in Constitutional equality. Nokia is the opposite of a recalcitrant party—one that was offered and rejected a chance to settle with the Government.  For almost twenty years, Nokia has engaged in good faith with EPA to further the investigation and cleanup of the LPRSA, funding and performing such activities alongside many Defendants.  ECF No. 307-1 ¶ 13.  Unlike OxyChem, Nokia fully participated in the outsourced allocation.  *Id.* ¶ 8.  After the Government received the Report, Nokia twice made substantial settlement offers that the Government totally ignored.  *Id.* ¶¶ 9–10.  Instead, the Government held fast to its classification of Nokia—based only on Mr. Batson's flawed tiers—as a "work" party ineligible for a cashout settlement.  Thus, Nokia is in a predicament not of its own making: victim of the Government's obdurate clinging to an arbitrary distinction between Nokia and the Defendants; at risk of joint and several liability for $3.68 billion; and robbed of any right to seek contribution from Defendants for disproportionate liability.

Why would the Government persist in a settlement so obviously flawed that it mustered no opposition to Nokia or Dr. Plancich?  Perhaps it is because the Government bears no risk from an inadequate settlement.  If the settlement fails to recover the Defendants' fair share, the Government simply can hold the remaining few it blocked from the settlement—including Nokia—jointly and severally liable for the shortfall.  *See Pa. Dep't of Env't Prot. v. Trainer Custom Chem., LLC*, 906 F.3d 85, 90 (3d Cir. 2018) ("[d]efendants may be held jointly and severally liable in a [CERCLA] cost recovery action").  Or, perhaps because having spent millions of dollars and three years on the outsourced allocation, ECF Nos. 309-5 at 4–22, 288-5 ¶¶ 34, 47 (leaving it to Mr. Batson alone to determine the APs' distinguishment), the Government could not stomach that Mr. Batson's results cannot support a settlement that meaningfully distinguishes between and among the non-OxyChem APs.

Neither explanation—nor any other advanced by the Government or the Defendants—justifies the District Court's erroneous endorsement of the Government's baseless discrimination, and its critical consequences to Nokia and others.  This is not the law.  Rather, it is an abuse of discretion requiring reversal.

## <u>CONCLUSION</u>

For all these reasons, the Court should reverse the District Court's order granting the Motion to Enter.

Respectfully submitted,

Dated:  July 28, 2025

/s/ Michael D. Lichtenstein
Michael D. Lichtenstein, Esq.
Mark S. Heinzelmann, Esq.
Thomas E. Mesevage, Esq.
Zachary L. Berliner, Esq.
LOWENSTEIN SANDLER LLP
One Lowenstein Drive
Roseland, NJ 07068
(973) 597-2500
*Counsel for Intervenor-Appellant*
*Nokia of America Corporation*

## COMBINED CERTIFICATIONS

In accordance with the Federal Rules of Appellate Procedure and Local Rules of this Court, I hereby certify the following:

1.    I am a member of the Bar of this Court.

2.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts exempted by Fed. R. App. P. 32(f), this brief contains 12,690 words.

3.    This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font in the text and footnotes.

4.    The electronic file containing this brief was scanned for viruses using Microsoft Defender version 1.431.327.0, and no virus was detected.

Dated:  July 28, 2025          By:    */s/ Michael D. Lichtenstein*
                                                Michael D. Lichtenstein

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 28, 2025, a true and correct copy of the foregoing brief was filed with the Clerk using the appellate CM/ECF system.  All counsel of record are registered CM/ECF Filing Users, and service will be accomplished by the CM/ECF system.

Dated:  July 28, 2025              By:    */s/ Michael D. Lichtenstein*
                                                   Michael D. Lichtenstein