Nos. 25-1049 & 25-1272

---

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff/Appellee*,
and
OCCIDENTAL CHEMICAL CORP.,
*Intervenor/Appellant*,
NOKIA OF AMERICA CORP.,
*Intervenor/Appellant*,
v.
ALDEN LEEDS INC, et al.,
*Defendants/Appellees*.

---

Appeal from the United States District Court for the District of New Jersey
No. 2:22-cv-07326 (Hon. Madeline Cox Arleo)

---

**ANSWERING BRIEF FOR APPELLEE UNITED STATES**

---

STANLEY E. WOODWARD, JR.
*Associate Attorney General*

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*

BRIAN C. TOTH
ROBERT P. STOCKMAN
*Attorneys*
U.S. Department of Justice, ENRD
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3275
Robert.Stockman@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iv

GLOSSARY ........................................................................................... viii

INTRODUCTION ...................................................................................... 1

STATEMENT OF JURISDICTION ........................................................... 3

STATEMENT OF THE ISSUES .................................................................. 4

STATEMENT OF THE CASE ..................................................................... 4

    A.    CERCLA ..................................................................................... 4

    B.    Factual background ...................................................................... 6

        1.    Diamond Alkali Superfund Site........................................ 6

        2.    Diamond Alkali/OxyChem ......................................... 10

        3.    Other PRPs and EPA's enforcement efforts ............................ 11

        4.    Negotiations leading to the consent decree.............................. 13

            a.    Phase 1: AlterEcho prepares the Allocation
                Recommendation Report. ............................................ 15

            b.    Phase 2: The United States negotiates the
                settlement. ................................................................ 17

    C.    Proceedings below........................................................................ 21

        1.    The United States accepted comments on the
            proposed consent decree and made changes........................... 21

        2.    The district court reviewed and entered the consent
            decree. ........................................................................ 22

SUMMARY OF ARGUMENT .................................................................... 23

ARGUMENT ....................................................................................25

I.  The Attorney General has statutory authority to enter into this
    consent decree, and it accords with CERCLA. ............................................25

    A.  The Attorney General has statutory authority to file this
        suit and enter into the consent decree independent of
        CERCLA § 122. ..................................................................26

    B.  CERCLA § 122 provides the President with additional,
        *discretionary* settlement procedures. ..................................28

    C.  Subprovisions 122(e)(3)(A) and 122(f) are discretionary
        and inapplicable...................................................................33

        1.  CERCLA § 122(e)(3)(A) provides discretionary
            authority to engage in an NBAR process but does
            not foreclose other approaches....................................33

        2.  CERCLA § 122(f)(1) provides discretionary
            authority, and the limits OxyChem identifies do
            not apply to cashout settlements. ..............................37

II.  The district court did not abuse its discretion in finding that the
     consent decree is fair, reasonable, and consistent with
     CERCLA..................................................................................41

     A.  The consent decree is substantively fair...............................43

         1.  The consent decree reflects a rational estimate of
             the harm caused by the Settling Defendants. ...........44

         2.  There is a rational basis for attributing 85% of the
             comparative fault to OxyChem. ................................48

         3.  The United States had a rational basis for
             distinguishing Nokia. ..............................................52

         4.  The consent decree is rationally related to the harm
             each party has caused in sections of the river it
             covers. ....................................................................57

B.    The consent decree is reasonable and consistent with
CERCLA's goals. ................................................................................ 59

CONCLUSION .................................................................................................. 59

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF
APPELLATE PROCEDURE 32(A) AND LOCAL RULES 28.3 & 31.1

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Components Inc.*,
    66 F.3d 213 (9th Cir. 1995) ............................................................ 31, 34

*ASARCO LLC v. Atl. Richfield Co., LLC*,
    975 F.3d 859 (9th Cir. 2020) ................................................................45

*Bialek v. Mukasey*,
    529 F.3d 1267 (10th Cir. 2008) ............................................................27

*Control Data Corp. v. SCSC Corp.*,
    53 F.3d 930 (8th Cir. 1995) ............................................................ 45, 47

*Daikin Applied Americas Inc. v. EPA*,
    39 F.4th 701 (D.C. Cir. 2022) ................................................................5

*Diamond Shamrock Chemicals Co. v. Aetna Cas. & Sur. Co.*,
    609 A.2d 440 (N.J. Super. Ct. App. Div. 1992) ...................................10

*Dravo Corp. v. Zuber*,
    13 F.3d 1222 (8th Cir. 1994) ................................................................29

*Engquist v. Oregon Dep't of Agr.*,
    553 U.S. 591 (2008).............................................................................57

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    579 U.S. 93 (2016)...............................................................................29

*In re Cuyahoga Equip. Corp.*,
    980 F.2d 110 (2d Cir. 1992)............................................................ 31, 39

*In Re LTC Holdings, Inc.*,
    10 F.4th 177 (3d Cir. 2021) ................................................................42

*In re Tutu Water Wells CERCLA Litig.*,
    326 F.3d 201 (3d Cir. 2003)........................ 4, 34, 41, 42, 44, 45, 46, 52

*Lesende v. Borrero*,
752 F.3d 324 (3d Cir. 2014)........................................................53

*Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Env't Prot.*,
725 F.3d 369 (3d Cir. 2013)........................................................47

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)..................................................................30

*Paek v. Att'y Gen. of the U.S.*,
793 F.3d 330 (3d Cir. 2015).......................................................28

*PG Pub. Co. v. Aichele*,
705 F.3d 91 (3d Cir. 2013).........................................................57

*Startzell v. City of Philadelphia, Pennsylvania*,
533 F.3d 183 (3d Cir. 2008).......................................................57

*Swift & Co. v. United States*,
276 U.S. 311 (1928).................................................................26

*Trinity Indus., Inc. v. Greenlease Holding Co.*,
903 F.3d 333 (3d Cir. 2018).......................................................48

*United States v. Akzo Coatings of Am., Inc.*,
949 F.2d 1409 (6th Cir. 1991) ....................................................39

*United States v. BP Amoco Oil PLC*,
277 F.3d 1012 (8th Cir. 2002) ....................................................48

*United States v. Cannons Eng'g Corp.*,
899 F.2d 79 (1st Cir.1990)...................... 23, 41, 42, 45, 46, 50, 53, 54, 59

*United States v. DiBiase*,
45 F.3d 541 (1st Cir. 1995).......................................................45

*United States v. E.I. Dupont De Nemours & Co. Inc.*,
432 F.3d 161 (3d Cir. 2005)................................................ 5, 6, 41

*United States v. Hercules, Inc.*,
  961 F.2d 796 (8th Cir. 1992) ........................................................... 27, 29, 31, 34

*United States v. Morgan*,
  222 U.S. 274 (1911) ........................................................................................27

*United States v. OxyChem*,
  200 F.3d 143 (3d Cir. 1999)............................................... 5, 6, 31, 40, 44

*United States v. Republic Steel Corp.*,
  362 U.S. 482 (1960) ........................................................................................27

*United States v. Se. Pennsylvania Transp. Auth. (SEPTA)*,
  235 F.3d 817 (3d Cir. 2000)......................................... 34, 39, 40, 41, 44, 45, 46

*United States v. Vertac Chem. Corp.*,
  756 F. Supp. 1215 (E.D. Ark. 1991) ......................................................31

## Statutes

5 U.S.C. §§ 571-84.............................................................................................13
28 U.S.C. § 516.................................................................................. 23, 26, 27
28 U.S.C. § 519.................................................................................................26
28 U.S.C. § 1331 ...............................................................................................3

CERCLA:
  42 U.S.C. § 9604 ...........................................................................................6
  42 U.S.C. § 9607(a) ....................................................................................3, 4
  42 U.S.C. § 9613...........................................................................................1
  42 U.S.C. § 9613(f)........................................................................................5
  42 U.S.C. § 9613(f)(2) ........................................................... 32, 40, 54
  42 U.S.C. § 9615...........................................................................................5
  42 U.S.C. § 9622(a) ............................................................... 26, 28, 29
  42 U.S.C. § 9622(d)(2)................................................................................37
  42 U.S.C. § 9622(e)(2)................................................................................35
  42 U.S.C. § 9622(e)(3)(A) ...................................................... 33, 34, 35
  42 U.S.C. § 9622(e)(3)(B) ..........................................................................36
  42 U.S.C. § 9622(f)(1) ........................................................... 37, 38
  42 U.S.C. § 9622(f)(3) .................................................................................38

## Federal Register

50 Fed. Reg. 5034-01 (February 5, 1985)..................................................38

52 Fed. Reg. 19,919-01 (May 28. 1987).......................................... 35, 38

52 Fed. Reg. 28,038-01 (July 27, 1987) ...............................................38

87 Fed. Reg. 78,038-01 (December 22, 2022).......................................36

# GLOSSARY

| | |
|---|---|
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| COC | Contaminant of Concern |
| EPA | Environmental Protection Agency |
| NBAR | Non-binding Preliminary Allocation of Responsibility under CERCLA § 122(e)(3)(A) |
| NPL | National Priorities List |
| OxyChem | Occidental Chemical Corporation |
| OU | Operable Unit |
| PCBs | Polychlorinated Biphenyls |
| PRPs | Potentially Responsible Parties |
| PSEG | Public Service Electric and Gas Company |
| RI/FS | Remedial Investigation and Feasibility Study |
| SARA | Superfund Amendments and Reauthorization Act of 1986 |

**INTRODUCTION**

This appeal concerns a consent decree that is one part of the Environmental Protection Agency's (EPA's) multi-decade cleanup and enforcement effort for the Diamond Alkali Superfund Site in Newark, New Jersey. Over decades, operators of the Diamond Alkali facility knowingly discharged many hazardous substances into the Passaic River, including highly toxic dioxin. EPA adopted a National Dioxin Strategy in 1983. As a result of this Strategy, in 1983 EPA began investigating and remediating the Site under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Although many other facilities polluted the Passaic River, Diamond Alkali's was the most toxic by far. The geographic extent of the Site and cleanup are defined by the presence of dioxin and other contaminants of concern (COCs) released from Diamond Alkali's facility. Intervenor-Appellant Occidental Chemical Corporation (OxyChem) is the corporate successor to the Diamond Alkali Company, and therefore OxyChem may be held liable for CERCLA response costs flowing from Diamond Alkali's operation of this facility.

But this appeal does not concern OxyChem's liability. Rather, the consent decree at issue resolves CERCLA claims for 82 other parties (the Settling Defendants) for the two parts of the Site that include the Passaic River—Operable Units 2 (OU2) and 4 (OU4). EPA has selected cleanup actions for these parts and

estimated the total past and future costs at $1.89 billion.  Here, based in part on an

allocation conducted by a third-party neutral and in part on EPA's experience with

the Site, EPA concluded the Settling Defendants bear only a relatively minor share

of the responsibility (less than 3.88%) for the harms to OU2 and OU4.  Notably,

EPA repeatedly invited OxyChem to participate in that allocation process, but it

refused.  The United States negotiated a cashout settlement in which the Settling

Defendants agreed to pay $150 million of the cleanup costs, nearly 8% of total

estimated costs.  In exchange, the United States agreed not to sue the Settling

Defendants, who obtained protection from contribution claims by third parties

under CERCLA § 113(f), including non-settlors such as OxyChem, Nokia, and

Pharmacia.

After careful consideration, the district court entered the settlement

agreement as a consent decree.  This Court reviews that entry for an abuse of

discretion.  None occurred.  OxyChem contends that the decree cannot be upheld

because the United States did not use all the procedures laid out CERCLA

§§ 122(e)(3)(A) and 122(f)(1).  But § 122's settlement procedures are optional and

subject to the President's exclusive discretion, as exercised by the Department of

Justice or EPA.  And these two subprovisions in particular provide the President

with discretionary authorities he "may" use when entering certain *cleanup*

settlements; they do not restrict the Attorney General's authority to enter this type of settlement that recovers past and estimated future *costs*.

The consent decree is also fair, reasonable, and consistent with CERCLA's goals. An allocation may consider the degree of toxicity of COCs, and such consideration is particularly reasonable here given that dioxins (and to a lesser extent, polychlorinated biphenyls (PCBs)) overwhelmingly cause the harm and the need for the selected remedies. The allocation indicated OxyChem is responsible for 99.99% of the dioxin, and non-settlors Nokia and Pharmacia were responsible for far more PCBs than the other allocation parties. Given that the Settling Defendants are responsible for about 0.003% of the dioxin and do not include those most responsible for PCBs, the settlement amount reasonably reflects the Settling Defendants' comparative fault and harm they caused.

This Court should affirm.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1345 and 42 U.S.C. §§ 9607(a), 9613(b). The United States concurs in Appellants' statements of appellate jurisdiction.

## STATEMENT OF THE ISSUES

1.     Does CERCLA § 122 provide exclusive and mandatory settlement procedures for the United States to enter into a voluntary cashout settlement with potentially responsible parties?  (OxyChem Issue One)

2.     Did the district court abuse its discretion in finding this consent decree fair, reasonable, and consistent with CERCLA's goals?  (OxyChem Issue Two; Nokia Issues One, Two, and Three)

## STATEMENT OF THE CASE

### A.    CERCLA

CERCLA was enacted to ensure that hazardous waste sites are cleaned up and that those responsible for the disposal of chemical poisons bear the costs for remedying the harm they caused.  *In re Tutu Water Wells CERCLA Litig.*, 326 F.3d 201, 206 (3d Cir. 2003).  Potentially responsible parties (PRPs) include past owners and operators at the time of hazardous waste disposal, present owners and operators of contaminated sites, and those who transported or arranged for the disposal of hazardous waste at the sites.  42 U.S.C. § 9607(a).  Each responsible party is strictly liable for "all" response costs that are "not inconsistent with the national contingency plan."  *Id.* § 9607(a)(4)(A).

Concerned about vast amounts of money being spent on CERCLA litigation, Congress enacted the Superfund Amendments and Reauthorization Act of 1986

(SARA) "to further CERCLA's general policy of encouraging settlement." *United States v. E.I. Dupont De Nemours & Co. Inc.*, 432 F.3d 161, 175 (3d Cir. 2005). SARA added a subsection to CERCLA § 113 establishing that a PRP who has "resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement." 42 U.S.C. § 9613(f). Although non-settling parties may not sue settling parties for contribution, the non-settlors' potential liability to the United States is reduced by the amount of the settlement. *Id.* SARA also added CERCLA § 122, granting the President discretionary authority to enter certain settlements. *Id.* § 9622(a).[1]

CERCLA provides the Executive Branch, often acting through EPA, with "a variety of tools for achieving the efficient and cost-effective cleanup of the nation's hazardous waste sites." *United States v. OxyChem*, 200 F.3d 143, 147 (3d Cir. 1999). CERCLA § 105 authorizes EPA "to establish and revise annually a National Priorities List [(NPL)] of known hazardous waste sites considered high priorities for environmental remediation." *Daikin Applied Americas Inc. v. EPA*,

---

[1]    CERCLA refers to the "President" throughout the statute and authorizes him "to delegate and assign any duties or powers imposed upon or assigned to him." 42 U.S.C. § 9615. The Department of Justice and EPA exercise authority delegated by the President to implement CERCLA and enter settlement agreements resolving CERCLA liability. Executive Order No. 12580 §§ 4(d)(1), 6(a), *reprinted in* 42 U.S.C. § 9615.

39 F.4th 701, 704 (D.C. Cir. 2022).  CERCLA establishes a detailed process to investigate, select, and implement a cleanup plan to protect human health and the environment at each site.  *See* 42 U.S.C. §§ 9604, 9606, 9621.  The government may conduct the cleanup itself, compel or persuade private parties to do so, or litigate to recover the cleanup costs.  *OxyChem*, 200 F.3d at 147; *see also E.I. Dupont*, 432 F.3d at 164-66.  The government also has broad settlement authority; some settlements require PRPs to perform cleanup work, while others are cashout settlements in which a party pays a portion of costs in exchange for a release from liability.  *OxyChem*, 200 F.3d at 147.

## B.    Factual background

### 1.    Diamond Alkali Superfund Site

In 1983, as part of EPA's National Dioxin Strategy, EPA found high levels of dioxin and other hazardous substances at the Diamond Alkali facility and in the Passaic River.  ECF288-5:4.  Because of the dioxin, EPA listed the Site on the NPL in 1984.  *See* ECF288-5:4; ECF288-7:6-7.  In 1987, EPA selected an interim remedy and began remediating the facility, designated as Operable Unit 1 (OU1) of the Site.  ECF288-5:4-7.  OxyChem completed the interim remedy for OU1 in 2004 under a consent decree with the United States.  ECF288-6.

As with all Superfund sites, EPA defines the Site according to the location of hazardous substances, not property lines.  ECF288-7:6.  "The geographic extent

of the Diamond Alkali Site and the cleanup are defined by the presence of dioxin and other [COCs] released from the Diamond Alkali facility."  ECF288-7:6.

The consent decree at issue here involves part of the Site—the Lower Passaic River, comprising both OU2 and OU4.  OU2 is the lower 8.3 miles of the Passaic River, while OU4 covers the 17-mile tidal reach of the Passaic River from Newark Bay upstream to Dundee Dam, including the 8.3 miles making up OU2.  ECF288-5:5; ECF288-9:14 (map).  Because of the river's tidal nature, COCs continually move upstream and downstream throughout the Lower Passaic River; contaminated sediments from various sources are thus commingled and deposited throughout OU4.  ECF288-5:9-10, 37; ECF288-9:5-14.

Because early data showed most contaminated sediment was in the lower 8.3 miles of the river (OU2), EPA conducted an agency-funded Remedial Investigation and Focused Feasibility Study for that area, which showed that 90% of contaminated sediments are found in OU2.  ECF288-5:8-9.  In 2016, EPA selected a remedy for OU2, including, among other things, an engineered cap constructed bank to bank over the river bottom.  ECF288-5:11.  Before the cap is installed, portions of the river must be dredged, with the dredged material disposed of off-site.  ECF288-5:11.  The estimated cost of the OU2 remedy is $1.38 billion.  ECF288-5:37.  In 2021, EPA selected an interim remedy for the upper 9 miles of OU4 involving targeted dredging and capping of "hot spots" with elevated

concentrations of dioxins and PCBs.  ECF288-6:6-8; ECF288-5:12.  The current

estimated cost for OU4 is $441 million.  ECF288-5:37.

Of the COCs at this Site, dioxin (specifically, 2,3,7,8-TCDD) "is the most

toxic by far, and dioxin drives the risks to human health and the environment that

are addressed by the remedies."  ECF288-7:22; *see also* ECF288-7:24-25

(describing dioxin as the "most potent and toxic" for human health "by an

overwhelming margin").  To give a quantitative sense of 2,3,7,8-TCDD dioxin's

toxicity, these are peer-reviewed toxicity factors for dioxin and PCBs:

|  | Human Health Cancer Toxicity Factor | Human Health Non-Cancer Toxicity Factor |
|---|---|---|
| 2,3,7,8-TCDD (dioxin) | 150000 | 0.0000000007 |
| PCBs | 2 | 0.00002 |
|  | Larger number means more carcinogenic. | Smaller number means greater chance of adverse health effect. |

ECF288-7:24-26; ECF289-3:40.  To be clear, PCBs themselves are considered

very toxic, *see, e.g.*, ECF288-7:18-24, so these numbers highlight dioxin's

overwhelming toxicity.  Dioxins alone (without dioxin-like PCBs) are responsible

for 70-82% of the human health cancer risk for OU2.  ECF309-2:70.

Together, dioxin and PCBs contribute *overwhelmingly* more risk than the

other COCs.  For OU2, "[d]ioxins/furans and PCBs contribute more than 98% of

the risk."  ECF288-7:20.  For human cancer risks, "the other COCs contribute a

combined 3% or less" of the risk, and "for human health non-cancer hazards,

dioxin and PCBs combined to contribute more than 96% of the hazard." ECF288-5:34; ECF288-7:20, 29.

Because dioxin presents most of the risk and is so toxic and difficult to clean up, many of EPA's choices during the remedial design were driven by the need to address dioxin, which increased the estimated costs of the remedies. ECF288-4:51-53; ECF288-8:7 ("The risk of COCs was a primary consideration of EPA when evaluating the Site and the corresponding remedial activities."). Because of dioxin's high toxicity, "the cap had to be designed with a high level of conservatism (e.g., the cap will have to be thicker and contain more additives to bind to the COCs to prevent them from breaking through the cap)." ECF288-5:13. Few landfills accept waste with high concentrations of dioxin, so the cost of disposal will likely be higher. ECF288-5:13. Correspondingly, transportation costs may increase, since dredged material may need to be shipped further. ECF288-4:51. And "thermal treatment is the only technology known to be able to treat sediments that contain dioxin," which may be necessary for disposal and could increase remedial costs. ECF288-4:52. Analyzing sediments, water, and biota samples for dioxin, as required by both remedies, is also several times more expensive than testing for other COCs. ECF288-4:52; ECF288-6:13-15.

## 2. Diamond Alkali/OxyChem

OxyChem's corporate predecessor, Diamond Alkali, manufactured pesticides and phenoxy herbicides, including Agent Orange for the Vietnam War, at the Diamond Alkali facility, with dioxin as a byproduct. ECF288-9:6. Despite knowledge of the byproducts' toxic nature, Diamond Alkali intentionally dumped large amounts of its waste into the Passaic River. "[I]t was clear that prior to 1956, all waste products from [Diamond Alkali's] chemical processes were either directly discharged or ultimately released into the Passaic River." *Diamond Shamrock Chemicals Co. v. Aetna Cas. & Sur. Co.*, 609 A.2d 440, 448 (N.J. Super. Ct. App. Div. 1992). While part of the facility was connected to the sewer system in 1956, "not all of the effluent from the plant was directed to that sewer line." *Id.* Ample testimony and documentary evidence confirm that Diamond Alkali discharged substantial amounts of materials containing dioxin and other hazardous substances into the Passaic River, while concealing many of these discharges from inspectors. *E.g.*, ECF289-6:264-79, 303-04 (summarizing evidence). Diamond Alkali's decades-long dumping into the river explains the large amount of dioxin in OU2 and OU4, creating one of the nation's largest, most expensive Superfund sites.

Several investigations "concluded that the Diamond Alkali facility was the dominant source of 2,3,7,8-TCDD." ECF288-9:7 (citing multiple studies). For

example, the highest sediment concentrations are adjacent to the facility.  ECF288-9:6.  Analyses of the concentrations and ratios of dioxins from samples downstream and upstream of the facility corroborated that Diamond Alkali was the dominant source of dioxin.  ECF288-9:12; ECF289-6:303-04.  Thus, "the Lower Passaic River is part of the Site because the areal extent of the dioxin contamination from [the Diamond Alkali facility] extends to the River."  ECF288-4:48; ECF288-7:6-7.

### 3.    Other PRPs and EPA's enforcement efforts

Beginning in the 1990s, EPA worked to identify other facilities that released or potentially released hazardous substances into the river.  ECF288-5:10; ECF289-2:14 (map).  EPA has notified over 100 parties of their potential responsibility under CERCLA § 107(a), and frequently, EPA has investigated parties in response to requests from OxyChem or its indemnitor, which has often provided information to EPA.  ECF288-5:10-11.

Over the decades, EPA has entered into many agreements with OxyChem and other PRPs to perform or fund investigations of OU2 and OU4.  ECF288-5:7-8, 14-15.  EPA has produced volumes of scientific information documenting the extent of contamination in the Lower Passaic River and the risks that it poses to human health and the environment.  ECF288-5:11; *see also* ECF288-6:10-11.  EPA has worked to maximize the funds available for cleaning up the Site by filing

proofs of claims when PRPs file for bankruptcy, as well as reaching administrative cashout settlements with various minor PRPs.  ECF288-5:42.  These funds are deposited into an account for the Site and used to fund response actions; to date, these efforts have recovered over $116 million that will reduce the liability of all other PRPs at the Site.  ECF288-5:42-43.

When a Superfund site like this one involves many PRPs, it may be difficult or impractical for EPA either to litigate with everyone or settle in a manner that allows many or all parties to perform the cleanup.  Often, one or a few PRPs will clean up a site, while other PRPs provide a percentage of financing to support the cleanup or pay a lump sum to cash out their liability for response costs.  Sometimes, PRPs cooperate among themselves to allocate their relative responsibility.  Other times, the PRPs that perform the cleanup pursue other PRPs in contribution settlements or litigation.

Here, EPA selected a remedy for OU2 in March 2016 and then notified 100 parties that they were PRPs for OU2.  ECF288-5:11, 13, 45-70.  EPA determined that an effective and timely cleanup would require determining which parties might perform or finance the work, and which parties might be considered for cashout settlements.  ECF288-5:13.  EPA planned to negotiate with OxyChem and other major PRPs to implement and pay for the OU2 remedy and to identify other parties that might be eligible for a cashout settlement.  ECF288-5:14.

The consent decree at issue here is one product of EPA's efforts to identify parties for cashout settlements. But EPA continues to work on other aspects of its enforcement efforts, including negotiating with OxyChem and other major PRPs to perform and pay for the remedial efforts. OxyChem completed the remedial design for OU2 and is performing the remedial design for OU4 under EPA-issued administrative orders. *See* ECF288-5:14-15. EPA anticipates that remedial actions will begin soon. *See* ECF288-5:14-15. But "[n]o PRP, including [OxyChem], has made an offer to enter into a consent decree to perform the entirety of the OU2 and OU4 remedial actions." ECF288-5:15.

### 4.    Negotiations leading to the consent decree

EPA initiated the process leading to this consent decree, in part, because the PRPs had failed to allocate responsibility among themselves, despite attempts to do so in 2012 and 2015. ECF288-5:72.

To assist EPA and the parties with making decisions regarding potential settlements, EPA sponsored an allocation by a contractor, AlterEcho. ECF288-5:18-20, 72-73, 158-78. In that allocation, a team of specialists, including a third-party neutral (David Batson), performed a site-specific allocation. ECF288-5:18-22. EPA arranged for AlterEcho to conduct the allocation as an alternative dispute resolution process under the Administrative Dispute Resolution Act of 1996, 5 U.S.C. §§ 571-84. ECF288-5:26. The purpose of AlterEcho's allocation was "to

13

provide recommendations regarding the relative shares of responsibility of the parties." ECF288-5:183.

Thus, the AlterEcho Recommendation was the first phase of a two-phase process to obtain future cashout and work-party settlements between EPA and responsible parties. ECF289:7. The second phase involved negotiations between EPA and the parties. ECF289:7. Neither EPA nor any of the parties were bound by AlterEcho's recommended allocation, though EPA committed to using the allocation as a primary factor in future negotiations. ECF289:7; ECF288-5:183. EPA agreed to invite all private PRPs to the allocation process to ensure fairness and transparency. ECF288-5:18; ECF288-5:73, ECF288-5:133.[2]

Participation in the AlterEcho allocation was not mandatory. EPA repeatedly asked OxyChem to participate in that process, but it refused. ECF288-5:23. Nokia participated. ECF289-3:59. The allocation sought to determine the relative share of responsibility among private PRPs EPA had identified (private PRPs which still existed and had received notices of potential liability from EPA), not among all entities who had ever polluted the river. *See* ECF289:7; ECF289-2:46-47.

---

[2]    The Passaic Valley Sewer Commission and several municipalities were not invited to participate in the allocation nor allocated shares of responsibility. ECF288-5:21-22; ECF288-4:73. EPA determined that these public entities "are uniquely positioned to provide in-kind services." ECF288-4:73.

### a. Phase 1: AlterEcho prepares the Allocation Recommendation Report.

EPA provided AlterEcho with about 130,000 pages of documentation about the parties, including materials that OxyChem and parties affiliated with OxyChem had provided to EPA over the years pertaining to most of the other PRPs. ECF288-5:24. The participating parties (including Nokia) also had many opportunities to provide factual information, expert reports, briefing, and comments. ECF288-5:24-25. The allocation considered releases of contaminants to the entire 17 miles of the Lower Passaic River. ECF288-5:37.

AlterEcho provided a numerical ranking of the relative responsibility of the allocation parties, assigning shares of responsibility totaling up to 100%. ECF288-1:24; ECF289:20. To calculate those shares, AlterEcho first assessed how much of each COC each facility discharged directly or indirectly to the river. ECF289:20-32; ECF288-5:20, 28-29.

Some COCs include discharges that could not be attributed to the allocation parties (which AlterEcho termed "orphan shares"). ECF288-5:29; ECF288-8:7. AlterEcho employed two different methods to equitably distribute the unallocated (orphan) shares among the allocation facilities. ECF288-5:29-30. The method relevant here is the "Alternative Method," which distributed the unattributed mass of COCs on a COC-by-COC basis (e.g., a facility was assigned responsibility for unattributed PCBs based on its relative discharges of PCBs). ECF289:29-30;

ECF288-5:29.  The "Protocol Method," on which the United States did not rely, distributed the unallocated shares on a pro rata basis, based on total relative responsibility for all COCs.  ECF288-5:29.

AlterEcho then multiplied each facility's share of each COC by the "relative risk number" for that type of COC.  ECF288-5:30-31, 33-34; ECF289:32-33; ECF289-3:12-52.  AlterEcho developed the relative risk numbers by combining the results of EPA's human health and ecological risk assessments.  ECF288-5:33-34; *see also* ECF288-7:23-26, 29 (explaining risk numbers were consistent with EPA's risk assessments).  The products of these calculations, for each facility, were summed to establish facility base scores.  ECF288-5:31.

AlterEcho then adjusted each facility's base score based on an assessment of culpability and cooperation factors assessed for that party.  ECF289:33-35.

For each party with multiple facilities, AlterEcho summed the adjusted base scores for that party's facilities.  ECF289:35.  Finally, AlterEcho normalized each party's score, so the allocation parties' percentage shares added up to 100%.  ECF289:35.

Based on the results, AlterEcho established relative rankings and tier designations for each allocation party, for both the Alternative and Protocol approaches to distributing unallocated (orphan) shares.  ECF289-19:368-70.  Under both approaches, OxyChem is the sole PRP in tier one.  ECF289-19:369;

ECF289-8:3.  This distribution of responsibility reflects that dioxin is by far the

most toxic of the COCs, and AlterEcho's analysis attributed 99.99% of the dioxin

to OxyChem, 0.003% to Givaudan, and essentially a zero value to four other

parties.  ECF289-9:11.

Under both approaches, Nokia and Pharmacia were in tier two, largely

because they were responsible for the most PCBs; all other ranked parties were in

tiers three, four, or five.  ECF289-19:369; ECF289-8:3.  AlterEcho did not rank

five PRPs because they had not discharged any COCs that reached the river.

ECF289:32, 36.  AlterEcho used tiers in part because the variability of available

data on facilities created uncertainty about "relative numerical share calculations

among and between similarly ranked individual Allocation Parties," with this

uncertainty increasing for those with the least responsibility.  ECF289:36.

This phase of the process concluded in December 2020 when AlterEcho

issued the Allocation Recommendation Report.  ECF288-5:32.

> **b.** **Phase 2: The United States negotiates the settlement.**

Based on a careful review of the AlterEcho Recommendation, the United

States identified parties from tiers three, four, and five that were eligible to

participate in this settlement.  ECF288-5:36.  Some participating allocation parties

chose not to join the settlement, some participating parties were not offered an

opportunity to settle, and one non-participating allocation party joined the

settlement.  ECF288-5:16; ECF288-4:18.  The United States also did not invite

every party identified in tiers three through five to settle; the Public Service

Electric and Gas Company (PSEG) was not invited to settle.  ECF288-10:2.

The United States concluded that the defendants invited to settle,

"individually and collectively, are responsible for a minor share of the response

costs incurred and to be incurred at or in connection with the cleanup of OU2, for

releases from the facilities identified."  ECF288-5:37.  Before negotiating the

settlement's specific terms, the United States decided to extend the settlement to

include OU4.  ECF288-5:37.  The United States did so because, among other

things, the tidal nature of the Passaic River means contaminants are carried up and

down the river, and the AlterEcho allocation considered releases of contaminants

to the entire 17 miles of the river (all of OU4).  ECF288-5:37; *see also infra* Part

II.A.4.

The United States then assessed the total costs on which the settlement

should be based by summing EPA's past costs and the estimated costs for remedial

designs and remedial actions for OU2 and OU4, which totaled to $1.89 billion.

ECF288-5:37.

The United States made several adjustments to the allocation results for

settlement purposes.  The United States adopted the Alternative Method, not the

Protocol Method, for addressing unallocated (orphan) shares, which substantially

increased the Settling Defendants' responsibility and reduced the potential

responsibility of non-settling parties such as OxyChem.  ECF288-5:38.  This

change increased the Settling Defendants' responsibility to about 1.9%.  ECF288-

5:38.  The United States also did not adopt AlterEcho's cooperation and culpability

adjustments due to their subjectivity.  ECF288-5:38.  Removing those factors

maximizes recovery from the Settling Defendants.  ECF288-5:38.  With these

changes, the allocation distribution became:

| Allocation Party | Share |
|---|---|
| OxyChem | 85.07% |
| Nokia and Pharmacia combined | 11.01% |
| Parties invited to settle | 3.88% |

ECF288-5:39.

In the settlement, the United States insisted on a "premium" of 100% for

estimated future remedial costs for both OU2 and OU4 to account for potential cost

overruns.  ECF288-5:39.  The United States also included an additional payment of

about $6 million to account for work remaining under an existing administrative

order.  ECF288-5:39.

After considering all these factors, the United States offered to settle for a

$150 million payment by the Settling Defendants, which they accepted.  ECF288-

5:40.  For comparison, if the United States had calculated the settlement amount by

adding up recommended shares under the Alternative Method and using the same

estimated costs, the Settling Defendants would be paying approximately $36 million.  ECF288-5:40.

Thus, the settlement embodied in the consent decree is not identical to the AlterEcho Recommendation; the recommendation was a starting point.  The funds recovered through this settlement combined with funds already recovered through other settlements and bankruptcy claims would bring the United States' recovery to approximately 14% of the total costs incurred by EPA, plus estimated future costs for OU2 and OU4.  ECF288-5:41.

In exchange for the Settling Defendants' payment, the United States "covenants not to sue or to take administrative action against Settling Defendants under Sections 106 and 107(a) of CERCLA regarding OU2 and OU4," subject to several reservations.  JA62-63.  The consent decree "constitutes a judicially-approved settlement under which each Settling Defendant … resolve[s] liability to the United States within the meaning of Sections 113(f)(2) and 113(f)(3)(B) of CERCLA for OU2 and OU4."  JA65.  Under CERCLA § 113(f), the Settling Defendants are also entitled to "protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA … for the 'matters addressed' in this Consent Decree."  JA65.

### C.    Proceedings below

#### 1.    The United States accepted comments on the proposed consent decree and made changes.

In 2022, the United States lodged the proposed consent decree, published notice in the Federal Register, and provided 90 days for public comment. ECF288-3:2. EPA released over 700,000 pages of documents supporting the settlement, including the Allocation Recommendation Report. ECF288-5:41.

After carefully considering public comments, the United States made certain modifications to the decree, including removing three parties from the settlement and from the Amended Complaint: Kearny Smelting & Refining, Conopco, Inc., and The Sherwin-Williams Company. The United States did so to allow it to further evaluate whether or how to settle with them.

The United States also added a "reopener" provision to account for potential cost overruns. JA63. The United States may seek additional amounts from the Settling Defendants, and other parties could seek contribution, if the combined costs of the remedial actions for OU2 and OU4 exceed $3.68 billion (twice the combined estimated costs). JA63.

After making the changes and obtaining the assent of the Settling Defendants, the United States filed the consent decree with the district court in January 2024. ECF283. The United States also filed a detailed response to comments and explained changes. ECF288-4. The United States moved to enter

the consent decree. OxyChem opposed, and Nokia filed a response that did not request the motion be denied. *See infra* pp.52-53.

### 2. The district court reviewed and entered the consent decree.

The district court considered the parties' filings, rejected OxyChem's many arguments (including those raised on appeal that the decree violated §§ 122(e)(3) and 122(f) and was substantively unfair), and entered the consent decree. JA1-48. The court found the decree is procedurally sound, the parties had not conspired against OxyChem, and no conflict of interest undermined the decree. JA23-28.

The court explained that the consent decree "does not violate the portions of the statute at issue, § 122(e)(3) and § 122(f)." JA31; JA28-34. CERCLA "provides EPA with multiple tools to effectuate its purpose," including authority to enter certain settlements, and the "Attorney General, too, retains authority to enter settlements resolving CERCLA litigation." JA20. The court reasoned that "§ 122 in no way restricts EPA's discretion to utilize alternative methods to apportion responsibility among PRPs. To the contrary, § 122(e)(3)(A) merely states that the President 'may' provide [a nonbinding preliminary allocation of responsibility (NBAR)], not that he or she is required to." JA32. "Accordingly, because the AlterEcho allocation was not an NBAR, it did not need to abide by the strictures of § 122(e)(3)." JA32.

The court also found the decree "complies with § 122(f)(1) because … the [decree] is both in the public interest and expedites response action." JA33. And the court was "satisfied that the [decree] does no violence to § 122(f)(3)." JA33. Because the decree includes numerous reservations of rights and the reopener, "Settling Defendants will not be 'off the hook' for future liability until, at the earliest, both of the OU2 and OU4 remedies have been completed." JA34.

The court found the consent decree is substantively fair, reasonable, and furthers CERCLA's goals. JA34-40. The court considered OxyChem's "highly technical" challenges to the allocation, including that it allegedly underestimated other PRPs' contributions, should not have relied on the relative risks of the COCs, and did not adequately consider dioxin-like PCBs. JA35. But the court concluded the government had "adequately and coherently addressed these arguments." JA35. "'[R]ational (if necessarily imprecise) estimates of how much harm each PRP has done' suffice under CERCLA." JA36 (quoting *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 87 (1st Cir.1990)).

## SUMMARY OF ARGUMENT

1. The Attorney General had authority to file this suit and enter into the consent decree under 28 U.S.C. § 516, independent of CERCLA § 122. Courts will not interpret other statutes to limit the Attorney General's inherent authority to conduct litigation under § 516 absent clear, unambiguous language. CERCLA

§ 122 provides broad discretionary authorities to the President and does not impose any restriction—much less a clear and unambiguous restriction—on the Attorney General's authority; the text of § 122 repeatedly emphasizes the President's "discretion" and that the President "may" use its procedures, not must.

The two subprovisions of CERCLA § 122 cited by OxyChem, 122(e)(3)(A) and 122(f), both state that the President "may" use them, and CERCLA's text describes both as being in the President's "discretion."  Moreover, these subsections consistently state that they govern agreements for response or remedial action, as opposed to cashout settlements such as this one.  And interpreting that language to allow the United States to enter into this type of cashout consent decree finds ample support in the legislative history, CERCLA's purpose of encouraging settlement, and the Executive Branch's contemporaneous, consistent statutory interpretation.

2.    The district court did not abuse its discretion in finding the consent decree fair, reasonable, and consistent with CERCLA.  This Court's review of that finding is highly deferential.  The settlement recovers nearly 8% of total past and estimated future costs for OU2 and OU4 from the Settling Defendants, whom the United States concluded were collectively responsible for a minor share.  That recovery reduces the remaining PRPs' potential liability by a fair amount, and the

United States has provided evidence that the amount reasonably reflects the Settling Defendants' comparative fault for the harm they caused.

Courts have long recognized that cost allocations may consider the degree of toxicity, and such consideration is particularly reasonable here given that dioxins overwhelmingly cause the harm and the need for the selected remedies. The allocation indicated OxyChem is responsible for 99.99% of the dioxin; the United States' review of and adjustments to the allocation distributed an 85% share of the overall comparative fault to OxyChem. The United States could also decide not to settle with Nokia (and Pharmacia) because, among other things, they bear significant responsibility for the PCBs, which drive much of the rest of the harm. As such, the United States reasonably identified those parties as potential work parties and did not invite them to participate in this settlement.

The consent decree is fair, reasonable, and furthers CERCLA's goals. This Court should affirm.

## ARGUMENT

## I.    The Attorney General has statutory authority to enter into this consent decree, and it accords with CERCLA.

OxyChem's brief is heavy on bluster and light on substance. Its lead argument (Br. 31) is that the United States failed to comply with the "procedural requirements" of § 122 for settling CERCLA liability. This is squarely refuted by the statutory text, which makes § 122's procedures optional: The President may

"decide[] not to use the procedures in this section," and "[a] decision of the President to use or not to use the procedures in this section is not subject to judicial review." 42 U.S.C. § 9622(a). That ends the matter. Not only is OxyChem wrong, but its argument is not even subject to judicial review.

For the additional reasons explained below, the United States has plenary authority to settle legal liability through settlement agreements, and § 122 imposes no relevant limit on that authority. This Court reviews that statutory interpretation question *de novo.*

### A.    The Attorney General has statutory authority to file this suit and enter into the consent decree independent of CERCLA § 122.

Congress has long vested the Attorney General with plenary authority to "conduct … litigation" on behalf of the United States, "[e]xcept as otherwise authorized by law." 28 U.S.C. § 516; *see also* 28 U.S.C. § 519. This includes the authority to enter into consent decrees and settlements. *Swift & Co. v. United States*, 276 U.S. 311, 331-32 (1928). In *Swift*, the Supreme Court rejected arguments that the Attorney General had agreed to a consent decree beyond the limits of his authority under the relevant substantive statute, because the Court did "not find in the statutes defining the power and duties of the Attorney General any such limitation on the exercise of his discretion." *Id.* at 331.

*Swift* is grounded in a broader, well-established principle that courts will not interpret statutes to restrict the Attorney General's authority to conduct litigation absent "clear and unambiguous" language.  *See, e.g.*, *United States v. Morgan*, 222 U.S. 274, 281-82 (1911) (holding that statute imposing procedural requirements on agency before referring matters for enforcement did not restrict district attorney's general powers to bring cases absent a "clear and unambiguous expression").  The "Attorney General by virtue of his office may bring" suits to enforce federal law, and "no statute is necessary to authorize the suit." *United States v. Republic Steel Corp.*, 362 U.S. 482, 492 (1960) (citation omitted).  In particular, the Court will not interpret a substantive statute's provision of certain, specific powers to implicitly limit the Attorney General's broad authority to enforce the law.  *See id.* (rejecting argument that because the relevant substantive statute authorized injunctive suits to remove "structures," it limited the Attorney General's authority to pursue injunctive suits seeking to remove "obstructions" under that statute).

Thus, the Courts of Appeals have consistently recognized that the "statutory authority of the Attorney General to control litigation is not diminished without a clear and unambiguous directive from Congress." *United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir. 1992); *see also, e.g.*, *Bialek v. Mukasey*, 529 F.3d 1267, 1270-71 (10th Cir. 2008).  The Attorney General's authority under 28 U.S.C. § 516 thus includes authority to file this suit and execute the consent decree.

**B.    CERCLA § 122 provides the President with additional,
*discretionary* settlement procedures.**

OxyChem contends (Br. 31-38) that the consent decree violates CERCLA

§§ 122(e)(3)(A) and 122(f).  But OxyChem ignores the obvious, discretionary

language in the statute; whistles past the jurisdiction-stripping provision; and then

inserts its own broad, mandatory language before isolated statutory phrases.  The

correct interpretation of statutory language depends on the "statutory context in

which that language is used and the broader context of the statute as a whole as

well as the language itself."  *Paek v. Att'y Gen. of the U.S.*, 793 F.3d 330, 333-34

(3d Cir. 2015) (citation omitted).  In context, CERCLA § 122 grants broad

discretionary authority to enter into certain settlements without restricting the

United States' ability to enter into others.  Even within the scope of § 122, the

choice of what settlement procedures to use rests exclusively with the President.

Further, on their face, the two subprovisions at issue merely provide *discretionary*

authority and are inapplicable to this cashout consent decree.  They do not

restrict—much less clearly and unambiguously restrict—the government's ability

to enter into the consent decree.

**1.** CERCLA § 122(a) explicitly grants the President *discretionary* authority

to enter into settlements under that section and expressly forecloses judicial review

of his decision whether to use the procedures set forth in § 122.  42 U.S.C.

§ 9622(a).  "The President, in his *discretion*, *may* enter into an agreement with any

person … to perform any response action." *Id.* (emphases added).  "[T]he 'word "may" clearly connotes discretion.'" *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103 (2016) (citation omitted).

Lest there be any doubt, § 122(a) states that the President may "decide[] not to use the procedures in this section" and provides that a "decision of the President to use or not to use the procedures in this section is not subject to judicial review." 42 U.S.C. § 9622(a).  Congress chose the language in § 122(a) to ensure that "the decision of the President to undertake the settlement procedures set forth in this section is discretionary."  H.R. Rep. No. 99-962, at 252 (1986) (Conf. Rep.).  The Conference "modified the language of section 122(a) to clarify this intent." *Id.* Thus, at the outset, OxyChem's arguments that isolated phrases in § 122 limit the Attorney General's ability to enter into this consent decree are foreclosed by § 122(a)'s plain language, as confirmed by its legislative history. *See Dravo Corp. v. Zuber*, 13 F.3d 1222, 1227-28 (8th Cir. 1994) (finding Congress had not authorized review of certain aspects of § 122 compliance).

As the Eighth Circuit explained in *Hercules*, § 122 "is an affirmative grant of settlement authority as opposed to any limitation on the power of the Attorney General to settle litigation."  961 F.2d at 800.  "The President delegated authority to act under § 122 to 'the heads of the Executive departments and agencies' with the concurrence of the Attorney General." *Id.* (citing Executive Order No. 12580

§ 4(b)(1)).  "Notwithstanding this delegation of authority to act under § 122, however, the President reserved responsibility for the 'conduct and control of all litigation arising under the Act' to the Attorney General."  *Id.* (quoting Executive Order No. 12580 § 6(a)).  As revealed by the quoted Executive Order, the government's contemporaneous, consistent interpretation has been that CERCLA § 122 does not limit the Attorney General's authority to conduct or settle litigation. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) (explaining that contemporaneous, consistent Executive Branch interpretations "may be especially useful in determining the statute's meaning").

2.  Even if § 122 were mandatory, and even if § 122 did not expressly preclude judicial review, § 122 does not govern the type of cashout settlement entered here.  Section 122 authorizes and provides procedures for several kinds of settlements that are not presented here, including:

- settlements to perform a response action, *i.e.*, to do investigation or cleanup work (Subsections 122(a)-(f));

- *de minimis* settlements with parties who added minimal pollution to the site (Subsection 122(g));

- administrative cost-recovery settlements, *i.e.*, EPA settlements in an administrative forum (Subsection 122(h)).

As *Hercules* explained, "[s]ubsections (a) through (f) of CERCLA § 122 …

consistently refer to agreements for actual remedial action as opposed to

agreements for the recovery of costs occasioned by environmental damage."  961

F.2d at 799.[3]  Other Circuits have agreed that certain subprovisions of § 122 do not

govern settlements to recover costs, like this one.  *See Arizona v. Components Inc.*,

66 F.3d 213, 216-17 (9th Cir. 1995); *In re Cuyahoga Equip. Corp.*, 980 F.2d 110,

116 (2d Cir. 1992) (recognizing that cost-recovery settlement is not governed by

§ 122(d)'s provisions regarding "consent decrees for remedial cleanup actions").

 "Reading the statute as a whole, it contemplates different types of

settlements," and reading § 122's subprovisions as universally applicable would

render several provisions redundant or inconsistent.  *See Hercules*, 961 F.2d at

799.  "[B]ecause CERCLA § 122(a)-(f) inclusive do not apply to a cost recovery

settlement, those provisions cannot be said to contain any clear and unambiguous

limitation on the Attorney General's plenary ability to enter into settlements of cost

recovery litigation."  *Id*.  This Court has also recognized the distinction between

settlements for remedial work and "'cash out' settlements" under CERCLA's

various subprovisions.  *See OxyChem*, 200 F.3d at 148.

---

[3] OxyChem attempts (Br. 41) to distinguish *Hercules* on the grounds that the
consent decree only resolved CERCLA § 107 claims.  Incorrect.  That decree
settled "[a]ll civil claims" under CERCLA.  *United States v. Vertac Chem. Corp.*,
756 F. Supp. 1215, 1224 (E.D. Ark. 1991).

CERCLA's broader text and structure confirm that § 122 does not govern all issues relating to CERCLA settlement. Many other provisions of CERCLA address settlement and provide authority separate from § 122. Most notably, the contribution protection underlying OxyChem's objections to this settlement is found in CERCLA § 113(f)(2), *not* § 122. 42 U.S.C. § 9613(f)(2). Section 113(f)(2) is also entitled "Settlement," turns on settlements, and is not contingent on the settlement's meeting § 122's discretionary provisions. *Id.* CERCLA § 117(c)(3) acknowledges that some CERCLA consent decrees are entered into under provisions other than § 122. *See id.* § 9617(c)(3) (explaining that the President must publish an explanation in certain circumstances "if any settlement or consent decree under section 9606 of this title *or* section 9622 of this title is entered into" (emphasis added)); *see also id.* § 9621(f)(2)(C).

As explained next, neither §§ 122(e)(3)(A) nor 122(f) apply to cashout or cost-recovery settlements. OxyChem's arguments contradict the statutory text and are also impracticable. They would greatly constrain the United States' current approach to settling CERCLA claims, increasing litigation, delaying cleanups, and frustrating the goals of CERCLA.

### C. Subprovisions 122(e)(3)(A) and 122(f) are discretionary and inapplicable.

#### 1. CERCLA § 122(e)(3)(A) provides discretionary authority to engage in an NBAR process but does not foreclose other approaches.

Subprovision 122(e)(3)(A) states that: "[w]hen it would expedite settlements under this section *and remedial action*, the President *may* … provide a nonbinding preliminary allocation of responsibility." 42 U.S.C. § 9622(e)(3)(A) (emphases added).[4] This provision creates a discretionary process for a § 122(e)(3)(A) nonbinding preliminary allocation of responsibility (NBAR), but on its face does not mandate this process for all settlements or sweep broadly across all negotiations. The "may" conveys discretion, and that discretion is confirmed later in subsection 122(e), which refers to situations "[w]here the President, *in his discretion*, has provided [an NBAR]." *Id.* § 9622(e)(3)(E) (emphasis added). The Conference Report confirms that "[t]he President's decision to prepare or not prepare [an NBAR] at a facility is discretionary and therefore not subject to citizens suits or judicial review." H.R. Rep. No. 99-962, at 253 (1986).

OxyChem insists (Br. 33) that this provision regarding NBARs must cover "any" "nonbinding preliminary allocation of responsibility," but tellingly, the word "any" is absent from the statute, and nothing in the text suggests that this

---

[4]    OxyChem's quote (Br. 42) cuts off "and remedial action," but the full text matters.

subprovision imposes sweeping mandates or restrictions.  As the district court stated, OxyChem's insistence to the contrary "rel[ies] primarily on its own say-so." JA31.  Moreover, the introduction to the NBAR subprovision expressly states that these NBAR procedures relate to settlements for "remedial action," not cost recovery or cashout settlements like the one under review.  42 U.S.C. § 9622(e)(3)(A); *Hercules*, 961 F.2d at 799; *see also Arizona*, 66 F.3d at 216-17 (agreeing with *Hercules* that § 122(e)(3)(A) would not apply to cost-recovery).

OxyChem's argument is breathtaking if one considers the words that are reflected in the acronym NBAR.  *Anytime* the government is considering settlement in a situation where more than one party bears some responsibility for a problem, the government appropriately considers how "responsibility" should be "allocated," and given the nature of settlement negotiations, such consideration will inherently be both "nonbinding" and "preliminary."

As explained in Part II, this Court has recognized that the United States may negotiate consent decrees based on "comparative fault," and the courts have consistently upheld decrees if they were based on "rational estimates of the harm each party has caused."  *Tutu*, 326 F.3d at 207 (quoting *United States v. Se. Pennsylvania Transp. Auth. (SEPTA)*, 235 F.3d 817, 823 (3d Cir. 2000)). Producing such assessments of comparative fault involves the government's allocating responsibility, but the government often has not proceeded under the

§ 122(e)(3)(A) NBAR process.  This makes sense because nothing in
§ 122(e)(3)(A) suggests Congress intended that subprovision to govern every
settlement involving multiple parties or foreclose other approaches to alternative
dispute resolution.

The AlterEcho Recommendation was not an NBAR as set forth in
§ 122(e)(3)(A).  When EPA sent notices of potential liability in 2016, EPA stated
that it had "decided not to use the 'special notice' procedures of Section 122(e)."
ECF288-5:48.  As relevant here, EPA explained that negotiations would focus on
the opportunity for a "cash-out settlement."  ECF288-5:48.  Further, as the district
court explained, "what OxyChem casts as procedural infirmities [in the AlterEcho
Recommendation] are better viewed as indicia that the allocation was not, in fact,
an NBAR."  JA31.  The AlterEcho Recommendation differed from an NBAR in
many ways, including that it "was performed by a third-party neutral, not EPA, …
and began after EPA completed the [Remedial Investigation and Feasibility Study
(RI/FS)] … for OU2."  JA32.  In contrast, EPA's NBAR Guidance, in part
reflecting the statutory language that NBARs seek to expedite remedial
settlements, provides that NBARs "will normally be prepared during the RI/FS."
52 Fed. Reg. 19,919-01 (May 28, 1987); *see also* 42 U.S.C. § 9622(e)(2).  EPA
may also provide an "NBAR" with numerical, percentage results of the total costs
*without details*.  *See* 42 U.S.C. § 9622(e)(3)(A); 52 Fed. Reg. at 19,921 ("EPA will

not provide a detailed explanation for the results."). In contrast, the AlterEcho Recommendation synthesized extensive information and compiled a massive, detailed record.

Factually, OxyChem's implication (Br. 39) that the consent decree here depended on §§ 122(e)(3)(A) or 122(f) mischaracterizes the decree. OxyChem states that the "consent decree repeatedly refers to §122: It includes covenants not to sue pursuant to §122(f)." Br. 39 (citing ¶¶ 13-14). But the cited paragraphs of the consent decree do *not* refer to § 122—and certainly not § 122(f) specifically. JA62.[5] The decree's substantive terms refer to § 122 only twice, and neither reference indicates that the Attorney General was relying on § 122 for authority to settle, much less on the textual subprovisions OxyChem insists apply. JA66, JA70. First, the Settling Defendants certify full compliance "with any and all EPA requests for information" under a variety of authorities, including "122(e) of CERCLA." JA66. The subprovision of § 122(e) authorizing the President to request information is not limited to the NBAR process in 122(e)(3)(A) and can be used "for otherwise implementing this section," so the decree's mention of this subprovision does not implicitly indicate use of an NBAR process. 42 U.S.C. § 9622(e)(3)(B). Second, the decree states it will be lodged with the court for

---

[5]    The notice announcing the public comment period for the consent decree also does not refer to § 122. 87 Fed. Reg. 78,710-01 (Dec. 22, 2022).

public notice-and-comment "in accordance with Section 122(d)(2)." JA70. The United States is not foreclosed from, as a matter of policy, choosing to hold notice-and-comment consistent with § 122(d)(2) on other types of agreements, even though it is not required under the plain language of 42 U.S.C. § 9622(d)(2).

Section 122(e)(3)(A) did not require the United States to prepare an NBAR, and it did not foreclose this alternative approach to negotiating a settlement. Because the AlterEcho Recommendation is not a § 122(e)(3)(A) NBAR, it does not violate the subprovision governing such an NBAR.

### 2. CERCLA § 122(f)(1) provides discretionary authority, and the limits OxyChem identifies do not apply to cashout settlements.

As with § 122(e)(3)(A), the text of § 122(f)(1) provides discretionary authority and does not address cashout or cost-recovery settlements. Section 122(f)(1) is titled "discretionary covenants" and states: the "President *may*, in his *discretion*, provide any person with a covenant not to sue concerning any liability … resulting from a release or threatened release of a hazardous substance addressed by a *remedial action, whether that action is onsite or offsite*," if certain conditions are met, including that the "person is in full compliance with a consent decree … for *response*" and the "*response* action has been approved." 42 U.S.C. § 9622(f)(1) (emphases added). Thus, § 122(f)(1) expressly provides *discretionary*

authority, and it does not limit the Attorney General's pre-existing authority to provide settlors with covenants not to sue.

Again, OxyChem's argument would have sweeping implications. Covenants not to sue are a longstanding aspect of settlements; these covenants have historically been used to allow a party to settle with one or some parties without releasing all other, non-settling parties. *See, e.g.*, RESTATEMENT (SECOND) OF TORTS § 885(2) & Reporters Note (1979); *see also* 50 Fed. Reg. 5034-01, 5040 (Feb. 5, 1985) (explaining that "covenants not to sue" are the appropriate way to draft a release clause for CERCLA, published before § 122's enactment).

As with § 122(e)(3)(A), the language of §§ 122(f)(1) and (f)(3) addresses consent decrees for "remedial action" or "response action." 42 U.S.C. § 9622(f)(1), (f)(3). As this settlement is for costs and not for a response or remedial action, it is not governed by these subprovisions. Section 122(f)(3) is particularly inapposite because it provides that a "covenant not to sue concerning *future* liability to the United States shall not take effect until the President certifies that *remedial action has been completed* …." 42 U.S.C. § 9622(f)(3) (emphases added). Thus, § 122(f)(3) does not apply to *present* liability for remedial actions or to removal actions, as relevant here. *See* 52 Fed. Reg. 28,038-01, 28,040 (July 27, 1987) (describing difference between present and future liability). And Congress enacted this requirement against the backdrop of existing EPA guidance that such

covenants should generally become effective "upon the completion of the cleanup

(or phase of cleanup)," "[w]here the cleanup is to be performed by the PRPs," 50

Fed. Reg. at 5040, *i.e.*, in cleanup settlements.

The cleanup/cashout distinction is not just formalism; it makes sense.  The

aspects of § 122(f) that OxyChem faults this decree for lacking are designed for

decrees requiring response work that are unnecessary for a cashout or cost-

recovery settlement.  Section 122(f)(1) and (3)'s language about requiring the

cleanup to be "approved" or "completed" makes sense for cleanup settlements

because only when the cleanup is complete will it be clear the settlors have

fulfilled their obligations under the decree.  Here, when the Settling Defendants

complete their payment in this cashout settlement, they will have performed their

obligations under the consent decree (assuming they have provided complete and

accurate information).  JA62, JA66; *see also Cuyahoga Equip.*, 980 F.2d at 116

(distinguishing cost-recovery from cleanup activities because the latter "require

ongoing court supervision").  And even cleanup decrees have been upheld when

"written to ensure that the covenant not to sue takes effect only when defendants

have completed *their* work" and the only outstanding phases of cleanup lie with

other parties.  *See United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1452

(6th Cir. 1991); *see also SEPTA*, 235 F.3d at 821 (upholding contribution

protection for entire site even though settling parties agreed to provide remedies for only portion of site and reimburse certain response costs).

OxyChem's proposed interpretation of § 122(f)(1) and (f)(3) would also conflict with CERCLA § 113(f)(2) and (3). Sections 113(f)(3) and (3) expressly contemplate that the United States may enter settlements resolving a party's liability where the United States may "obtain[] less than complete relief" and the settlor may "resolve[] its liability" for only "*some* or all of a response action or for *some* or all of the *costs* of [a response] action." 42 U.S.C. § 9613(f)(2), (3) (emphases added). Section 113(f) still provides such settlors with protection from contribution claims and allows them to pursue their own suits for contribution even for partially completed actions. *Id.*[6] OxyChem does not (and cannot) explain how such settlors could "resolve" their liability to the United States if the government were foreclosed from agreeing not to sue them until all remedial action is complete.

OxyChem's argument would practically mean that the government could never include a "covenant not to sue" in a cashout or cost-recovery settlement unless *all* remedial actions were completed. *But see SEPTA*, 235 F.3d at 825

---

[6]    As here (Br. 7-8), OxyChem has long complained that § 113(f)'s contribution protections unfairly disfavor non-settlors, but this Court has explained that they reflect a "deliberate policy choice made by Congress." *OxyChem*, 200 F.3d at 150 n.8.

(reasoning that "uncertainty [about future costs] should not be used to hinder settlement"). No court has reached that conclusion, and Congress would have included clear and unambiguous language had it intended such a rule.

*    *    *

Reading §§ 122(e)(3)(A) and 122(f) in the context of CERCLA as a whole, they provide discretionary authorities and do not impose mandatory requirements on cashout consent decrees. Congress enacted the Superfund Amendments and Reauthorization Act of 1986 (SARA), which added § 122, "to further CERCLA's general policy of encouraging settlement." *E.I. Dupont*, 432 F.3d at 175. This purpose supports reading these provisions to allow the United States to negotiate this consent decree. The Court should not impose restrictions *contrary* to Congress' purpose based on OxyChem's garbled reading and policy disagreements with Congress' decision to provide contribution protection for early settlors under § 113(f).

## II.    The district court did not abuse its discretion in finding that the consent decree is fair, reasonable, and consistent with CERCLA.

This Court "review[s] a district court's decision to grant a motion for entry of a consent decree for abuse of discretion." *SEPTA*, 235 F.3d at 822; *see also Tutu*, 326 F.3d at 207. "[A] district court's approval of a consent decree in CERCLA litigation" receives two layers of deference. *SEPTA*, 235 F.3d at 822 (quoting *Cannons*, 899 F.2d at 84). "The first layer is the deference the district

41

court owes to EPA's expertise and to the law's policy of encouraging settlement; the second layer is the deference we owe to the district court's discretion." *Id.* (citing *Cannons,* 899 F.2d at 84). "CERCLA favors fair and efficient settlements through consent decrees." *Tutu*, 326 F.3d at 209.

"A court should approve a consent decree if it is fair, reasonable, and consistent with CERCLA's goals," assessing both procedural and substantive considerations. *Tutu*, 326 F.3d at 207.

"Procedural fairness requires that settlement negotiations take place at arm's length," and the court "look[s] to the negotiation process and attempt[s] to gauge its candor, openness and bargaining balance." *Id.* (quoting *Cannons,* 899 F.2d at 86). The negotiations leading to this consent decree were procedurally fair. JA23-29. On appeal, neither OxyChem nor Nokia develop any argument that the consent decree violated procedural fairness (aside from the statutory arguments discussed in Part I), and thus such arguments are forfeited. *In Re LTC Holdings, Inc.*, 10 F.4th 177, 181 n.1 (3d Cir. 2021) (treating undeveloped arguments as forfeited).

The consent decree is also substantively fair. As explained below, the district court followed precedent, thoroughly considered the arguments, and did not abuse its discretion. JA21-47. OxyChem's argument (Br. 44-46) that the district court did not exercise its discretion is misplaced; CERCLA does not require a court to exhaustively rebut, point-by-point, an objector's every argument, particularly

when the objector offers a scattershot of factual objections with little development while citing thousands of pages, all adding up to little.

### A.    The consent decree is substantively fair.

As a preliminary point, this Court is reviewing the district court's review of the substantive fairness of the consent decree, *not* the AlterEcho Recommendation. *See* JA36.  This distinction matters because the consent decree "recovers nearly 8% of total estimated past and future costs for OU2 and OU4."  ECF288-5:41.  The United States' negotiations were based on its analysis of and adjustments to the allocation, resulting in the conclusion that the Settling Defendants were equitably responsible for 3.88% of the costs; the United States then negotiated a 100% premium.  ECF288-5:38.  The United States concluded that "the Settling Defendants, individually and collectively, are responsible for a minor share of the response costs," ECF-288-5:37, and thus the settlement captures their fair share of responsibility, ECF-288-5:41.  Appellants prefer to flyspeck the recommended allocation, and OxyChem (*e.g.*, Br. 29, 43) repeatedly criticizes as unfair the allocation's supposed conclusion that it should bear 99.9% of the costs.  But the consent decree does not reflect such a conclusion: the question presented is whether the consent decree's recovery of nearly 8% of the total estimated costs for OU2 and OU4 from these Settling Defendants was substantively fair, *i.e.*, reasonably reflects their comparative fault.

Before addressing the details, none of Appellants' arguments establish that the Settling Defendants bear more than an 8% share of the comparative fault, much less that the United States could not reasonably *settle* for an 8% recovery. While the decree does, in fact, reflect the Settling Defendants' fair share, "settlement requires compromise. Thus, it makes sense for the government, when negotiating, to give a [PRP] a discount on its maximum potential liability as an incentive to settle." *Tutu*, 326 F.3d at 208 (quoting *SEPTA*, 235 F.3d at 824).

Moreover, OxyChem made a choice not to participate in the non-binding AlterEcho process and thus to forgo the opportunity to present arguments about the relative weight assigned to factors, the degree of toxicity of contaminants, and other factual issues. As this Court has held, "non-settling defendants may bear disproportionate liability for their acts." *Id.* (quoting *OxyChem,* 200 F.3d at 150 n.8). CERCLA "contemplates that those who are slow to settle ought to bear the risk of paying more." *Id.* (quoting *SEPTA,* 235 F.3d at 824). And a party that declines to raise arguments at the appropriate time often faces adverse consequences from that choice; that is not unfair.

### 1. The consent decree reflects a rational estimate of the harm caused by the Settling Defendants.

OxyChem's argument (Br. 48-50) that a consent decree cannot be based, in part, on the toxicity and health risks of the COCs (and thus the parties' relative responsibility for the harm they caused) is incorrect and foreclosed by precedent.

In *Tutu*, this Court held that "[s]ubstantive fairness requires that the terms of the consent decree are based on '*comparative fault*' and apportion liability 'according to rational estimates of the *harm each party has caused*.'"  326 F.3d at 207 (emphases added) (quoting *SEPTA,* 235 F.3d at 823).  "Substantive fairness introduces into the equation concepts of corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *Cannons*, 899 F.2d at 87.  OxyChem does not (and cannot) identify precedent or any provision of CERCLA foreclosing the United States from considering in settlement the relative responsibility for harms caused, including the far greater harms caused by overwhelmingly more toxic substances like dioxin.  And courts allocating response costs under CERCLA have long considered "the degree of toxicity of the hazardous waste" as a factor, when appropriate.  *See, e.g.*, *Control Data Corp. v. SCSC Corp.*, 53 F.3d 930, 935 (8th Cir. 1995); *see also ASARCO LLC v. Atl. Richfield Co., LLC*, 975 F.3d 859, 870 (9th Cir. 2020).

As recognized in *Cannons*, "[t]here is no universally correct approach" to "how comparative fault is to be measured."  899 F.2d at 87; *United States v. DiBiase*, 45 F.3d 541, 546 (1st Cir. 1995) ("There is no litmus test for it and no one allocation that will, in a CERCLA case, comprise the only fair allocation."). Rather, EPA's formula or scheme for comparing fault "should be upheld so long as the agency supplies a plausible explanation for it, welding some reasonable linkage

between the factors it includes in its formula or scheme and the proportionate shares of the settling PRPs." *Cannons*, 899 F.2d at 87.  Agreeing with *Cannons*, this Court recognized that as "long as the measure of comparative fault on which the settlement terms are based is not 'arbitrary, capricious, and devoid of a rational basis,' the district court should uphold it." *SEPTA*, 235 F.3d at 824 (quoting *Cannons*, 899 F.2d at 87).  "The relevant standard, after all, is not whether the settlement is one which the court itself might have fashioned." *Tutu*, 326 F.3d at 209 (quoting *Cannons*, 899 F.2d at 84).

Here, the Site was identified and listed because of dioxin, dioxin overwhelmingly drives the risks and harms at this Site, and it influenced the remedial design in ways that increase the costs.  *See supra* pp.6-9.  Thus, the United States reasonably relied on the substantially greater toxicity of dioxin in assessing comparative harm.  As the United States' expert, Wittenbrink, explained: the "reliance on risk (*i.e.*, toxicity) is consistent with allocation factors applied at other sites," ECF288-8:3, and the "allocation process used at the Site is consistent with allocation processes used at other sites," ECF288-8:4.  Responding to OxyChem's comments, Wittenbrink explained that an approach giving all COCs "equal weighting" would "not reflect actual differences in how COCs impact the overall consideration of Site remedy and Site risk."  ECF288-8:8.

CERCLA's text does not specify which factors to consider in equitably allocating costs among responsible parties. *See Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Env't Prot.*, 725 F.3d 369, 387 (3d Cir. 2013). Judicial allocations under CERCLA often consider "the degree of toxicity of the hazardous waste involved" as a potential factor. *See, e.g.*, *id.* Considering degree of toxicity makes eminent sense. As with dioxin here, *see supra* p.9, a more toxic substance often "influence[s] the design and construction of the remediation system," logically increasing costs. *Control Data*, 53 F.3d at 938. And "CERCLA, in the allocation stage, places the costs of response on those responsible for creating the hazardous condition. Allocating responsibility based partially on toxicity does just that because those who release substances that are more toxic are more responsible for the hazardous condition." *Id.* Just as courts can reasonably consider toxicity and relative risk when allocating costs, the United States reasonably considered the greater toxicity of dioxins (and, to a lesser extent, PCBs) at this Site for settlement purposes.

OxyChem's central premise is a supposed "rule that cost-recovery settlements must assign liability based on responsibility for response costs" (Br. 48), rather than using toxicity in assessing harm caused. Because toxicity can affect costs as here, this is a false dichotomy. Furthermore, OxyChem's only support for that "rule"—which again is its central theory on appeal—is an

inapposite footnote in a single case, *Trinity Indus., Inc. v. Greenlease Holding Co.*, 903 F.3d 333, n.20 (3d Cir. 2018). *Trinity* did not review a district court's entry of a consent decree, and it never addressed whether relative risk and degree of toxicity can be used as a primary factor in allocation. *Trinity* involved a site on land with "many impact areas and remediation activities with varying costs," *id.* at 358, and the Court's findings would have allowed it to "differentiate between major remediation activities," *id.* at 359 n.20. That is irrelevant here because, as explained *infra* in Part II.A.4, the COCs are dispersed and commingled throughout OU2 and OU4, so neither the harm nor costs can be reasonably allocated in that way.

### 2. There is a rational basis for attributing 85% of the comparative fault to OxyChem.

When negotiating this settlement, EPA used an approach reflecting an appropriate share of responsibility for the Settling Defendants. While this approach, as applied to OxyChem, allocates to it 85.07% of the responsibility, ECF288-5:30, the allocation is not binding on OxyChem. OxyChem's high share of responsibility, as explained *supra* at pp.6-11, 16-17, is due to dioxin releases that drive most of the risks at this Site, and 99.99% of the dioxin can be attributed to OxyChem. ECF288-8:11; *see United States v. BP Amoco Oil PLC*, 277 F.3d 1012, 1020 (8th Cir. 2002) (affirming consent decree that "assigned complete

responsibility for the [volatile organic chemicals]-related costs" to the entity responsible for those chemicals).

When OxyChem objected to that attribution to argue the Settling Defendants' payment is insufficient, the United States considered and responded to those objections. ECF288-8:9-13. OxyChem identified (Br. 52) one alleged mathematical error in the AlterEcho process, related to the mass of dioxin contributed by the former Diamond Alkali facility. But, as Wittenbrink explained, even OxyChem's alternative dioxin mass calculation, "do[es] not materially alter the Alternative Allocation results because OxyChem's estimated mass of dioxin released is substantially larger than other [allocation parties]." ECF288-8:13. Even under OxyChem's estimate, OxyChem, among the allocation parties, would be responsible for at least 99.838% of the dioxin. ECF288-8:11-13.

On appeal, OxyChem asserts (Br. 53) that Givaudan is responsible for more dioxin than AlterEcho attributed to it. OxyChem's brief ignores the detailed responses that the United States has already provided on this issue. ECF288-4:55-56, 107-10. In short, "the supporting data in the allocation" support the conclusion that Givaudan and other facilities "contributed miniscule amounts of dioxin compared to" Diamond Alkali. ECF288-4:55. AlterEcho's conclusion that Diamond Alkali released large amounts of dioxin is consistent with the facility's

history and the record and certainly satisfies rational basis review given the double deference required.  ECF288-4:55.

Similarly, the United States' conclusion that dioxin drives most of the risk finds ample support in the record, and the consent decree reasonably reflects the risks of PCBs, including dioxin-like PCBs.  OxyChem insists (Br. 50-52) that AlterEcho's allocation was flawed because it did not separately analyze dioxin-like PCBs from other PCBs.  But AlterEcho did not distinguish them because "[t]he vast majority of PCB concentration data available to the allocator was in terms of PCB Aroclor mixtures, which does not allow for evaluation of dioxin-like PCBs."  ECF288-7:28.  The allocator could not have derived estimates of dioxin-like PCB concentrations from PCB Aroclor data without introducing a high level of uncertainty into the allocation results.  OxyChem does not (and cannot) contend that precise data about dioxin-like PCBs was collected over the decades and thus available for each PRP.  "[I]t would disserve a principal end of the statute— achievement of prompt settlement and a concomitant head start on response activities—to leave matters in limbo until more precise information was amassed." *Cannons*, 899 F.2d at 88.  Where the comparative fault assessment "falls along the broad spectrum of plausible approximations, judicial intrusion is unwarranted." *Id.*

Additionally, AlterEcho's assessment of the risks from PCBs is generally consistent with EPA's risk assessments for OU2 and OU4, which *did* consider

dioxin-like PCBs because EPA had overseen the collection of the data for those assessments. ECF288-4:63-64; ECF288-7:29; ECF288-7:18, 27-28. Thus, the United States could rationally rely on AlterEcho's assessment of PCB risks, given limitations in the available historical data. And the United States did not settle with Nokia or Pharmacia in part because, among the allocation parties, they were responsible for most of the PCBs. ECF288-4:59.

OxyChem does not (and cannot) develop any argument that the United States lacked a rational basis for concluding: (1) OxyChem was responsible for the vast majority of the dioxin, *see* ECF288-9:7; ECF288-8:11, and (2) of all the COCs in the Lower Passaic River, dioxin is overwhelmingly the most toxic, driving the risks to human health and the environment addressed by the remedies, ECF288-7:22. OxyChem's high comparative fault flows from those facts.

OxyChem's further nits (Br. 54-55) are not persuasive and ignore the United States' responses. For example, the United States responded to OxyChem's concerns (Br. 54) about the assessment of some of PPG Industries' potential discharges (of copper, lead, and mercury) in the early 1900s and explained that they would increase PPG's base score from 0.0004 to only 0.003, ECF288-4:116-17; ECF288-5:35-36, 185-86, which did not change PPG's eligibility to settle.

Similarly, the allocation concluded that Benjamin Moore had discharged a relatively small portion of the PCBs; the United States reviewed the data in

response to OxyChem's concerns and did not find a basis to change the result.

ECF288-4:97, 101. On appeal, OxyChem appears to argue (Br. 54) that the United

States should have presumed that Benjamin Moore's large, ongoing operations

involving PCBs resulted in large discharges of PCBs to the Passaic River, but the

United States is not required to presume parties have polluted based solely on their

production levels. In its own words, OxyChem's failure to engage with (or even

acknowledge) the United States' substantive responses to its concerns "goes on and

on." *E.g.*, *compare* Br. 54-55, *with* ECF288-4:122-24 (addressing testimony about

STWB); ECF288-4:103-104 (addressing EnPro/Crucible Steel).

In sum, OxyChem has "not met [its] 'heavy burden' to demonstrate a

'meaningful error in judgment' by the District Court." *Tutu*, 326 F.3d at 208.

### 3. The United States had a rational basis for distinguishing Nokia.

Many of Nokia's arguments on appeal are forfeited or waived. When

commenting on the consent decree in 2023, Nokia was part of a group submitting

"joint comments in support of the proposed CERCLA Consent Decree." ECF288-

10:2. That comment states: "Nokia and Pharmacia support the settlement."

ECF288-10:17 n.95. The comment argued that the Settling Defendants had

"agreed to an aggregate settlement to address their COC contributions to the River

that *far* exceeds their actual responsibility, by any reasonable measure." ECF288-

10:19. Later, Nokia filed a "response" to the motion to enter the consent decree,

but it did not ask the court to deny the motion.  ECF307.  To the extent it asked for a remedy, it stated that "the United States should be compelled to … sit down with Nokia" and "engage in good-faith negotiations."  ECF307:38.  While Nokia argued that "the United States's exclusion of Nokia from the Proposed [consent decree] is both arbitrary and irrational," ECF307:23, it failed to develop any argument that the Settling Defendants were not paying their fair share.[7]

Nokia thus forfeited the arguments it now asserts that (*e.g.*, Br. 5, 49) the settlement value is "arbitrary" or has "no basis" or that (Br. 34) the Settling Defendants "are paying far too little."  *See Lesende v. Borrero*, 752 F.3d 324, 334 (3d Cir. 2014) (holding inadequate presentation to district court waives issue). Nokia also forfeited arguments that (Br. 51-57) the decree violates the Constitution or is not in the public interest.  The issue Nokia preserved is whether the United States had a rational basis for executing this settlement with these Settling Defendants and not Nokia.

Legally, nothing in CERCLA required the United States to include non-settling PRPs in its negotiations, nor to reach a settlement with all PRPs at once. *See Cannons*, 899 F.2d at 93.  "Under the SARA Amendments, the right to draw

---

[7]    After the United States filed its reply, Nokia filed a letter supporting a motion in limine (ECF350), another on a supplemental authority (ECF366), and another requesting a case management conference (ECF379).  These letters gesture at arguments Nokia now raises, but a party does not preserve arguments on the merits by burying them in post-briefing letters on other issues.

fine lines, and to structure the order and pace of settlement negotiations to suit, is an agency prerogative.… So long as it operates in good faith, the EPA is at liberty to negotiate and settle with whomever it chooses." *Id.* As explained above, the Settling Defendants are paying their fair share of the past and estimated future costs. Thus, the settlement is fair to all the non-settling PRPs (including Nokia) because it reduces their overall potential liability by an amount that is more than adequate. 42 U.S.C. § 9613(f)(2).

Moreover, the United States had a rational basis for distinguishing Nokia (and Pharmacia) from the Settling Defendants and for declining to include them in this settlement. Under the "Alternative Method" of the AlterEcho Recommendation, the parties in tiers one and two each received shares of relative responsibility above 1%, whereas the share of each party in tiers three through five falls below 1%. ECF289-8:3. It is rational to draw a distinction between those with relative shares under 1% from those over 1%. *See, e.g.*, *Cannons*, 899 F.2d at 86 (upholding "separating minor and major players" based on a "1% cutoff point"). And as revealed by the United States' decision not to offer to settle with all parties under 1% (the settlement does not include PSEG), the United States considered comparative fault beyond just the tiers, using the AlterEcho Recommendation as a starting point.

While Nokia focuses (*e.g.*, Br. 20-26, 39-49) on the rankings and tiers, the tiers were not the entirety of the analysis.  They reflect (among other things) that Nokia was responsible for *far more* PCBs than any other allocation party.  The data computation sheets for each analyzed facility include the estimates of each COC contributed by each allocation party; here are the amounts for the four allocation parties with the most PCBs:

| Allocation Party | COC Historic CMass of PCBs (kg) |
|---|---|
| Nokia | 112.18 |
| Pharmacia | 62.5 |
| Hexcel | 9.12 |
| ISP Chemicals | 5.34 |

ECF289-13:69-71; ECF289-14:11-13, 83-85; ECF289-15:48-50; *see also* ECF289-6:223-44 (Nokia facility sheets).  Thus, Nokia contributed far more PCBs than any other PRP in the allocation.  After dioxin, PCBs contribute the most harm and drive the risks addressed by the remedies.  ECF288-5:33-34; ECF288-6:7-8; ECF288-7:19-25.  "[T]he rest of the COCs contribut[e] less risk by an order of magnitude (or more) than dioxin and PCBs."  ECF288-7:29.  Given that Nokia bore substantially more responsibility for PCBs than the Settling Defendants, the United States's different treatment of Nokia was rational.

Nokia relies (Br. 42-49) on a declaration that it did not provide during the comment period on the consent decree.  Given Nokia's failure to provide it earlier, this Court should reject Nokia's complaints (Br. 46) that the government did not

respond to it.  Nor can the district court be faulted for providing little analysis when Nokia did not object to entry of the decree or contend that the declaration provided a basis for denying it.  JA19 ("Nokia … primarily bemoan[s] the Government's failure to settle with [it].").  The court correctly addressed Nokia's arguments made below.  JA44-47.

Nokia's declaration attempts (Br. 43) to repackage as a "sensitivity" analysis or an "adjustment" of an "estimate" what is fundamentally an evidentiary objection that AlterEcho already considered and rejected.  Because of wide variation in sampling data for each facility, AlterEcho calculated the amount of PCB contamination through the overland pathway (the allocation parties' primary pathway for PCBs) based on the single sample for each facility that AlterEcho determined to be the most appropriate to represent the contamination at that facility, rather than averaging sampling data.  ECF288-4:77; ECF289:22-23.  The AlterEcho Recommendation considered the available PCB data at the Nokia facility, ECF289-6:223-224, and Nokia does not identify flaws in the sample selection.  Rather, Nokia would prefer that, instead of selecting the most representative sample, AlterEcho had produced a "geometric mean" of all the samples for each site.  ECF307-3:2-7.  But Nokia's Brief does not develop any argument that such an approach would be more accurate or would solve the

inevitable data gaps when dealing with variable data collection over many decades, much less demonstrate that the chosen approach was irrational.

Finally, Nokia's constitutional arguments are meritless.  Nokia contends (Br. 54) that the United States' settling with other parties is selective enforcement that treats it unfairly based on a class of one theory under the Equal Protection Clause.  But a "class of one" theory cannot be extended to the type of inherently discretionary, individualized decisions made in CERCLA settlements.  *Cf. Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 602-04 (2008) (reasoning that "class of one" does not extend to certain state actions which by their nature involve discretionary decisionmaking); *see also PG Pub. Co. v. Aichele*, 705 F.3d 91, 115 (3d Cir. 2013) (holding "selective enforcement" requires "an element of intentional or purposeful discrimination") (citation omitted).  In any event, for Nokia's argument to succeed, the parties must be "similarly situated" and "alike 'in all relevant aspects.'"  *Startzell v. City of Philadelphia, Pennsylvania*, 533 F.3d 183, 203 (3d Cir. 2008) (citation omitted).  As discussed above, Nokia was not the same as the Settling Defendants in all relevant aspects; among other things, it was responsible for more PCBs.

### 4.    The consent decree is rationally related to the harm each party has caused in sections of the river it covers.

The United States reasonably decided to settle claims for both OU2 and OU4 in exchange for the Settling Defendants paying their fair share based on the

costs for OU2 and OU4.  *See* ECF288-5:37; ECF288-4:85-88.  The district court concluded the United States had provided a "'plausible explanation'" for "the Government's well-considered choice to extend the [consent decree] to OU4." JA37 (citation omitted).  Because the Lower Passaic River (OU4, which includes OU2) is tidal, COCs are transported both up and down the river, and COCs introduced anywhere in the stretch of OU4 come to be found throughout OU4 ECF288-9:8-12.  As a result, "COC-contaminated sediments from various sources are now commingled and deposited throughout the 17-mile Lower Passaic River." ECF288-5:10.  "[T]he harm at OU2 and OU4 of [the] Site is indivisible and cannot be apportioned."  ECF288-4:46.

The AlterEcho Recommendation "considered releases of contaminants to the 17-mile Lower Passaic River [*i.e.*, OU4]," ECF288-5:37, and it considered facilities alongside both OU2 and OU4.  ECF288-4:85-88; ECF289-14 (map).  Its estimates of responsibility for the COCs in the river thus form a rational basis for assessing comparative fault for both OU2 and OU4.  OxyChem insists (*e.g.*, Br. 59) that AlterEcho "never considered" OU4, but OxyChem does not (and cannot) identify what additional, material information needed to be considered to allocate the *fault* for COCs in OU4.

Certainly, OU2 and the rest of OU4 differ in some respects, and therefore different remedies are appropriate.  ECF288-9.  But the settlement reflects those

differences because the United States based the settlement amount on the estimated costs of the remedies selected for OU2 and OU4. Tidal forces have spread COCs throughout the river, thereby rendering fault alike for both OU2 and OU4.

### B.    The consent decree is reasonable and consistent with CERCLA's goals.

For the reasons discussed above, the district court did not abuse its discretion in finding that this consent decree "is reasonable and furthers CERCLA's goals." JA39-40. The decree also serves the public interest. The decree "extracts $150 million from Settling Parties—a sum significantly more than their estimated liability for the decided upon remedial action—that will be immediately available for cleanup efforts." JA39. It allows reopening for potential cost overruns, JA63; ECF288-5:38, and contains carefully crafted reservations of rights, JA62-63. As a result, the decree ensures "the public is 'satisfactorily compensate[d] … for the actual (and anticipated) costs of remedial and response measures.'" JA39 (quoting *Cannons*, 899 F.2d at 90).

## CONCLUSION

The district court's judgment should be affirmed.

Respectfully submitted,

/s/ *Robert P. Stockman*

STANLEY E. WOODWARD, JR.
*Associate Attorney General*

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*

ROBERT N. STANDER
*Deputy Assistant Attorney General*

BRIAN C. TOTH
ROBERT P. STOCKMAN
*Attorneys*
U.S. Department of Justice, ENRD
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3275
Robert.Stockman@usdoj.gov
MD Bar 0712120314

October 27, 2025
90-11-3-07683/17

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(A) AND LOCAL RULES 28.3 & 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 12,997 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 2016 version of Microsoft Word in 14-point Times New Roman.

Under Local Rule 28.3(d), I certify that as counsel representing the United States, this Court does not require that I be a member of the bar of this Court.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Microsoft Defender Antivirus (version 1.435.539.0) has been run on the file containing the electronic version of this brief and no viruses have been detected.

Dated: October 27, 2025            */s/ Robert P. Stockman*
                                   Robert P. Stockman

**CERTIFICATE OF SERVICE**

I hereby certify that on October 27, 2025, I electronically filed the foregoing using the Court's CM/ECF system.  All counsel of record are registered CM/ECF Filing Users, and service will be accomplished by the CM/ECF system.

<u>/s/ Robert P. Stockman</u>

# ADDENDUM

CERCLA § 122, 42 U.S.C. § 9622. ........................................................... 1a

CERCLA § 113, 42 U.S.C. § 9613 .......................................................... 8a

(C) Nothing in this section precludes, and the court shall not enjoin, the Federal agency from taking any remedial action unrelated to or not inconsistent with such standard, requirement, criteria, or limitation.

(Pub. L. 96–510, title I, § 121, as added Pub. L. 99–499, title I, § 121(a), Oct. 17, 1986, 100 Stat. 1672.)

#### REFERENCES IN TEXT

The Solid Waste Disposal Act, referred to in subsecs. (b)(1)(B) and (d)(2)(A)(i), (3)(B), is title II of Pub. L. 89–272, Oct. 20, 1965, 79 Stat. 997, as amended generally by Pub. L. 94–580, § 2, Oct. 21, 1976, 90 Stat. 2795, which is classified generally to chapter 82 (§ 6901 et seq.) of this title. Subtitle C of the Solid Waste Disposal Act is classified generally to subchapter III (§ 6921 et seq.) of chapter 82 of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6901 of this title and Tables.

This chapter, referred to in subsecs. (d)(1) and (e)(2), was in the original "this Act", meaning Pub. L. 96–510, Dec. 11, 1980, 94 Stat. 2767, known as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 9601 of this title and Tables.

The Toxic Substances Control Act, referred to in subsec. (d)(2)(A)(i), (3), is Pub. L. 94–469, Oct. 11, 1976, 90 Stat. 2003, which is classified generally to chapter 53 (§ 2601 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 2601 of Title 15 and Tables.

The Safe Drinking Water Act, referred to in subsec. (d)(2)(A), is title XIV of act July 1, 1944, as added Dec. 16, 1974, Pub. L. 93–523, § 2(a), 88 Stat. 1660, which is classified generally to subchapter XII (§ 300f et seq.) of chapter 6A of this title. For complete classification of this Act to the Code, see Short Title note set out under section 201 of this title and Tables.

The Clean Air Act, referred to in subsec. (d)(2)(A)(i), is act July 14, 1955, ch. 360, 69 Stat. 322, which is classified generally to chapter 85 (§ 7401 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 7401 of this title and Tables.

The Clean Water Act, referred to in subsec. (d)(2)(A)(i), (B)(i), is act June 30, 1948, ch. 758, as amended generally by Pub. L. 92–500, § 2, Oct. 18, 1972, 86 Stat. 816, also known as the Federal Water Pollution Control Act, which is classified generally to chapter 26 (§ 1251 et seq.) of Title 33, Navigation and Navigable Waters. For complete classification of this Act to the Code, see Short Title note set out under section 1251 of Title 33 and Tables.

The Marine Protection, Research and Sanctuaries Act, referred to in subsec. (d)(2)(A)(i), probably means the Marine Protection, Research and Sanctuaries Act of 1972, Pub. L. 92–532, Oct. 23, 1972, 86 Stat. 1052, which enacted chapters 32 (§ 1431 et seq.) and 32A (§ 1447 et seq.) of Title 16, Conservation, and chapters 27 (§ 1401 et seq.) and 41 (§ 2801 et seq.) of Title 33. For complete classification of this Act to the Code, see Short Title note set out under section 1401 of Title 33 and Tables.

#### EFFECTIVE DATE

Pub. L. 99–499, title I, § 121(b), Oct. 17, 1986, 100 Stat. 1678, provided that: "With respect to section 121 of CERCLA [this section], as added by this section—

"(1) The requirements of section 121 of CERCLA shall not apply to any remedial action for which the Record of Decision (hereinafter in this section referred to as the 'ROD') was signed, or the consent decree was lodged, before date of enactment [Oct. 17, 1986].

"(2) If the ROD was signed, or the consent decree lodged, within the 30-day period immediately following enactment of the Act [Oct. 17, 1986], the Administrator shall certify in writing that the portion of the remedial action covered by the ROD or consent decree com-

plies to the maximum extent practicable with section 121 of CERCLA.

Any ROD signed before enactment of this Act [Oct. 17, 1986] and reopened after enactment of this Act to modify or supplement the selection of remedy shall be subject to the requirements of section 121 of CERCLA.''

#### TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of provisions of law requiring submittal to Congress of any annual, semiannual, or other regular periodic report listed in House Document No. 103–7 (in which the report under subsec. (c) of this section appears to be the report listed as the 15th item on page 20), see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance.

### § 9622. Settlements

#### (a) Authority to enter into agreements

The President, in his discretion, may enter into an agreement with any person (including the owner or operator of the facility from which a release or substantial threat of release emanates, or any other potentially responsible person), to perform any response action (including any action described in section 9604(b) of this title) if the President determines that such action will be done properly by such person. Whenever practicable and in the public interest, as determined by the President, the President shall act to facilitate agreements under this section that are in the public interest and consistent with the National Contingency Plan in order to expedite effective remedial actions and minimize litigation. If the President decides not to use the procedures in this section, the President shall notify in writing potentially responsible parties at the facility of such decision and the reasons why use of the procedures is inappropriate. A decision of the President to use or not to use the procedures in this section is not subject to judicial review.

#### (b) Agreements with potentially responsible parties

##### (1) Mixed funding

An agreement under this section may provide that the President will reimburse the parties to the agreement from the Fund, with interest, for certain costs of actions under the agreement that the parties have agreed to perform but which the President has agreed to finance. In any case in which the President provides such reimbursement, the President shall make all reasonable efforts to recover the amount of such reimbursement under section 9607 of this title or under other relevant authorities.

##### (2) Reviewability

The President's decisions regarding the availability of fund financing under this subsection shall not be subject to judicial review under subsection (d).

##### (3) Retention of funds

If, as part of any agreement, the President will be carrying out any action and the parties will be paying amounts to the President, the President may, notwithstanding any other provision of law, retain and use such amounts for purposes of carrying out the agreement.

##### (4) Future obligation of Fund

In the case of a completed remedial action pursuant to an agreement described in para-

graph (1), the Fund shall be subject to an obligation for subsequent remedial actions at the same facility but only to the extent that such subsequent actions are necessary by reason of the failure of the original remedial action. Such obligation shall be in a proportion equal to, but not exceeding, the proportion contributed by the Fund for the original remedial action. The Fund's obligation for such future remedial action may be met through Fund expenditures or through payment, following settlement or enforcement action, by parties who were not signatories to the original agreement.

### (c) Effect of agreement

#### (1) Liability

Whenever the President has entered into an agreement under this section, the liability to the United States under this chapter of each party to the agreement, including any future liability to the United States, arising from the release or threatened release that is the subject of the agreement shall be limited as provided in the agreement pursuant to a covenant not to sue in accordance with subsection (f). A covenant not to sue may provide that future liability to the United States of a settling potentially responsible party under the agreement may be limited to the same proportion as that established in the original settlement agreement. Nothing in this section shall limit or otherwise affect the authority of any court to review in the consent decree process under subsection (d) any covenant not to sue contained in an agreement under this section. In determining the extent to which the liability of parties to an agreement shall be limited pursuant to a covenant not to sue, the President shall be guided by the principle that a more complete covenant not to sue shall be provided for a more permanent remedy undertaken by such parties.

#### (2) Actions against other persons

If an agreement has been entered into under this section, the President may take any action under section 9606 of this title against any person who is not a party to the agreement, once the period for submitting a proposal under subsection (e)(2)(B) has expired. Nothing in this section shall be construed to affect either of the following:

(A) The liability of any person under section 9606 or 9607 of this title with respect to any costs or damages which are not included in the agreement.

(B) The authority of the President to maintain an action under this chapter against any person who is not a party to the agreement.

### (d) Enforcement

#### (1) Cleanup agreements

##### (A) Consent decree

Whenever the President enters into an agreement under this section with any potentially responsible party with respect to remedial action under section 9606 of this title, following approval of the agreement by the Attorney General, except as otherwise provided in the case of certain administrative settlements referred to in subsection (g), the agreement shall be entered in the appropriate United States dis-

trict court as a consent decree. The President need not make any finding regarding an imminent and substantial endangerment to the public health or the environment in connection with any such agreement or consent decree.

##### (B) Effect

The entry of any consent decree under this subsection shall not be construed to be an acknowledgment by the parties that the release or threatened release concerned constitutes an imminent and substantial endangerment to the public health or welfare or the environment. Except as otherwise provided in the Federal Rules of Evidence, the participation by any party in the process under this section shall not be considered an admission of liability for any purpose, and the fact of such participation shall not be admissible in any judicial or administrative proceeding, including a subsequent proceeding under this section.

##### (C) Structure

The President may fashion a consent decree so that the entering of such decree and compliance with such decree or with any determination or agreement made pursuant to this section shall not be considered an admission of liability for any purpose.

#### (2) Public participation

##### (A) Filing of proposed judgment

At least 30 days before a final judgment is entered under paragraph (1), the proposed judgment shall be filed with the court.

##### (B) Opportunity for comment

The Attorney General shall provide an opportunity to persons who are not named as parties to the action to comment on the proposed judgment before its entry by the court as a final judgment. The Attorney General shall consider, and file with the court, any written comments, views, or allegations relating to the proposed judgment. The Attorney General may withdraw or withhold its consent to the proposed judgment if the comments, views, and allegations concerning the judgment disclose facts or considerations which indicate that the proposed judgment is inappropriate, improper, or inadequate.

#### (3) 9604(b) agreements

Whenever the President enters into an agreement under this section with any potentially responsible party with respect to action under section 9604(b) of this title, the President shall issue an order or enter into a decree setting forth the obligations of such party. The United States district court for the district in which the release or threatened release occurs may enforce such order or decree.

### (e) Special notice procedures

#### (1) Notice

Whenever the President determines that a period of negotiation under this subsection would facilitate an agreement with potentially responsible parties for taking response action (including any action described in section 9604(b) of this title) and would expedite remedial action, the President shall so notify all such parties

and shall provide them with information concerning each of the following:

(A) The names and addresses of potentially responsible parties (including owners and operators and other persons referred to in section 9607(a) of this title), to the extent such information is available.

(B) To the extent such information is available, the volume and nature of substances contributed by each potentially responsible party identified at the facility.

(C) A ranking by volume of the substances at the facility, to the extent such information is available.

The President shall make the information referred to in this paragraph available in advance of notice under this paragraph upon the request of a potentially responsible party in accordance with procedures provided by the President. The provisions of subsection (e) of section 9604 of this title regarding protection of confidential information apply to information provided under this paragraph. Disclosure of information generated by the President under this section to persons other than the Congress, or any duly authorized Committee thereof, is subject to other privileges or protections provided by law, including (but not limited to) those applicable to attorney work product. Nothing contained in this paragraph or in other provisions of this chapter shall be construed, interpreted, or applied to diminish the required disclosure of information under other provisions of this or other Federal or State laws.

**(2) Negotiation**

**(A) Moratorium**

Except as provided in this subsection, the President may not commence action under section 9604(a) of this title or take any action under section 9606 of this title for 120 days after providing notice and information under this subsection with respect to such action. Except as provided in this subsection, the President may not commence a remedial investigation and feasibility study under section 9604(b) of this title for 90 days after providing notice and information under this subsection with respect to such action. The President may commence any additional studies or investigations authorized under section 9604(b) of this title, including remedial design, during the negotiation period.

**(B) Proposals**

Persons receiving notice and information under paragraph (1) of this subsection with respect to action under section 9606 of this title shall have 60 days from the date of receipt of such notice to make a proposal to the President for undertaking or financing the action under section 9606 of this title. Persons receiving notice and information under paragraph (1) of this subsection with respect to action under section 9604(b) of this title shall have 60 days from the date of receipt of such notice to make a proposal to the President for undertaking or financing the action under section 9604(b) of this title.

**(C) Additional parties**

If an additional potentially responsible party is identified during the negotiation period or after an agreement has been entered into under this subsection concerning a release or threatened release, the President may bring the additional party into the negotiation or enter into a separate agreement with such party.

**(3) Preliminary allocation of responsibility**

**(A) In general**

The President shall develop guidelines for preparing nonbinding preliminary allocations of responsibility. In developing these guidelines the President may include such factors as the President considers relevant, such as: volume, toxicity, mobility, strength of evidence, ability to pay, litigative risks, public interest considerations, precedential value, and inequities and aggravating factors. When it would expedite settlements under this section and remedial action, the President may, after completion of the remedial investigation and feasibility study, provide a nonbinding preliminary allocation of responsibility which allocates percentages of the total cost of response among potentially responsible parties at the facility.

**(B) Collection of information**

To collect information necessary or appropriate for performing the allocation under subparagraph (A) or for otherwise implementing this section, the President may by subpoena require the attendance and testimony of witnesses and the production of reports, papers, documents, answers to questions, and other information that the President deems necessary. Witnesses shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In the event of contumacy or failure or refusal of any person to obey any such subpoena, any district court of the United States in which venue is proper shall have jurisdiction to order any such person to comply with such subpoena. Any failure to obey such an order of the court is punishable by the court as a contempt thereof.

**(C) Effect**

The nonbinding preliminary allocation of responsibility shall not be admissible as evidence in any proceeding, and no court shall have jurisdiction to review the nonbinding preliminary allocation of responsibility. The nonbinding preliminary allocation of responsibility shall not constitute an apportionment or other statement on the divisibility of harm or causation.

**(D) Costs**

The costs incurred by the President in producing the nonbinding preliminary allocation of responsibility shall be reimbursed by the potentially responsible parties whose offer is accepted by the President. Where an offer under this section is not accepted, such costs shall be considered costs of response.

**(E) Decision to reject offer**

Where the President, in his discretion, has provided a nonbinding preliminary allocation of responsibility and the potentially responsible parties have made a substantial offer pro-

viding for response to the President which he rejects, the reasons for the rejection shall be provided in a written explanation. The President's decision to reject such an offer shall not be subject to judicial review.

**(4) Failure to propose**

If the President determines that a good faith proposal for undertaking or financing action under section 9606 of this title has not been submitted within 60 days of the provision of notice pursuant to this subsection, the President may thereafter commence action under section 9604(a) of this title or take an action against any person under section 9606 of this title. If the President determines that a good faith proposal for undertaking or financing action under section 9604(b) of this title has not been submitted within 60 days after the provision of notice pursuant to this subsection, the President may thereafter commence action under section 9604(b) of this title.

**(5) Significant threats**

Nothing in this subsection shall limit the President's authority to undertake response or enforcement action regarding a significant threat to public health or the environment within the negotiation period established by this subsection.

**(6) Inconsistent response action**

When either the President, or a potentially responsible party pursuant to an administrative order or consent decree under this chapter, has initiated a remedial investigation and feasibility study for a particular facility under this chapter, no potentially responsible party may undertake any remedial action at the facility unless such remedial action has been authorized by the President.

**(f) Covenant not to sue**

**(1) Discretionary covenants**

The President may, in his discretion, provide any person with a covenant not to sue concerning any liability to the United States under this chapter, including future liability, resulting from a release or threatened release of a hazardous substance addressed by a remedial action, whether that action is onsite or offsite, if each of the following conditions is met:

(A) The covenant not to sue is in the public interest.

(B) The covenant not to sue would expedite response action consistent with the National Contingency Plan under section 9605 of this title.

(C) The person is in full compliance with a consent decree under section 9606 of this title (including a consent decree entered into in accordance with this section) for response to the release or threatened release concerned.

(D) The response action has been approved by the President.

**(2) Special covenants not to sue**

In the case of any person to whom the President is authorized under paragraph (1) of this subsection to provide a covenant not to sue, for the portion of remedial action—

(A) which involves the transport and secure disposition offsite of hazardous substances in a facility meeting the requirements of sections 6924(c), (d), (e), (f), (g), (m), (o), (p), (u), and (v) and 6925(c) of this title, where the President has rejected a proposed remedial action that is consistent with the National Contingency Plan that does not include such offsite disposition and has thereafter required offsite disposition; or

(B) which involves the treatment of hazardous substances so as to destroy, eliminate, or permanently immobilize the hazardous constituents of such substances, such that, in the judgment of the President, the substances no longer present any current or currently foreseeable future significant risk to public health, welfare or the environment, no byproduct of the treatment or destruction process presents any significant hazard to public health, welfare or the environment, and all byproducts are themselves treated, destroyed, or contained in a manner which assures that such byproducts do not present any current or currently foreseeable future significant risk to public health, welfare or the environment,

the President shall provide such person with a covenant not to sue with respect to future liability to the United States under this chapter for a future release or threatened release of hazardous substances from such facility, and a person provided such covenant not to sue shall not be liable to the United States under section 9606 or 9607 of this title with respect to such release or threatened release at a future time.

**(3) Requirement that remedial action be completed**

A covenant not to sue concerning future liability to the United States shall not take effect until the President certifies that remedial action has been completed in accordance with the requirements of this chapter at the facility that is the subject of such covenant.

**(4) Factors**

In assessing the appropriateness of a covenant not to sue under paragraph (1) and any condition to be included in a covenant not to sue under paragraph (1) or (2), the President shall consider whether the covenant or condition is in the public interest on the basis of such factors as the following:

(A) The effectiveness and reliability of the remedy, in light of the other alternative remedies considered for the facility concerned.

(B) The nature of the risks remaining at the facility.

(C) The extent to which performance standards are included in the order or decree.

(D) The extent to which the response action provides a complete remedy for the facility, including a reduction in the hazardous nature of the substances at the facility.

(E) The extent to which the technology used in the response action is demonstrated to be effective.

(F) Whether the Fund or other sources of funding would be available for any additional remedial actions that might eventually be necessary at the facility.

(G) Whether the remedial action will be carried out, in whole or in significant part, by the responsible parties themselves.

**(5) Satisfactory performance**

Any covenant not to sue under this subsection shall be subject to the satisfactory performance by such party of its obligations under the agreement concerned.

**(6) Additional condition for future liability**

(A) Except for the portion of the remedial action which is subject to a covenant not to sue under paragraph (2) or under subsection (g) (relating to de minimis settlements), a covenant not to sue a person concerning future liability to the United States shall include an exception to the covenant that allows the President to sue such person concerning future liability resulting from the release or threatened release that is the subject of the covenant where such liability arises out of conditions which are unknown at the time the President certifies under paragraph (3) that remedial action has been completed at the facility concerned.

(B) In extraordinary circumstances, the President may determine, after assessment of relevant factors such as those referred to in paragraph (4) and volume, toxicity, mobility, strength of evidence, ability to pay, litigative risks, public interest considerations, precedential value, and inequities and aggravating factors, not to include the exception referred to in subparagraph (A) if other terms, conditions, or requirements of the agreement containing the covenant not to sue are sufficient to provide all reasonable assurances that public health and the environment will be protected from any future releases at or from the facility.

(C) The President is authorized to include any provisions allowing future enforcement action under section 9606 or 9607 of this title that in the discretion of the President are necessary and appropriate to assure protection of public health, welfare, and the environment.

**(g) De minimis settlements**

**(1) Expedited final settlement**

Whenever practicable and in the public interest, as determined by the President, the President shall as promptly as possible reach a final settlement with a potentially responsible party in an administrative or civil action under section 9606 or 9607 of this title if such settlement involves only a minor portion of the response costs at the facility concerned and, in the judgment of the President, the conditions in either of the following subparagraph (A) or (B) are met:

(A) Both of the following are minimal in comparison to other hazardous substances at the facility:

(i) The amount of the hazardous substances contributed by that party to the facility.

(ii) The toxic or other hazardous effects of the substances contributed by that party to the facility.

(B) The potentially responsible party—

(i) is the owner of the real property on or in which the facility is located;

(ii) did not conduct or permit the generation, transportation, storage, treatment, or disposal of any hazardous substance at the facility; and

(iii) did not contribute to the release or threat of release of a hazardous substance at the facility through any action or omission.

This subparagraph (B) does not apply if the potentially responsible party purchased the real property with actual or constructive knowledge that the property was used for the generation, transportation, storage, treatment, or disposal of any hazardous substance.

**(2) Covenant not to sue**

The President may provide a covenant not to sue with respect to the facility concerned to any party who has entered into a settlement under this subsection unless such a covenant would be inconsistent with the public interest as determined under subsection (f).

**(3) Expedited agreement**

The President shall reach any such settlement or grant any such covenant not to sue as soon as possible after the President has available the information necessary to reach such a settlement or grant such a covenant.

**(4) Consent decree or administrative order**

A settlement under this subsection shall be entered as a consent decree or embodied in an administrative order setting forth the terms of the settlement. In the case of any facility where the total response costs exceed $500,000 (excluding interest), if the settlement is embodied as an administrative order, the order may be issued only with the prior written approval of the Attorney General. If the Attorney General or his designee has not approved or disapproved the order within 30 days of this referral, the order shall be deemed to be approved unless the Attorney General and the Administrator have agreed to extend the time. The district court for the district in which the release or threatened release occurs may enforce any such administrative order.

**(5) Effect of agreement**

A party who has resolved its liability to the United States under this subsection shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially responsible parties unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

**(6) Settlements with other potentially responsible parties**

Nothing in this subsection shall be construed to affect the authority of the President to reach settlements with other potentially responsible parties under this chapter.

**(7) Reduction in settlement amount based on limited ability to pay**

**(A) In general**

The condition for settlement under this paragraph is that the potentially responsible party is a person who demonstrates to the President an inability or a limited ability to pay response costs.

**(B) Considerations**

In determining whether or not a demonstration is made under subparagraph (A) by a person, the President shall take into consideration the ability of the person to pay response costs and still maintain its basic business operations, including consideration of the overall financial condition of the person and demonstrable constraints on the ability of the person to raise revenues.

**(C) Information**

A person requesting settlement under this paragraph shall promptly provide the President with all relevant information needed to determine the ability of the person to pay response costs.

**(D) Alternative payment methods**

If the President determines that a person is unable to pay its total settlement amount at the time of settlement, the President shall consider such alternative payment methods as may be necessary or appropriate.

**(8) Additional conditions for expedited settlements**

**(A) Waiver of claims**

The President shall require, as a condition for settlement under this subsection, that a potentially responsible party waive all of the claims (including a claim for contribution under this chapter) that the party may have against other potentially responsible parties for response costs incurred with respect to the facility, unless the President determines that requiring a waiver would be unjust.

**(B) Failure to comply**

The President may decline to offer a settlement to a potentially responsible party under this subsection if the President determines that the potentially responsible party has failed to comply with any request for access or information or an administrative subpoena issued by the President under this chapter or has impeded or is impeding, through action or inaction, the performance of a response action with respect to the facility.

**(C) Responsibility to provide information and access**

A potentially responsible party that enters into a settlement under this subsection shall not be relieved of the responsibility to provide any information or access requested in accordance with subsection (e)(3)(B) or section 9604(e) of this title.

**(9) Basis of determination**

If the President determines that a potentially responsible party is not eligible for settlement under this subsection, the President shall provide the reasons for the determination in writing to the potentially responsible party that requested a settlement under this subsection.

**(10) Notification**

As soon as practicable after receipt of sufficient information to make a determination, the President shall notify any person that the President determines is eligible under paragraph (1)

of the person's eligibility for an expedited settlement.

**(11) No judicial review**

A determination by the President under paragraph (7), (8), (9), or (10) shall not be subject to judicial review.

**(12) Notice of settlement**

After a settlement under this subsection becomes final with respect to a facility, the President shall promptly notify potentially responsible parties at the facility that have not resolved their liability to the United States of the settlement.

**(h) Cost recovery settlement authority**

**(1) Authority to settle**

The head of any department or agency with authority to undertake a response action under this chapter pursuant to the national contingency plan may consider, compromise, and settle a claim under section 9607 of this title for costs incurred by the United States Government if the claim has not been referred to the Department of Justice for further action. In the case of any facility where the total response costs exceed $500,000 (excluding interest), any claim referred to in the preceding sentence may be compromised and settled only with the prior written approval of the Attorney General.

**(2) Use of arbitration**

Arbitration in accordance with regulations promulgated under this subsection may be used as a method of settling claims of the United States where the total response costs for the facility concerned do not exceed $500,000 (excluding interest). After consultation with the Attorney General, the department or agency head may establish and publish regulations for the use of arbitration or settlement under this subsection.

**(3) Recovery of claims**

If any person fails to pay a claim that has been settled under this subsection, the department or agency head shall request the Attorney General to bring a civil action in an appropriate district court to recover the amount of such claim, plus costs, attorneys' fees, and interest from the date of the settlement. In such an action, the terms of the settlement shall not be subject to review.

**(4) Claims for contribution**

A person who has resolved its liability to the United States under this subsection shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement shall not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

**(i) Settlement procedures**

**(1) Publication in Federal Register**

At least 30 days before any settlement (including any settlement arrived at through arbitration) may become final under subsection (h), or under subsection (g) in the case of a settlement embodied in an administrative order, the head of the department or agency which has jurisdiction over the proposed settlement shall publish

in the Federal Register notice of the proposed settlement. The notice shall identify the facility concerned and the parties to the proposed settlement.

**(2) Comment period**

For a 30-day period beginning on the date of publication of notice under paragraph (1) of a proposed settlement, the head of the department or agency which has jurisdiction over the proposed settlement shall provide an opportunity for persons who are not parties to the proposed settlement to file written comments relating to the proposed settlement.

**(3) Consideration of comments**

The head of the department or agency shall consider any comments filed under paragraph (2) in determining whether or not to consent to the proposed settlement and may withdraw or withhold consent to the proposed settlement if such comments disclose facts or considerations which indicate the proposed settlement is inappropriate, improper, or inadequate.

**(j) Natural resources**

**(1) Notification of trustee**

Where a release or threatened release of any hazardous substance that is the subject of negotiations under this section may have resulted in damages to natural resources under the trusteeship of the United States, the President shall notify the Federal natural resource trustee of the negotiations and shall encourage the participation of such trustee in the negotiations.

**(2) Covenant not to sue**

An agreement under this section may contain a covenant not to sue under section 9607(a)(4)(C) of this title for damages to natural resources under the trusteeship of the United States resulting from the release or threatened release of hazardous substances that is the subject of the agreement, but only if the Federal natural resource trustee has agreed in writing to such covenant. The Federal natural resource trustee may agree to such covenant if the potentially responsible party agrees to undertake appropriate actions necessary to protect and restore the natural resources damaged by such release or threatened release of hazardous substances.

**(k) Section not applicable to vessels**

The provisions of this section shall not apply to releases from a vessel.

**(l) Civil penalties**

A potentially responsible party which is a party to an administrative order or consent decree entered pursuant to an agreement under this section or section 9620 of this title (relating to Federal facilities) or which is a party to an agreement under section 9620 of this title and which fails or refuses to comply with any term or condition of the order, decree or agreement shall be subject to a civil penalty in accordance with section 9609 of this title.

**(m) Applicability of general principles of law**

In the case of consent decrees and other settlements under this section (including covenants not to sue), no provision of this chapter shall be construed to preclude or otherwise affect the applica-

bility of general principles of law regarding the setting aside or modification of consent decrees or other settlements.

(Pub. L. 96–510, title I, § 122, as added Pub. L. 99–499, title I, § 122(a), Oct. 17, 1986, 100 Stat. 1678; amended Pub. L. 107–118, title I, § 102(b), Jan. 11, 2002, 115 Stat. 2359.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 96–510, Dec. 11, 1980, 94 Stat. 2767, known as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 9601 of this title and Tables.

The Federal Rules of Evidence, referred to in subsec. (d)(1)(B), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

AMENDMENTS

2002—Subsec. (g)(7) to (12). Pub. L. 107–118 added pars. (7) to (12).

EFFECT ON CONCLUDED ACTIONS

Amendment by Pub. L. 107–118 not to apply to or in any way affect any settlement lodged in, or judgment issued by, a United States District Court, or any administrative settlement or order entered into or issued by the United States or any State, before Jan. 11, 2002, see section 103 of Pub. L. 107–118, set out as a note under section 9607 of this title.

COORDINATION OF TITLES I TO IV OF PUB. L. 99–499

Any provision of titles I to IV of Pub. L. 99–499, imposing any tax, premium, or fee; establishing any trust fund; or authorizing expenditures from any trust fund, to have no force or effect, see section 531 of Pub. L. 99–499, set out as a note under section 1 of Title 26, Internal Revenue Code.

**§ 9623. Reimbursement to local governments**

**(a) Application**

Any general purpose unit of local government for a political subdivision which is affected by a release or threatened release at any facility may apply to the President for reimbursement under this section.

**(b) Reimbursement**

**(1) Temporary emergency measures**

The President is authorized to reimburse local community authorities for expenses incurred (before or after October 17, 1986) in carrying out temporary emergency measures necessary to prevent or mitigate injury to human health or the environment associated with the release or threatened release of any hazardous substance or pollutant or contaminant. Such measures may include, where appropriate, security fencing to limit access, response to fires and explosions, and other measures which require immediate response at the local level.

**(2) Local funds not supplanted**

Reimbursement under this section shall not supplant local funds normally provided for response.

**(c) Amount**

The amount of any reimbursement to any local authority under subsection (b)(1) may not exceed $25,000 for a single response. The reimbursement

competency ends or the date on which a legal representative is duly appointed for such incompetent person.

**(e) Other statutory or common law claims not waived, etc.**

Regardless of any State statutory or common law to the contrary, no person who asserts a claim against the Fund pursuant to this subchapter shall be deemed or held to have waived any other claim not covered or assertable against the Fund under this subchapter arising from the same incident, transaction, or set of circumstances, nor to have split a cause of action. Further, no person asserting a claim against the Fund pursuant to this subchapter shall as a result of any determination of a question of fact or law made in connection with that claim be deemed or held to be collaterally estopped from raising such question in connection with any other claim not covered or assertable against the Fund under this subchapter arising from the same incident, transaction, or set of circumstances.

**(f) Double recovery prohibited**

Where the President has paid out of the Fund for any response costs or any costs specified under section 9611(c)(1) or (2) of this title, no other claim may be paid out of the Fund for the same costs.

(Pub. L. 96–510, title I, § 112, Dec. 11, 1980, 94 Stat. 2792; Pub. L. 99–499, title I, §§ 109(a)(3), 112, Oct. 17, 1986, 100 Stat. 1633, 1646.)

REFERENCES IN TEXT

This chapter, referred to in subsec. (c)(2), was in the original "this Act", meaning Pub. L. 96–510, Dec. 11, 1980, 94 Stat. 2767, known as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 9601 of this title and Tables.

AMENDMENTS

1986—Subsec. (a). Pub. L. 99–499, § 112(a), amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: "All claims which may be asserted against the Fund pursuant to section 9611 of this title shall be presented in the first instance to the owner, operator, or guarantor of the vessel or facility from which a hazardous substance has been released, if known to the claimant, and to any other person known to the claimant who may be liable under section 9607 of this title. In any case where the claim has not been satisfied within sixty days of presentation in accordance with this subsection, the claimant may elect to commence an action in court against such owner, operator, guarantor, or other person or to present the claim to the Fund for payment."

Subsec. (b)(1). Pub. L. 99–499, § 112(b), added heading.

Pub. L. 99–499, § 109(a)(3), substituted "in accordance with the applicable provisions of title 18 or imprisoned for not more than 3 years (or not more than 5 years in the case of a second or subsequent conviction), or both" for "up to $5,000 or imprisoned for not more than one year, or both".

Subsec. (b)(2) to (6). Pub. L. 99–499, § 112(b), added pars. (2) to (6) and struck out former pars. (2) to (4) which related to the settlement and arbitration of claims against liable persons and against the Fund.

Subsec. (d). Pub. L. 99–499, § 112(c), amended subsec. (d) generally. Prior to amendment, subsec. (d) read as follows: "No claim may be presented, nor may an action be commenced for damages under this subchapter, unless that claim is presented or action commenced within three

years from the date of the discovery of the loss or December 11, 1980, whichever is later: *Provided, however,* That the time limitations contained herein shall not begin to run against a minor until he reaches eighteen years of age or a legal representative is duly appointed for him, nor against an incompetent person until his incompetency ends or a legal representative is duly appointed for him."

Subsec. (f). Pub. L. 99–499, § 112(d), added subsec. (f).

COORDINATION OF TITLES I TO IV OF PUB. L. 99–499

Any provision of titles I to IV of Pub. L. 99–499, imposing any tax, premium, or fee; establishing any trust fund; or authorizing expenditures from any trust fund, to have no force or effect, see section 531 of Pub. L. 99–499, set out as a note under section 1 of Title 26, Internal Revenue Code.

## § 9613. Civil proceedings

**(a) Review of regulations in Circuit Court of Appeals of the United States for the District of Columbia**

Review of any regulation promulgated under this chapter may be had upon application by any interested person only in the Circuit Court of Appeals of the United States for the District of Columbia. Any such application shall be made within ninety days from the date of promulgation of such regulations. Any matter with respect to which review could have been obtained under this subsection shall not be subject to judicial review in any civil or criminal proceeding for enforcement or to obtain damages or recovery of response costs.

**(b) Jurisdiction; venue**

Except as provided in subsections (a) and (h) of this section, the United States district courts shall have exclusive original jurisdiction over all controversies arising under this chapter, without regard to the citizenship of the parties or the amount in controversy. Venue shall lie in any district in which the release or damages occurred, or in which the defendant resides, may be found, or has his principal office. For the purposes of this section, the Fund shall reside in the District of Columbia.

**(c) Controversies or other matters resulting from tax collection or tax regulation review**

The provisions of subsections (a) and (b) of this section shall not apply to any controversy or other matter resulting from the assessment of collection of any tax, as provided by subchapter II[1] of this chapter, or to the review of any regulation promulgated under title 26.

**(d) Litigation commenced prior to December 11, 1980**

No provision of this chapter shall be deemed or held to moot any litigation concerning any release of any hazardous substance, or any damages associated therewith, commenced prior to December 11, 1980.

**(e) Nationwide service of process**

In any action by the United States under this chapter, process may be served in any district where the defendant is found, resides, transacts business, or has appointed an agent for the service of process.

---

[1] See References in Text note below.

**(f) Contribution**

**(1) Contribution**

Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

**(2) Settlement**

A person who has resolved its liability to the United States or a State in an administrative or judicially approved settlement shall not be liable for claims for contribution regarding matters addressed in the settlement. Such settlement does not discharge any of the other potentially liable persons unless its terms so provide, but it reduces the potential liability of the others by the amount of the settlement.

**(3) Persons not party to settlement**

(A) If the United States or a State has obtained less than complete relief from a person who has resolved its liability to the United States or the State in an administrative or judicially approved settlement, the United States or the State may bring an action against any person who has not so resolved its liability.

(B) A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2).

(C) In any action under this paragraph, the rights of any person who has resolved its liability to the United States or a State shall be subordinate to the rights of the United States or the State. Any contribution action brought under this paragraph shall be governed by Federal law.

**(g) Period in which action may be brought**

**(1) Actions for natural resource damages**

Except as provided in paragraphs (3) and (4), no action may be commenced for damages (as defined in section 9601(6) of this title) under this chapter, unless that action is commenced within 3 years after the later of the following:

(A) The date of the discovery of the loss and its connection with the release in question.

(B) The date on which regulations are promulgated under section 9651(c) of this title.

With respect to any facility listed on the National Priorities List (NPL), any Federal facility identified under section 9620 of this title (relating to Federal facilities), or any vessel or facility at which a remedial action under this chapter is otherwise scheduled, an action for damages under this chapter must be commenced within 3 years after the completion of the remedial action (excluding operation and maintenance activities) in lieu of the dates referred to in subparagraph (A) or (B). In no event may an action for damages under this chapter with respect to such a vessel or facility be commenced (i) prior to 60 days after the Federal or State natural resource trustee provides to the President and the potentially responsible party a notice of intent to file suit, or (ii) before selection of the remedial action if the President is diligently proceeding with a remedial investigation and feasibility study under section 9604(b) of this title or section 9620 of this title (relating to Federal facilities). The limitation in the preceding sentence on commencing an action before giving notice or before selection of the remedial action does not apply to actions filed on or before October 17, 1986.

**(2) Actions for recovery of costs**

An initial action for recovery of the costs referred to in section 9607 of this title must be commenced—

(A) for a removal action, within 3 years after completion of the removal action, except that such cost recovery action must be brought within 6 years after a determination to grant a waiver under section 9604(c)(1)(C) of this title for continued response action; and

(B) for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action, except that, if the remedial action is initiated within 3 years after the completion of the removal action, costs incurred in the removal action may be recovered in the cost recovery action brought under this subparagraph.

In any such action described in this subsection, the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

**(3) Contribution**

No action for contribution for any response costs or damages may be commenced more than 3 years after—

(A) the date of judgment in any action under this chapter for recovery of such costs or damages, or

(B) the date of an administrative order under section 9622(g) of this title (relating to de minimis settlements) or 9622(h) of this title (relating to cost recovery settlements) or entry of a judicially approved settlement with respect to such costs or damages.

#### (4) Subrogation

No action based on rights subrogated pursuant to this section by reason of payment of a claim may be commenced under this subchapter more than 3 years after the date of payment of such claim.

#### (5) Actions to recover indemnification payments

Notwithstanding any other provision of this subsection, where a payment pursuant to an indemnification agreement with a response action contractor is made under section 9619 of this title, an action under section 9607 of this title for recovery of such indemnification payment from a potentially responsible party may be brought at any time before the expiration of 3 years from the date on which such payment is made.

#### (6) Minors and incompetents

The time limitations contained herein shall not begin to run—

    (A) against a minor until the earlier of the date when such minor reaches 18 years of age or the date on which a legal representative is duly appointed for such minor, or

    (B) against an incompetent person until the earlier of the date on which such incompetent's incompetency ends or the date on which a legal representative is duly appointed for such incompetent.

### (h) Timing of review

No Federal court shall have jurisdiction under Federal law other than under section 1332 of title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following:

    (1) An action under section 9607 of this title to recover response costs or damages or for contribution.

    (2) An action to enforce an order issued under section 9606(a) of this title or to recover a penalty for violation of such order.

    (3) An action for reimbursement under section 9606(b)(2) of this title.

    (4) An action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

    (5) An action under section 9606 of this title in which the United States has moved to compel a remedial action.

### (i) Intervention

In any action commenced under this chapter or under the Solid Waste Disposal Act [42 U.S.C. 6901 et seq.] in a court of the United States, any person may intervene as a matter of right when such person claims an interest relating to the subject of the action and is so situated that the disposition of the action may, as a practical matter, impair or impede the person's ability to protect that interest, unless the President or the State shows that the person's interest is adequately represented by existing parties.

### (j) Judicial review

#### (1) Limitation

In any judicial action under this chapter, judicial review of any issues concerning the adequacy of any response action taken or ordered by the President shall be limited to the administrative record. Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court.

#### (2) Standard

In considering objections raised in any judicial action under this chapter, the court shall uphold the President's decision in selecting the response action unless the objecting party can demonstrate, on the administrative record, that the decision was arbitrary and capricious or otherwise not in accordance with law.

#### (3) Remedy

If the court finds that the selection of the response action was arbitrary and capricious or otherwise not in accordance with law, the court shall award (A) only the response costs or damages that are not inconsistent with the national contingency plan, and (B) such other relief as is consistent with the National Contingency Plan.

#### (4) Procedural errors

In reviewing alleged procedural errors, the court may disallow costs or damages only if the errors were so serious and related to matters of such central relevance to the action that the action would have been significantly changed had such errors not been made.

### (k) Administrative record and participation procedures

#### (1) Administrative record

The President shall establish an administrative record upon which the President shall base the selection of a response action. The administrative record shall be available to the public at or near the facility at issue. The President also may place duplicates of the administrative record at any other location.

#### (2) Participation procedures

##### (A) Removal action

The President shall promulgate regulations in accordance with chapter 5 of title 5 establishing procedures for the appropriate participation of interested persons in the development of the administrative record on which the President will base the selection of removal actions and on which judicial review of removal actions will be based.

##### (B) Remedial action

The President shall provide for the participation of interested persons, including potentially responsible parties, in the development of the administrative record on which the President will base the selection of remedial actions and on which judicial review of remedial actions will be based. The procedures developed under this subparagraph shall include, at a minimum, each of the following:

(i) Notice to potentially affected persons and the public, which shall be accompanied by a brief analysis of the plan and alternative plans that were considered.

(ii) A reasonable opportunity to comment and provide information regarding the plan.

(iii) An opportunity for a public meeting in the affected area, in accordance with section 9617(a)(2) of this title (relating to public participation).

(iv) A response to each of the significant comments, criticisms, and new data submitted in written or oral presentations.

(v) A statement of the basis and purpose of the selected action.

For purposes of this subparagraph, the administrative record shall include all items developed and received under this subparagraph and all items described in the second sentence of section 9617(d) of this title. The President shall promulgate regulations in accordance with chapter 5 of title 5 to carry out the requirements of this subparagraph.

**(C) Interim record**

Until such regulations under subparagraphs (A) and (B) are promulgated, the administrative record shall consist of all items developed and received pursuant to current procedures for selection of the response action, including procedures for the participation of interested parties and the public. The development of an administrative record and the selection of response action under this chapter shall not include an adjudicatory hearing.

**(D) Potentially responsible parties**

The President shall make reasonable efforts to identify and notify potentially responsible parties as early as possible before selection of a response action. Nothing in this paragraph shall be construed to be a defense to liability.

**(*l*) Notice of actions**

Whenever any action is brought under this chapter in a court of the United States by a plaintiff other than the United States, the plaintiff shall provide a copy of the complaint to the Attorney General of the United States and to the Administrator of the Environmental Protection Agency.

(Pub. L. 96–510, title I, § 113, Dec. 11, 1980, 94 Stat. 2795; Pub. L. 99–499, title I, § 113, Oct. 17, 1986, 100 Stat. 1647; Pub. L. 99–514, § 2, Oct. 22, 1986, 100 Stat. 2095.)

REFERENCES IN TEXT

This chapter, referred to in text, was in the original "this Act", meaning Pub. L. 96–510, Dec. 11, 1980, 94 Stat. 2767, known as the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 9601 of this title and Tables.

Subchapter II of this chapter, referred to in subsec. (c), was in the original "title II of this Act", meaning title II of Pub. L. 96–510, Dec. 11, 1980, 94 Stat. 2796, known as the Hazardous Substance Response Revenue Act of 1980, which enacted subchapter II of this chapter and sections 4611, 4612, 4661, 4662, 4681, and 4682 of Title 26, Internal Revenue Code. Sections 221 to 223 and 232 of Pub. L. 96–510, which were classified to sections 9631 to 9633 and 9641 of this title, comprising subchapter II of this chapter, were repealed by Pub. L. 99–499, title V,

§§ 514(b), 517(c)(1), Oct. 17, 1986, 100 Stat. 1767, 1774. For complete classification of title II to the Code, see Short Title of 1980 Amendment note set out under section 1 of Title 26 and Tables.

The Federal Rules of Civil Procedure, referred to in subsec. (f)(1), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

The Solid Waste Disposal Act, referred to in subsec. (i), is title II of Pub. L. 89–272, Oct. 20, 1965, 79 Stat. 997, as amended generally by Pub. L. 94–580, § 2, Oct. 21, 1976, 90 Stat. 2795, which is classified generally to chapter 82 (§ 6901 et seq.) of this title. For complete classification of this Act to the Code, see Short Title note set out under section 6901 of this title and Tables.

AMENDMENTS

1986—Subsec. (b). Pub. L. 99–499, § 113(c)(1), substituted "subsections (a) and (h)" for "subsection (a)".

Subsec. (c). Pub. L. 99–514 substituted "Internal Revenue Code of 1986" for "Internal Revenue Code of 1954", which for purposes of codification was translated as "title 26" thus requiring no change in text.

Subsecs. (e) to (*l*). Pub. L. 99–499, § 113(a), (b), (c)(2), added subsecs. (e) to (*l*).

## § 9614. Relationship to other law

**(a) Additional State liability or requirements with respect to release of substances within State**

Nothing in this chapter shall be construed or interpreted as preempting any State from imposing any additional liability or requirements with respect to the release of hazardous substances within such State.

**(b) Recovery under other State or Federal law of compensation for removal costs or damages, or payment of claims**

Any person who receives compensation for removal costs or damages or claims pursuant to this chapter shall be precluded from recovering compensation for the same removal costs or damages or claims pursuant to any other State or Federal law. Any person who receives compensation for removal costs or damages or claims pursuant to any other Federal or State law shall be precluded from receiving compensation for the same removal costs or damages or claims as provided in this chapter.

**(c) Recycled oil**

**(1) Service station dealers, etc.**

No person (including the United States or any State) may recover, under the authority of subsection (a)(3) or (a)(4) of section 9607 of this title, from a service station dealer for any response costs or damages resulting from a release or threatened release of recycled oil, or use the authority of section 9606 of this title against a service station dealer other than a person described in subsection (a)(1) or (a)(2) of section 9607 of this title, if such recycled oil—

(A) is not mixed with any other hazardous substance, and

(B) is stored, treated, transported, or otherwise managed in compliance with regulations or standards promulgated pursuant to section 3014 of the Solid Waste Disposal Act [42 U.S.C. 6935] and other applicable authorities.

Nothing in this paragraph shall affect or modify in any way the obligations or liability of any person under any other provision of State